UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

FILED - GR
April 25, 2025 10:51 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB SCANNED BY: KB / 4/25

UNITED STATES OF AMERICA,

Plaintiff,

Case no. 1:23-cr-44

v.

Hon. Jane M. Beckering

SAMUEL ALEXANDER KUHL,

Defendant.

# MOTION TO DISMISS INDICTMENT

NOW INTO COURT comes Defendant Samuel Kuhl, proceeding pro se, who respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 12, to dismiss the indictment pending against him. A Memorandum in support of this Motion is attached.

# Memorandum

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, a Defendant may raise, by pretrial motion, any defense, objection, or request that the Court can determine without a trial on the merits. Defendant brings this Motion to Dismiss pursuant to Rule 12(b) requesting that this Court abstain from hearing this case pursuant to the principles of federalism and comity, the Tenth Amendment to the U.S. Constitution, substantive due process, and various abstention doctrines, as well as the right to counsel of choice.

As will be outlined below, this case is purely a State case, which is being prosecuted in State Court, and this Court should abstain from hearing this case.

## BACKGROUND

Mr. Kuhl has been being investigated by Kalamazoo Public Safety since late 2020. This investigation stems from accusations of fraud and murder. As early as March of 2021, the FBI began investigating Defendant alongside Kalamazoo Dept. of Public Safety (KDPS) in regards to fraud.

During this investigation, which spanned for a period of approximately 2 years, several phones have been seized alleged to belong to or utilized by Defendant. Not once during the execution of several search warrants on these phones did the FBI or KDPS locate any incriminating evidence in regards to child pornography or any other sexual

involvement with minors.

Defendant was a passenger in a vehicle that was stopped for tinted windows on October 13, 2022 in Wyoming, Michigan. Mr. Kuhl was arrested and police seized 10 credit/debit cards bearing names of ten different people and approximately $3400 in cash off of Kuhl's person. Two cell phones belonging to Mr. Kuhl were also seized.

Mr. Kuhl was released the next day due to a lack of probable cause to charge him with any crime. However, authorities refused to release Mr. Kuhl's property and obtained a search warrant for the phones that same day. Upon searching the Samsung phone, Sgt. Meredith of the Wyoming PD claims to have located evidence of fraud and turned at least one phone over to Michigan State Police (MSP).

MSP Det. Gensterblum then further searched the phone and claims to have come across a message discussing drivers training with a person who claimed to be a sophomore in highschool. For some reason, Gensterblum continued to read through this conversation and claims that it began to turn sexual. This resulted in Gensterblum opening a CSC investigation into Defendant.

While Mr. Kuhl was lodged at the Kalamazoo County Jail for unrelated reasons, Special Agent (SA) was listening to Defendant's phone calls. On one of these calls Defendant spoke with a law office seeking assistance to file a suit against the Wyoming PD officers who arrested him in October 2022. This call took place in mid-late November 2022.

After hearing this call, SA Buttery notified Detective John Stolsonburg with the KDPS. Stolsonburg then contacted Wyoming PD who stated that they had turned over at least one of the seized phones from the October 13, 2022 traffic stop to MSP as evidence of fraud and for further investigation. Stolsonburg then contacted MSP and was informed that MSP had two ongoing investigations into Mr. Kuhl, one fraud investigation, and the other for CSC. SA Buttery and Det. Stolsonberg then obtained a copy of a phone extraction that MSP had received from Wyoming PD that was supposedly from the Samsung phone. This release of the Samsung phone's data extraction to SA Buttery and Det. Stolsonsonburg supposedly took place on 12/1/22.

The FBI obtained a federal search warrant for this data extraction provided By MSP. However, the time and date of this search has not been verified because the federal government has yet to provide this supposed Federal search warrant. On April 25, 2023, a federal indictment was returned charging Mr. Kuhl with one count of Child Exploitation and Attempted Child Exploitation in violation of 18 U.S.C. §2251(a) and (e), and one count of Enticement of a Minor and Attempted Enticement of a Minor in violation of 18 U.S.C. §2422(b).

Prior to the federal indictment, Van Buren County of Michigan charged Mr. Kuhl with 7 felonies related to the same alleged victim and conduct as that which underlies the federal indictment. These state charges were authorized on 1/31/2023 and the court proceedings were ongoing before the federal indictment was returned. In this Van

Buren County criminal prosecution, as well as two other Kalamazoo County criminal proceedings unrelated to the federal charges, Mr. Kuhl's family had retained an attorney for one of the Kalamazoo cases and a separate attorney for the Van Buren case. Additionally, Mr. Kuhl had been adjudicated incompetent in the Kalamazoo cases and the Van Buren case and a court order had been issued mandating that Mr. Kuhl undergo competency treatment in a secure State Center of Forensics Psychology facility. Despite being aware of these ongoing state criminal prosecutions and judicial orders issued in furtherance of the state court's ability to perform their judicial functions, the federal government completely disregarded these things and disrupted the entire State process to ensure that they got their piece of the pie.

The federal government held Mr. Kuhl in their custody for over a year without even arraigning him; the majority of that time due to the delays in holding hearings and transporting Mr. Kuhl to and from places of evaluation/treatment. This arbitrary governmental action has oppressed Mr. Kuhl and placed severe stress and depression upon him. During this time, the federal government falsely held Kuhl under the guise of felony weapons charges and federal probation violation. As will be shown if this case continues, the government has capitalized on this time to fix the severe evidentiary and investigative issues in this case.

Federalism, Comity, and Separation-of-powers - Tenth Amendment

"Federalism is more than an exercise in setting the boundary between ~~institutions of~~ different institutions of government for their own integrity. 'State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of power.'" Bond v. U.S., 564 U.S. 211, 221, 131 S. Ct. 2355 (2011)(quoting New York v. U.S., 505 U.S. 144, 181, 112 S. Ct. 2408 (1992)). "Federalism secures the freedom of the individual.... [T]he individual liberty secured by federalism is not simply derivative of the rights of the states." Bond, 564 U.S. 221-22.

"By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake." Id.

"The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended benificiaries of federalism.... An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate." Id.

"The recognition of an injured person's standing to object to a violation of a constitutional principle that allocates power within government is illustrated, in an analogous context, by cases in which individuals sustain discrete, justiciable injury from actions that transgress separation-of-

powers limitations. Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well. In the precedents of this Court, the claims of individuals - not of Government departments - have been the principal source of judicial decisions concerning separation of powers and checks and balances." Id.

While Bond concerned an argument as to whether an individual can challenge a law's validity on grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States, the Supreme Court clearly recognized that an "individual, in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines." Id. at 220. Indeed, the Court held that, "[i]f the constitutional structure of our government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object." Id. at 223. The language of the decision shows that, in a proper case, an individual's right "to invoke separation-of-powers or checks-and-balances constraints," has clearly been historically recognized. See Bond, 564 U.S. at 223-224.

"The principles of limited national powers and state sovereignty are intertwined. While neither originates in the Tenth Amendment, both are expressed by it. Impermissible interference with state sovereignty is not

within the enumerated powers of the National Government, see New York, 505 U.S., 155-159, 112 S.Ct. 2408, and action that exceeds the National Government's enumerated powers undermines the sovereign interests of States. See United States v. Lopez, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed. 2d 626 (1995). The unconstitutional action can cause concomitant injury to persons in individual cases." Id. at. 225.

As will be shown here, the federal government's prosecution of this case intrudes upon the ~~liberties~~ liberty and other constitutional rights of Mr. Kuhl under both the United States and the State of Michigan. It also is duplicative, oppressive, arbitrary, unnecessary and is an incursion into the sovereign interests of the State of Michigan in enforcing its laws and maintaining order in its judicial proceedings within its criminal justice system.

Abstention Doctrines

While it is true that Federal Courts have an obligation to exercise jurisdiction vested in them by Congress, the Supreme Court has identified certain important countervailing interests that have justified the development of doctrines under which Federal Courts have discretion to decline to exercise jurisdiction. Younger v. Harris, 401 U.S. 37 (1971), is one of the first United States Supreme Court decisions setting forth the idea of Federal Courts abstaining from hearing a case, even though they have jurisdiction. Although the procedural aspects of Younger are somewhat different from this case, the concept of why this Court should abstain is

fully supported by Younger and other cases, as will be seen below.

In Younger, John Harris was indicted in a California state Court for violating the California Criminal Syndicalism Act. Harris filed a complaint in the Federal District Court in Los Angeles, asking the Court to enjoin Mr. Younger, the District Attorney for Los Angeles County, from prosecuting him. Harris alleged that the prosecution inhibited him in the exercise of his rights of free speech and the press guaranteed by the First and Fourteenth Amendments. A three judge Federal District Court panel held that it did have jurisdiction and power to restrain the State District Attorney from prosecuting Mr. Harris, and issued the injunction. The United States Supreme Court reversed. The Court started by noting that since the beginning of this Country's history, "Congress has, subject to few exceptions, manifested a desire to permit State courts to try State cases free from interference by Federal Courts." Younger, 401 U.S. at 43.

The Supreme Court noted that the "precise reasons for" the "longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain." Id. at 43. The Court did recognize that a "fundamental purpose" of this policy is "to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions." Id. at 44.

The Supreme Court chose "comity" as the first concept to discuss as the underlying reason for abstaining from interfering with State criminal prosecutions. Comity was described by the Court as "a proper respect for state functions, a recognition of the fact the entire country is made

up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Id.

The Court went on to note that these ideas have been referred to by many as "Our Federalism," and that "one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.'" Id. The concept of Our Federalism represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Id. at 44.

In the current case, no one contacted federal authorities in regards to the CSC investigation. While the FBI was investigating Mr. Kuhl, that investigation was not for any criminal conduct of a sexual nature; it was for fraud. Only after listening to privileged jail call and reaching out to multiple state law enforcement agencies did the federal government learn of the CSC investigation into Mr. Kuhl. Upon learning of this investigation, SA Buttery completely abandoned the approximately 2 year long fraud investigation to enjoin the entirely local state CSC investigation into Mr. Kuhl. The entire federal investigation was predicated on evidence and information obtained in the state CSC investigation. Then,

approximately three months after Van Buren County, of the State of Michigan brought 7 felony charges based on the same conduct and visual depictions as this federal indictment, Mr. Kuhl was indicted on April 25, 2023. The State of Michigan charges were authorized on 1/31/2023, and the Federal government was aware of these charges and that the court proceedings for these state charges were ongoing and that Mr. Kuhl's family had retained legal counsel to represent Mr. Kuhl in that state case.

The only link which the United States can come up with to bring this indictment in Federal Court is the allegation that the private communications between Mr. Kuhl and Minor 1, both residents of Michigan, were made via cell phone and Facebook Messenger, and that the visual depictions were produced using materials that have been transported in interstate or foreign commerce. However, the U.S. Attorney claims only that Mr. Kuhl received and stored the visual depictions at issue with phones that were manufactured outside of the U.S., but does not allege Mr. Kuhl produced any visual depiction, let alone specify the materials used to do so.

The Supreme Court reiterated that "absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions," in New Orleans Public Service, Inc v. Council of City of New Orleans, 491 U.S. 350, 364 (1989) (citing Younger at 43-44, 91 S. Ct. at 750. In Moore v. Sims, 442 U.S. 415, 423 (1979), the Court held that the Underlying concern of Younger is the "threat to our Federal system posed by

displacement of state courts by those of the National Government."

Although in somewhat of different context, the Sixth Circuit has stated that "Younger abstention derives from a desire to prevent federal courts from interfering with the functions of state criminal prosecutions and to preserve equity and comity." Doe v. Univ. of Ky., 860 F.3d 365, 368 (6th Cir. 2017). The Sixth Circuit has held "[s]pecifically, Younger proscribes federal courts from intruding into a (1) state criminal prosecution, (2) civil enforcement proceeding akin to a criminal prosecution, or (3) civil proceeding 'involving certain orders uniquely in furtherance of the state court's ability to perform their judicial functions.'" Satkowiak v. McClain, 24-1600, at 3 (6th Cir. 2024) (quoting Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72, 78 (2013)).

"If the proceeding falls into one of the three enumerated categories, a court may only apply Younger where the state proceeding: (1) is currently pending, (2) involves an important state interest, and (3) affords the plaintiff an adequate oppurtunity to raise his constitutional claims." Satkowiak, 24-1600 at 3 (citing Middlesex Cnty. Ethics Comm. v. Garden St. Bar Ass'n, 457 U.S. 423, 432 (1982)).

Incorporating the principle that "individual liberty secured by federalism is not simply derivative of the rights of the states," underscored by the Supreme Court in Bond, into the abstention doctrines, being that such doctrines are based on federalism and comity, clearly allows an individual to assert that abstention from an ongoing state proceeding, to which he is a party, is warranted and necessary because the federal court's intrusion

infringes upon his rights and interests and that such intrusion causes him injury that is concrete, particular, and redressable.

Just as the Supreme Court recognized in Bond, Mr. Kuhl is asserting that his conduct is local and subject to be prosecuted under the laws of Michigan, and was infact and still is, being prosecuted under Michigan law. However, that prosecution and the judicial orders issued in that prosecution, have been completely disregarded and stalled due to the anxious, arbitrary, and unnecessary interruption by the federal government flexing its muscle. Not only was Mr. Kuhl already being prosecuted by the State of Michigan for the same conduct underlying the federal indictment, as mentioned previously, there were also multiple State Court Orders issued mandating that Mr. Kuhl undergo competency restoration proceedings in accordance with Michigan law. The entire State proceeding was ceased and forfeited to the federal government's authoritarian incursion. The statutes and prosecution Mr. Kuhl is subject to, and the punishment he may face, would not have come about if the matter were left for the State of Michigan to decide. Indeed, Mr. Kuhl does face State criminal prosecution for the same alleged conduct underlying the federal prosecution, however, the expense of a decent State defense attorney, which Mr. Kuhl has already retained, is significantly less than a federal defense attorney of the same caliber. Additionally, the State criminal charges carry significant penalties in terms of imprisonment, however, the federal charges' mandatority minimums are equal to, or 2/3 of, the maximum possible sentence under State

of Michigan law.

Indeed, nothing about this case is extraordinary or poses a threat to National security to allow for such arbitrary action by the federal government. Nor does the government claim Mr. Kuhl's conduct was executed for a commercial purpose. Only because Mr. Kuhl allegedly used cell phones and a social media messaging platform (Facebook Messenger), to privately communicate with Minor 1, and because visual depictions were allegedly produced using some type of device that traveled in interstate commerce. Although the government still has not stated what device they claim was used for such production.

As multiple courts have recognized today, it is basically impossible in our modern society to communicate with others without using the phone or internet. Indeed, we are "in a modern society, where one can hardly complete menial tasks without using a computer or the internet." U.S. v. Senke, 986 F.3d 300, 318 (3rd Cir. 2021) (citing U.S. v. Holena, 906 F.3d 288, 292 (3rd Cir. 2018)). In Riley v. California, 134 S. Ct. 2473, 573 U.S. 373, 385 (2014), the Supreme Court held that cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."

The Supreme Court in 2017 recognized that social media platforms "for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human

thought and knowledge." Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017). Accordingly, social media platforms' private messaging features are utilized just as much, if not more, than normal text messaging. Indeed, the entire Trump adminstration's defense department and others were utilizing the private messaging application "Signal" to communicate about and orchestrate military attacks on our Country's enemies.

Additionally, the jurisdictional hook within §2251(a) and other provisions of the CPPA, that rests on the fact that prohibited visual depictions were "produced using materials that have been ... transported" in or affecting interstate commerce has been questioned as to whether it is reasonable and even constitutional, by several Circuit Courts. "Although this jurisdictional element ensures that any prosecuted conduct has a minimal nexus with interstate commerce, that minimal nexus may not meet the ~~substantial~~ substantial effect requirement of Morrison." U.S. v. Morales-De Jesus, 372 F.3d 6, 13-14 (1st Cir. 2004); see also U.S. v. Rodia, 194 F.3d 465, 473 (3rd Cir. 1999) ("At all events, it is at least doubtful in this case that the jurisdictional element adequately performs the function of guaranteeing that the final product regulated substantially affects interstate commerce."); U.S. v. Holston, 343 F.3d 83, 88-89 (2nd Cir. 2003) (finding the jurisdictional "hook" factor only superficially met and questioning the effectiveness of a jurisdictional element when "the interstate component underpinning the jurisdictional element, for example, the shipment of a video camera, is attenuated from the criminal conduct - the production of child pornography - which occurs entirely locally."); U.S. v.

Maxwell, 446 F.3d 1210, 1218 (11th Cir. 2006) (after deeming the jurisdictional element of §2252A(a)(5)(B) that prohibits possession of child pornography that has been produced using materials that have traveled in interstate commerce as unconstitutional, the Supreme Court remanded in light of Gonzalez v. Raich, 545 U.S. 1 (2005). However, the 11th Circuit held: "Nothing in Raich causes us to question that conclusion, nor to second guess our determination that, where a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce must be offered."); U.S. v. Matthews, 300 F. Supp. 2d 1220 (N.D. Ala. 2004) (same but as to §2251(a)).

The Constitution creates a Federal Government of enumerated powers. As James Madison wrote: "The powers delegated by the proposed Constitution to the Federal Government are few and defined. Those which are to remain in the State Governments are numerous and indefinite." The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). In Gregory v. Ashcroft, 501 U.S. 452 (1991), the Supreme Court held: "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." Id. at 458

Although a challenge to the statutes in this case under a Commerce Clause argument is not before the Court, the precedents which would support such challenge lend support to an Abstention argument. Such

precedents and principles also underscore the Defendant's argument that the government's interruption of an ongoing state criminal prosecution ~~unnecessary~~ and duplicate prosecution in Federal Court for the same conduct underlying that state prosecution is unnecessary, arbitrary, oppressive, contrary to the principles of comity and federalism, violatory of the Tenth Amendment, an unwise use of judicial administration, and a complete disregard to conservation of judicial resources.

As noted above, the Constitution creates a Federal Government of enumerated, limited powers. State Courts on the other hand have basically unrestricted powers in defining and enforcing criminal law. "We have also spoken of comity and Federalism. The States possess primary authority for defining and enforcing the criminal law. In criminal trials, they also hold the initial responsibility for vindicating Constitutional rights. Federal intrusions into State criminal trials frustrate both the States' sovereign power to punish offenders and their good faith attempts to honor Constitutional rights." Brecht v. Abrahamson, 507 U.S. 619 (1993).

The Constitutional Convention rejected language proposed by Gunning Bedford of Delaware that would have given Congress power "to legislate in all Cases for the general Interests of the Union, and also in those Cases to which the States are separately incompetent, or which in the Harmony of the United States may be interrupted by the Exercise of individual Legislation." Farrand, ed. 2 Records of the Federal Convention at 131-32 (Yale 1966). This rejection is consistent

with the fact that State criminal laws do not include jurisdiction elements like in Federal statutes. State Legislatures, exercising their powers, are not limited to Congress's enumerated powers.

The Tenth Amendment "expressly declares the Constitutional policy that Congress may not exercise power in a fashion that impairs the states' integrity or their ability to function effectively in a federal system." Fry v. U.S. 421 U.S. 542, 547, at n.7 (1975).

In Colorado River Water Conservation District v. U.S., 424 U.S. 800 (1976), the Supreme Court again addressed the issue of Federal Courts abstaining from hearing a case over which it did have jurisdiction. (Mr. Kuhl does not agree that this Court has jurisdiction) Although this was a civil case, the logic and reasoning behind abstention apply in this case. The Court started by noting that, abstention from the exercise of Federal jurisdiction is the exception, not the rule. However, the Court ultimately held that it should abstain for a variety of reasons.

The Court went through various abstention categories and ruled: "Although this case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" Colorado River at 817 (quoting Kerotest Mfg. Co. v.

C-O-Two Fire Equipment Co. 342 U.S. 180, 183 (1952)).

The Court noted that it has been held in previous cases that the Court first having jurisdiction over property may exercise that jurisdiction to the exclusion of other Courts. While it is true this holding was in the context of property in a civil matter, it is absurd to think a person is any less entitled to be free from being bounced between multiple jurisdictions for the same conduct and being subject to criminal penalties. As noted previously, the individual has the right to object to arbitrary and excessive governmental action causing him injury. We have come a long way in terms of the States' capability to effectively and independently define and punish its criminal laws. So, while the context of abstention has been applied in somewhat different procedural aspects, the logic and reasoning justifying abstention in this case are the same.

In assessing the appropriateness in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which the jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative. A carefully considered judgment, taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise, ~~are~~ is required. See Colorado at 818-19.

Here, substantial issues are presented which the State of Michigan is still in its journey to establish a standard. One specifically is the issue of cell phone search warrants and the corresping searches pursuant to those

warrants. If this case does continue in this Court, Mr. Kuhl will go deeper into this issue, but for now he will briefly touch on it to show the importance of allowing the state of Michigan to rule on this extremely sensitive matter. Mr. Kuhl's phones were allegedly seized and searched at different times by different law enforcement agencies for evidence of fraud. One of the most questionable searches, which the government claims resulted in a Michigan State Police officer stumbling across a conservation between Mr. Kuhl and Minor 1 in one of the phone's text history and suspected possible Criminal Sexual Conduct. The phone was seized by a separate police department under very questionable circumstances and obtained an even more concerning search warrant. Over the past decade, serious concerns have come to both State and Federal Courts across the Nation in the context of cell phone searches and Michigan is among them. See People v. Carson, 355925 (Mich. App. Feb. 15, 2024); People v. Hughes, 506 Mich. 512; 958 N.W.2d 98 (2020). Not only does this case present the issue of particularity in the aspect of cell phone search warrants, it also presents the issues of the plain view exception and exceeding the scope of the warrant.

Moreover, all of the information used by the Federal government in obtaining search warrants for Facebook and phones derives from and references information and evidence obtained by local state authorities. Mr. Kuhl is from Michigan and his family has retained counsel of choice for the Michigan case. Thus, if Mr. Kuhl is convicted, allowing him to be sentenced under state law will at least keep

him from being shipped all over the country and allow him to serve a substantial term of imprisonment locally. Indeed, the Supreme Court has recognized that some States protect an individual's privacy beyond the level required by the Fourth Amendment. See Virginia v. Moore, 553 U.S. 164-65, 128 S. Ct. 1598 (2008). Prosecuting Mr. Kuhl in the Federal forum strips him of these possible protections of the Michigan Constitution and strips Michigan of its oppurtunity to independently perform its separate functions and establish its own constitutional standards. As noted above, the cell phone search issue varies amongst the several states. See Buckham v. State, 185 A.3d 1 (Del. 2018); Tucker v. Commonwealth, 611 S.W.3d 297 (Ky. Ct. App. 2020); State v. Wilson, 315 Ga. 613, 884 S.E.2d 298 (2023); Pugh v. State, 899 S.E.2d 653 (Ga. 2024); People v. Herrera, 357 P.3d 1227 (Colo. 2015). Additionally, the federal prosecution will be an unnecessary use of taxpayers' money when Mr. Kuhl already faces prosecution in the State, and will be even more costly if he is convicted and must be imprisoned for several years in the BOP and MDOC. For these reasons and more, the federal forum is incovenient for all.

The two other factors - avoiding piecemeal litigation and the order in which jurisdiction was obtained, also weigh heavily in favor of this Court abstaining. All of the above-mentioned principles and abstention-doctrines support and allow federal courts to defer to State Courts and State judicial proceedings as the basis for refusing to exercise jurisdiction. Although abstention doctrines have different characteristics, the Supreme Court has observed that "various types of abstention are not rigid

pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." Pennzoil Company v. Texaco, Inc., 481 U.S. 1, 34 n.9 (1987).

This action by the federal government shocks the conscience. They knew Mr. Kuhl was deemed incompetent and thus Michigan Courts had multiple judicial orders and upcoming court dates. Further, the federal government knew Mr. Kuhl was charged with 7 felonies for the same conduct for which he was indicted. Again, Mr. Kuhl's family had hired a lawyer for his Van Buren charges which are practically moot now that the federal indictment has been brought and the money for the retained attorney essentially wasted. Had Mr. Kuhl and his family known that that he would face this federal indictment at the same time as the state prosecution, they surely would have utilized those funds on defense counsel in the federal case. Thus, the federal government's excessive and arbitrary dual prosecution has stripped Mr. Kuhl of his right to counsel of choice and forced him to forfeit all due process owed to him in the State proceeding. This is cruel and oppressive and even more so due to the federal government knowing Mr. Kuhl was having mental health issues and had been deemed incompetent and ordered to undergo treatment.

This case can, and is, being prosecuted under Michigan law seeing as this was a local/state matter. Federal jurisdiction is tenuous at best. There was no trading or distributing of pictures or any prostitution or

other commercial purpose related to this matter at all. As the Supreme Court held in Bond v. United States, 572 U.S. 844, 858 (2014), it is a long settled presumption that federal statutes do not abrogate state ~~soverieg~~ sovereign immunity, impose obligations on the States pursuant to section 5 of the Fourteenth Amendment, or preempt state law. The Court went on to note that perhaps the clearest example of traditional state authority is the punishment of local criminal activity. Id. The overreach of the tenuous jurisdictional hook in this matter (use of a cell phone produced outside the country and private communication by text or instant messaging) is so expansive "hardly a '[personal relationship] in the land would fall outside of the federal [government's] domain.'" Jones v. U.S., 529 U.S. 848, 857, S.Ct. 1904 (2000). This essentially turns "virtually every [statutory rape] in the country a federal offense." Id. at 859.

As Younger held, there has also been a desire to permit State Courts to try State cases free from interference by Federal Courts. The notion of comity holds that the federal government will fare best if the States and their institutions were left free to perform their separate functions in their separate ways. This Court should grant this Motion and abstain from exercising any jurisdiction it might have in hearing this case. Indeed, it has interfered in many ways with the State proceeding, including but not limited to stopping Mr. Kuhl's competency restoration process and completely disregarding the State's Courts' Orders. While it may not be specifically

applicable, the principles underlying the Petite Policy also support abstention in this case.

Indeed, the Michigan State parallel criminal case has issued a bench warrant for Defendant due to his failure to appear at a competency hearing. Any due process and speedy trial rights in Kuhl's state case ~~has~~ have been stripped from him by the federal government's unnecessary and arbitrary intrusion.

Respectfully,

S. Kuhl April 16, 2025

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349