UNITED STATES OF AMERICA
DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

FILED - GR
May 22, 2025 12:36 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW SCANNED BY: JW / 5-22

UNITED STATES OF AMERICA

Plaintiff,

v.

SAMUEL ALEXANDER KUHL,

Defendant.

Case no. 1:23-cr-44

Hon. Jane M. Beckering

Franks Hearing Requested

# MOTION TO SUPPRESS

Defendant now comes before this Honorable Court, proceeding pro se, to plea for the relief that all evidence in this case be suppressed. As will be seen by the facts, legal standards, and arguments presented, all evidence was directly obtained unlawfully and/or exploited and derived from such unlawfully obtained evidence. The facts and background pertaining to this case, as to how it originated and evolved, is set forth in the contemporaneously filed Motion to Suppress and is incorporated herein by reference. This motion is brought under Fed. R. Crim. P. 12(b)(3)(C).

Attached is a Memorandum of Law in support of this motion.

# I. AFFIDAVIT SUPPORTING WYOMING PD SEARCH WARRANT IS BARE BONES

## Legal Standard

"A bare-bones affidavit is one that contains wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." U.S. v. Godfrey, No. 19-50754, at 2 (5th Cir. May 18, 2020) (quoting U.S. v. Satterwhite, 980 F.2d 317, 321 (5th Cir. 1992)); see also U.S. v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996) ("For the magistrate to be able to properly perform this official function, the affidavit presented must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant.") "An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a "bare bones" affidavit." Weaver, 99 F.3d at 1378. "The use of generalized boilerplate recitations designed to meet all law enforcement needs for illustrating certain types of criminal conduct engenders the risk that insufficient "particularized facts" about the case or the suspect will be presented for a magistrate to determine probable cause." Id.

To demonstrate probable cause authorizing a search warrant, "an affidavit must show a likelihood of two things: first, that the items sought are 'seizable by virtue of being connected with criminal activity'; and second, 'that the items will be found in the place to be searched.'" U.S. v.

Church, 823 F.3d 351, 355 (6th Cir. 2016) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 555, 98 S. Ct. 1970 (1978)).

"The affidavit must state a nexus between the evidence sought and the area to be searched." U.S. v. White, 468 F. Supp. 3d 953, 958 (W.D. Mich. 2020). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" U.S. v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting U.S. v. Van Shutters, 163 F. 3d 331, 336-37 (6th Cir. 1998)). "The connection between the [phone] and the evidence of criminal activity must be specified and concrete, not vague or generalized." U.S. v. Brown, 828 F. 3d 375, 382 (6th Cir. 2016).

"While 'probable cause as to a person's criminal conduct can sometimes inform probable cause... to obtain records for electronic devices linked to that person,' the two inquiries remain distinct, because 'the existence of probable cause to arrest will not necessarily establish probable cause to search.'" U.S. v. Silva, 22 Cr. 347 (PGG), 23 Cr. 204 (PGG), page 7 (S.D. N.Y. July 19, 2024) (quoting U.S. v. ~~Loria~~ Lauria, 70 F. 4th 106, 134 n. 14 (2nd Cir. 2023) and U.S. v. Gomez, 652 F. Supp. 461, 462 (E.D. N.Y. 1987)). "Without such a nexus, there is no probable cause for the search of the targeted phone." In re Search of a White Apple iPhone, 2012 WL 2945996 (S.D. Tex. Apr. 11, 2012)

"Possessing a cell phone during one's arrest for a drug-related [offense] is insufficient by itself to establish a nexus between the cell phone and

any alleged drug activity." U.S. v. Armstrong, 21-cr-228 (DWF/ECW), 2022 WL 17417901 at 10 (D. Minn. Sep. 2, 2022) (quoting U.S. v. Ramirez, 180 F. Supp. 3d 491, 495 (W.D. Ky. 2016)); see also U.S. v. Cote, 23-cr-175 (DWF/DJF) (D. Minn. Oct. 25, 2023) ("The mere fact that Mr. Cole happened to use a cell phone shortly before his arrest also did nothing to create a nexus between the alleged illegal drug possession and the cell phones."); U.S. v. Tanzil, 23-20654 (E.D. Mich. Jan. 2, 2025) (suppressing evidence because the affidavits "did not contain any allegations stating the phone was used during the alleged offenses or that it was used to store evidence of the offenses."); U.S. v. Herron, 215 F.3d 812, 814-15 (8th Cir. 2000) (concluding that the good faith exception did not apply when the affidavits in support of the search warrants provided no evidence that the defendant was connected to illegal activity).

"In ~~determing~~ determining whether an affidavit is 'bare bones,' the reviewing court is concerned exclusively with the statements contained within the affidavit itself." Weaver, 99 F.3d at 1378, citing Whiteley v. Warden, 401 U.S. 560, 564-65 (1971). Review of whether a warrant was supported by sufficient indicia of probable cause is limited to "the four corners of the affidavit." Fry v. Robinson, 678 Fed. Appx. 313, 16-3498 (6th Cir. Jan. 31, 2017).

Below Mr. Kuhl will lay out the reasons why the affidavit prepared by Detective April Kroschel is "bare bones." Because the affidavit is bare bones, the good faith exception established by the Supreme Court in U.S. v. Leon, 468 U.S. 897 (1984) cannot apply. Moreover, Det. Kroschel did not even execute

the warrant, but instead relied on her colleague Sgt. Meredith, who was ignorant of the circumstances under which the warrant was obtained to conduct the search. See Leon, 468 U.S. at 923 n. 24, 104 S. Ct. at 3420 n. 24.

## Argument

### a. The Affidavit Failed To Establish Probable Cause Mr. Kuhl Was Connected To Illegal Activity

First, Mr. Kuhl, by law, was allowed to possess, transport, cultivate, purchase, and deliver without renumeration, up to 2.5 ounces of Marijuana under MCL 333.27955.1(a) and (d). Under MCL 333.27955.1(c), Mr. Kuhl could lawfully assist Coleman possess, transport, etc. up to 2.5 ounces of Marijuana. Moreover, Mr. Kuhl and Coleman can possess with intent to deliver up to 5 ounces each and be subject only to a civil infraction punishable by a fine of not more than #500 and ~~subject~~ forfeiture of the Marijuana, unless they consented to another disposition authorized by law. See MCL 333.27965.2(a). Accordingly, a total of 10 ounces of Marijuana could have been possessed with intent to deliver between Mr. Kuhl and Coleman. However, only 179.2 grams, approximately 6 ounces, of marijuana was located in the vehicle. Thus, if Coleman possessed 5 ounces himself, Mr. Kuhl could possess 1 ounce without breaking any law. Even if the marijuana was split evenly amongst Coleman and Mr. Kuhl, only 3 ounces would have been attributable to Mr. Kuhl and thus, he could

only lawfully be fined up to $500, and the marijuana forfeited. There was no probable cause Mr. Kuhl had committed a crime that would justify a search of his cell phones.

Regardless, none of the weed was Mr. Kuhl's and the affidavit does not establish probable cause that it was. Indeed, Kroschel generalized the evidence seized from the vehicle and Kuhl's presence as a passenger to illustrate possible marijuana delivery by Kuhl without "particularized facts" about the case. This is exactly what the Sixth Circuit reprimanded in Weaver, 99 F.3d. Kroschel did this intentionally to mislead the magistrate, as will be explained more, later on in this motion. However, Mr. Kuhl will briefly state these generalizations and lacking particularized facts. 1) Kroschel only states the amount of weed seized and the fact it was separated into various quantities in individual bags; 2) 2 phones, a scale, a box of plastic sandwich bags, and the weed was located in the vehicle; 3) Mr. Kuhl was a rear seat passenger. Kroschel omits that Coleman said the marijuana, scale, and bags were his, the location of these items, and that no charges related to marijuana were brought against Mr. Kuhl. Kroschel does not mention how 2 phones were recovered from the car, or where from in the vehicle they were recovered.

Further, one week prior to this incident, on 10/6/22, former President Biden pardoned citizens "who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act." Thus, even under Federal law during the Biden administration, prosecution for marijuana possession was highly unlikely. Proclamation No. 10467, 87 Fed. Reg. 61441 (Oct.

6, 2022). See People v. Armstrong, 344 Mich. App. 286, 300; 1 NW 3d 299 (2022). Indeed, as noted above, Marijuana is recreationally legal in Michigan. Accordingly, the Sixth Circuit has held that activity deemed lawful by a State cannot be, by itself, enough to establish reasonable suspicion, let alone probable cause. See Northrup v. City of Toledo Police Dept., 785 F.3d 1128 (6th Cir. 2015).

For these reasons, Kroschel's affidavit failed to establish probable cause Mr. Kuhl possessed any marijuana, let alone intended to deliver it. Indeed, Mr. Kuhl's mere presence in the vehicle as a passenger is not enough. See Ybarra v. Illinois, 444 U.S. 85, 86 (1979) citing U.S. v. Di Re, 332 U.S. 581 (1948). Kroschel does not state that she has any knowledge or credible information that Mr. Kuhl was known to sell marijuana or had been seen selling marijuana. Here, even less facts exist to establish probable cause that Mr. Kuhl was related to illegal marijuana delivery than in Weaver, F.3d 1372, 1380. Kroschel doesn't even refer to a statute.

Second, Mr. Kuhl's mere possession of 10 debit cards in other people's names is not, by itself, illegal. Indeed, Mr. Kuhl was not charged with any crime. Moreover, none of the cards were reported lost or stolen and Kroschel does not even state that she ~~sup~~ suspects such. As will be discussed more later, Kroschel omits the fact that one of the cards had the last name Kuhl and that the arresting officer checked each card in TIMS and every card returned negative results. Kroschel does not allege the cards were suspected of being taken from any known robberies or burglaries, or that any names on the cards were related to

any reported crimes. Kroschel doesn't state the magnetic strips of the cards did not match the information on the cards. There is no mention of the cards being used to buy merchandise such as electronics. Nothing, other than Mr. Kuhl possessing these cards, establishes probable cause of criminal activity. Thus, the affidavit failed to establish that any illegal activity was associated with the cards in Mr. Kuhl's possession.

Third, the affidavit states that Kroschel verily believes that the search of the cell phones involved will disclose evidence of Criminal Sexual Conduct (CSC) and use of a computer to commit a crime. Nothing in the affidavit even mentions anything of a sexual nature, let alone sexual misconduct involving the use of a computer. Ironically, it just so happens to be law enforcement's story that this search warrant led to the unexpected discovery of the evidence leading to Mr. Kuhl's current sexually related federal charges. One heck of a coincidence or Detective Kroschel is clairvoyant. This will be discussed more later, for now Mr. Kuhl will let your Honor ponder on this matter. Point being, the affidavit fails to establish Mr. Kuhl was connected to CSC, or use of a computer to commit a crime.

b. The Affidavit Failed To Establish Probable Cause That Evidence Of A Crime Would Be Located On Either Of Mr. Kuhl's Phones

Although it should go without saying that failure to establish probable cause that Mr. Kuhl was engaged in criminal activity defeats any probable cause that his phones will contain evidence of such, Mr. Kuhl will

still explain why the affidavit fails in this regard.

First, Kroschel does not state any basic knowledge about the relation between phones and criminal evidence. Indeed, there is nothing how phones are known to be used by drug dealers, fraudsters, or sex offenders within Kroschel's affidavit. The only basis for a search of Mr. Kuhl's phone is the general and conclusory statement "cell phone contents and data often assist with evidence showing where the phone was at during different times, showing suspects were at the scene(s) of the crime(s)." Thus, the affidavit fails to establish probable cause that evidence of any criminal activity would be found on Mr. Kuhl's phones, let alone evidence of a specific crime.

Second, Kroschel only states that she has been a police officer for over 9 years and is currently assigned as a detective to the Investigation Division with the Wyoming Police Department. She states that she is currently investigating a Possession of Marijuana With Intent to Deliver (PWID) and Possession of Financial Transaction Device - Illegal Sale/Use that occurred on 10/13/22 at 801 Burton, City of Wyoming, County of Kent.

For all anyone can tell, Kroschel was conducting traffic for 9 years. There is no elaboration on her time as a detective, nor what experience she has investigating any crimes, let alone drug or fraud crimes specifically, or sex crimes for that matter. Moreover, Kroschel states the ~~scene of the~~ scene of the supposed crimes and the date when they allegedly occurred. Accordingly, officers already knew Coleman and Mr. Kuhl were at 801 Burton along with their phones because Officer Bernard saw them

arrive at the gas station and followed them when they left, and immediately conducted a traffic stop. Thus, reviewing the "cell phones' contents and data" for "evidence showing where the phone was at during different times," to show that "suspects were at the scene(s) of the crime(s)" makes no sense. There is no statement Kuhl or Coleman possibly sold any marijuana at the gas station or made any fraudulent purchases; Mr. Kuhl never even got out of the car.

Third, Kroschel does not state Mr. Kuhl was using either of his phones at the time of the arrest or that any phone was on Mr. Kuhl's person within the affidavit. It actually states the Blue Samsung was "collected from vehicle" and the Green iPhone was "linked to Kuhl". Not only is this a false statement, it fails to establish probable cause any criminal evidence will be on the Samsung because the Samsung is not "linked" to anyone; neither is the location of where the Samsung was specifically located in the vehicle mentioned. Indeed, neither the warrant or the affidavit even allege that evidence of a crime might be found on the Samsung phone.

The affidavit's bold statement "And to there seize, secure, tabulate, and make return thereof according to law the following property or things which have been used in the commission of, or which constitute evidence of criminal conduct:" is followed by, "Coleman's phone (White iPhone in black case): Any and all evidence related to PWID"; "Kuhl's phone (Green iPhone): Any and all evidence related to PWID. Any and all evidence related to FTD"; and "Above-described cellular device and associated accounts used to send, receive, capture, or store electronic

messages." Thus, only the White iPhone in a black case (Coleman's phone) and the Green iPhone (Kuhl's phone) are even alleged to possibly contain evidence of a crime. Although Kroschel states that 2 phones were located in the vehicle, she claims only the Blue Samsung was "collected from vehicle." This will be discussed more, later in the motion.

Regardless of what phone is alleged to ~~blong~~ belong to who, or contain evidence of what crime, if any, the affidavit fails to establish probable cause that either the Blue Samsung or Green iPhone ~~will~~ would contain evidence of a crime. Indeed, no crime had even been committed by Mr. Kuhl as he was never charged.

c. The Affidavit Failed To Establish The Requisite Nexus Between Kuhl's Phones And Any Criminal Activity

The previous section is so intertwined, especially to Defendant who is by far inferior to the Court and Government's legal knowledge and understanding, it is hard to distinguish between the two. However, with that being said, Mr. Kuhl's review of caselaw does show that Courts analyze the probable cause and nexus standards separately. Honestly, Kuhl is preparing his second draft in this motion here to try avoid being verbose and circuitous. Accordingly, please bear with Defendant as he does his best to explain why the affidavit fails to establish a nexus between either the Blue Samsung ~~or~~ or the Green iPhone and any criminal activity.

First, the only information in the affidavit indicating any likelihood

that evidence of a crime might be found on Kuhl's phones was the fact they were present when a vehicle he was a passenger in, was found to contain evidence of possible marijuana delivery, as well as Mr. Kuhl had 10 debit cards on his person that were not in his name and approximately $3,400 in cash. As was held in Ramirez, mere possession of a phone when arrested for a drug related offense is not enough to establish a nexus between the phone and drug activity. Nowhere does Kroschel state that Mr. Kuhl was using the phone at, or shortly before his arrest. See Cole, 23-cr-175, at 18. The affidavit does not even specify how the Green iPhone was "linked to Kuhl," nor where the Blue Samsung was located when "collected from vehicle." Indeed, Mr. Kuhl was racking his mind quite certain he had the Blue Samsung phone and was trying to grab his green iPhone when exiting the vehicle. Well, Mr. Kuhl was not mistaken, attached to this motion is the Wyoming PD chain of custody report related to this incident. This chain of custody report describes Item number: 003 as the Blue Samsung phone w/ SIM card taped to back and the "collection location" as "Suspect." The collecting officer is Dylan Pfingsten, the officer who arrested Mr. Kuhl. However, this same report describes Item number: 010 as the Green iPhone and the "collection location" as "back right floor board" and the "owner" as Samuel Kuhl. Truthfully, the Green iPhone or the Blue Samsung was retrieved from off of the rear seat because it was knocked from Mr. Kuhl's hand, as is explained in the contemporaneously filed motion to suppress. Regardless, the affidavit completely lacks any information as to how the phones were used or possessed by Kuhl, nor how such use or possession establishes a

nexus between the phones and PWID, FTD, or CSC.

Second, Kroschel does not mention any statement as to her belief why Mr. Kuhl's phones are likely to contain evidence of a crime. Specifically, there is no statement that drug dealers commonly take pictures with money and drugs, or that they keep records of drug transactions on their phones. Even if such statements were in the affidavit, they would still not be enough. One, because they are "boilerplate" or general and conclusory, and ~~two~~, because the circumstances here do not present enough evidentiary or investigative facts to support such general statements. Indeed, this is a spur of the moment traffic stop, not some ongoing investigation, at least that is what it seems to be on its face. Accordingly, there is no statement that Mr. Kuhl is known to facilitate drug deals with phones, let alone the specific phones in the affidavit. The same goes for the FTD crime. Kroschel states nothing as to any knowledge or experience that would create a nexus between cell phones and illegal sale/use of FTDs. If Mr. Kuhl was stealing cards, it doesn't seem there would be much evidence on a phone anyways. It's not as if a typical thief records himself burglarizing a home or breaking into a car. Moreover, a person may typically take pictures with cash but they do not do so with credit/debit cards, nor do theives typically text out every random burglary or theft. Regardless, there is no statement as to Kroschel's knowledge and/or belief that the phones will contain evidence of criminal activity, neither general or specific. See U.S. v. Herbst, No. 17-CR-4059-LTS, 2017 WL 9440792, at 15-17 (N.D. Iowa Dec. 21, 2017) (holding that when officers had information from

a confidential informant that defendant was involved in drug trafficking and seized from his vehicle a cell phone, medicinal marijuana purchased in Colorado, $705 in cash, a nonpermitted firearm, and a safe, that officers had probable cause to believe contained drugs, the affidavit did not establish the requisite nexus between the cell phone and drug trafficking; the affidavit did not contain a "belief statement").

Third, Kroschel does not address any knowledge, training, or experience other than the vague statement that she has been a police officer for over 9 years. Even if Kroschel had elaborated on these subjects, it would still not be enough. "[A]lthough Detective [Kroschel]'s 'training and experience' may be considered in determining probable cause, 'it cannot substitute for the lack evidentiary nexus in this case, prior to the search,' between the cell phone and any criminal activity." Ramirez, 180 F.Supp.3d at 495, quoting U.S. v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994).

d. The Affidavit Fails To Describe What Criminal Activity The Affiant Believes The Phones Will Contain Evidence Of

A search warrant "satisfies the particularity requirement if its text constrains the search ~~the search~~ to evidence of a specific crime." U.S. v. Castro, 881 F.3d 961, 964 (6th Cir. 2018) (citing Andresen v. Maryland, 427 U.S. 463, 480-81 (1976)). The same logic applies to the affidavit supporting the search warrant. The issue here is the fact that the affidavit is inconsistent as to what criminal activity the search warrant

is seeking evidence of.

"The only statements referencing the cell phone were part of a template and did not even specify the offense of which the cell phone was alleged to contain evidence." U.S. v. Oglesby, 4:18-CR-0626 (S.D. Tex. Apr. 26, 2019). Merely referring to items as "evidence of a crime" is not particular enough. U.S. v. Stefonek, 179 F.3d 1030, 1032-33 (7th Cir. 1999); see also U.S. v. George, 975 F.2d 72, 76 (2nd Cir. 1992) ("Mere reference to 'evidence' of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize."); In re Application of Lafayette Acad. Inc., 610 F.2d 1, 3 (1st Cir. 1979) (holding that citing 5 criminal statutes was not particular enough because it would sanction "a general rummaging for evidence of any type of federal conspiracy or fraud").

First, as noted above, the affidavit does not describe the items to be seized, secured, tabulated and made return thereof from the Blue Samsung phone as being related to any criminal activity. It only describes Coleman's phone (White iPhone in back case) as possibly containing evidence of PWID, and Kuhl's phone (Green iPhone) as possibly containing evidence of PWID and FTD-Illegal Sale/Use.

Second, the last page of the affidavit states that Kroschel "verily believes" that the data and contents of the phones will constitute evidence of CSC and use of a computer to commit a crime. Now there are four separate crimes described that some or all of the phones may contain evidence of, use of a computer to commit a crime being the

broadest. There is no reference as to any specific crime a computer (phone) may have been used to commit. Accordingly, this allows the phones to be rummaged through limitlessly to find evidence it was used to commit any crime. Meanwhile, one cannot ascertain if CSC and use of a computer to commit a crime applies to all phones, some, or only one. Indeed, it states the "affiant verily believes the above-described item(s) will be found at the above-described property." While not grammatically correct as applied in this context, the "items" must be the overbroad description of the phones' contents and data, and the "property" must be the phones. Thus, CSC and use of a computer to commit a crime must apply to all phones, which is inconsistent with the information within the affidavit and the previous description of what phones were to be searched for evidence of what crimes.

Because of these clear errors, there was no limit as to what to search for and thus, the affidavit in support of the search warrant violates the Fourth Amendment to the U.S. Const. and Article 1, § 11 of the Michigan Const. Accordingly, the search here was unlawful and all evidence seized by it is fruit of the poisonous tree, therefore any subsequent search based on this poisonous fruit is tainted and all of it must be suppressed.

## II. KROSCHEL MADE FALSE STATEMENTS AND MATERIAL OMISSIONS WITHIN THE AFFIDAVIT

Legal Standard

As was established by the Supreme Court in Franks v. Delaware,

438 U.S. 154 (1978), a defendant may challenge the validity of a search warrant by claiming that the affidavit supporting the warrant contains false statements. Omissions of material information may similarily serve as a basis to challenge the search warrant. See U.S. v. Neal, 577 F. Appx. 434 (6th Cir 2014). The deliberate or reckless omission of facts that are material to a probable cause determination is unconstitutional. Wesley v. Campbell, 779 F.3d 421, 428-29 (6th Cir. 2015).

"Information is material if it is 'so probative as to negate probable cause.'" U.S. v. Cody, 812 F. Supp. 1123, 1125 (D. Colo. 1993) (quoting Stewart v. Donges, 915 F.2d 572, 582 n.13 (10th Cir. 1990)). "'A reckless disregard for the truth is demonstrated by showing that the officers... had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause.'" Caminata v. Cnty. of Wexford, 1:14-cv-203 (W.D. Mich. Oct. 27, 2015) (quoting Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 743 (7th Cir. 2003)).

## Argument

a. False Statement ~~That Samsung Phone Was Collected From Vehicle~~ And Material Omissions Within Affidavit

Kroschel falsely stated that the Samsung phone was collected from the vehicle. This false statement was made although the entire reason the incident occurred as to Kuhl reaching into the vehicle, was to obtain his second phone, which Kroschel, and the officers at the scene of arrest

knew. By stating the phone was collected from the vehicle made it plausible to infer that Coleman and/or Mr. Kuhl were seeking to distance themselves from the Samsung phone because it may be incriminating. This dishonest statement also leads to an illustration that multiple phones, or at least the Samsung, were being used interchangeably, consistent with a drug dealing partnership. As mentioned above, the chain of custody report describes the Samsung phone as being collected from Kuhl. This is only one of the false statements made by Kroschel and the weight of its misleading nature is only compounded by the following falsities and material omissions.

Second, Kroschel states that during a search of the vehicle 2 cell phones were located. This statement is blatantly false and made with reckless disregard for the truth in order to mislead the magistrate. The chain of custody report describes Coleman's phone as Item number: 011, and the "collection location" as "on person" and the owner as "Shaquan Coleman." Accordingly, the White iPhone in black case was on Coleman's person. As noted above, the chain of custody report describes the Samsung as being collected from "suspect" which was Mr. Kuhl, and the Green iPhone as being collected from the "back right floor board." Thus, 2 cell phones were not collected during a search of the vehicle and nothing states otherwise. Again, this statement was made to illustrate the use of multiple cell phones being in the vehicle with 6 ounces of marijuana and a scale for the purpose of a drug dealing enterprise, and thus, mislead the magistrate.

Third, Kroschel lied by stating a SIM card was taped to the back of the Samsung phone. This was done to plant evidence, or possibly put the SIM card in the Samsung because officers could not get into the iPhone and the extra SIM card was actually from the Green iPhone. This lie was made to create a plausible explanation for any forensics trace evidence showing that the Samsung's SIM card was swapped after Kuhl's arrest. Indeed, the CSC reference in the affidavit creates a high probability that officers had already searched the phones and found some type of CSC evidence. The other highly probable possibility is that officers staged the entire traffic stop and had been following Kuhl. Indeed, officers had been following and monitoring Kuhl ~~thorought~~ throughout 2022, supposedly investigating fraud. Yet, it seems they had voluminous evidence that could bring fraud charges against Mr. Kuhl, but no such charges were brought. This is partly due to the fact that those truly in power were profiting, unbeknownst to Mr. Kuhl. Can't speak too much on that though huh guys? Point being, this supposed CSC was known to law enforcement long before the October 13, 2022 stop, indeed the powers that be orchestrated it all, just as they orchestrated the desecration and destruction of the Kuhl and Hamrick bloodlines. The traffic stop and arrest in Wyoming was staged to pave the way for this prosecution. Whether or not Kroschel is fully aware of the scheme she was involved in, she made this lie as a key piece of their plan. Another reason for this lie was to make it seem as if the Samsung was owned by someone who was not in the car and thus, that the phone was stolen. Due to the multiple cards bearing different names found on Mr. Kuhl, this lie

about the SIM card leads to the plausible inference that the SIM card is that of one of the people named on the cards, and the Samsung phone as well. In all, this lie creates several issues that substantially misled the magistrate's probable cause determination.

Fourth, Kroschel misleadingly describes what occurred when Mr. Kuhl got out of the vehicle. Officer Pfingsten clearly states in the report that Mr. Kuhl did exit the vehicle then said hold on and reached back into the car toward the floorboard. However, Kroschel states that Mr. Kuhl refused to exit the car and was reaching toward the floorboard. While this may seem insignificant, it is not. By making this misleading statement along with the omissions that, Kuhl was trying to grab his phone, the location of the marijuana, scale, and bags, and that there was no contraband or weapon in the area where Kuhl was reaching, creates the plausible inference that Mr. Kuhl was attempting to hide contraband. Thus, this misleading statement was a substantial factor that improperly weighed in on the probable cause determination.

Fifth, Kroschel made the material omission that one of the cards that Mr. Kuhl possessed beared the unique last name Kuhl. Had this fact been provided it would support that Mr. Kuhl knew the card owners and had permission to possess them. People do use their friends' and family members' cards all the time legally.

Sixth, Kroschel makes the material omission that officer Pfingsten ran the cards through TIMS and received negative resuts on every card. Again, had this information been relayed to the judicial officer it would have negated probable cause that Mr. Kuhl illegally possessed the cards.

Seventh, Kroschel omits the location in the vehicle where the marijuana was found. She only states that Officer Bernard observed in plain view, individually packaged bags of marijuana inside of the driver's side door when Coleman was exiting the vehicle. Later she states that 8 corner baggies varying in size, 3 sandwich bags, and 1 half full bag, all containing marijuana were, found during a search of the vehicle totaling an amount of 179.2 grams. This is clearly misleading because if Kroschel had stated where the marijuana was located, it would have shown that Mr. Kuhl was not near the weed and could not see it. This most certainly would have negated probable cause that Mr. Kuhl possessed the marijuana, let alone intended to deliver it.

Eighth, Kroschel also omits that the vehicle was owned and registered to Coleman's mother. This is another fact that would have negated probable cause that Mr. Kuhl possessed the marijuana.

Ninth, Kroschel omits the material fact that the scale was located under Coleman's driver seat out of sight and reach of Mr. Kuhl. This is proof that Mr. Kuhl did not have knowledge of the scale and definitely could not, and did not, have the right or intent to exercise dominion and control over such. Accordingly, had this information been provided it would have negated probable cause.

Tenth, Kroschel makes the material omission that Coleman claimed ownership of all the marijuana, scale and bags. Specifically, he explained that he has multiple strains of weed because he smokes alot and uses the scale and bags to organize the marijuana and keep the different

strains separate from one another. All of this information was within the police report and thus known by Kroschel. The driver, whose mother was the owner of the vehicle, claimed ownership of the weed in his area of the car and out of sight and reach of Mr. Kuhl, as well as the scale and bags. If this does not negate probable cause, Mr. Kuhl is dying to know what possibly could.

Eleventh, Kroschel omits the material fact that the money on Mr. Kuhl's person consisted of bills that were crisp, clean, and of large denomination, not various bills of multiple denominations like the money taken from Coleman. Indeed, Officer Bernard specifically notes that the $975 taken from Coleman was in various cash bills on page 3 of the police report. This information is material because large bills, that are fresh, are inconsistent with drug dealing typically. Especially when the context of the drugs is a few ounces of marijuana split up into small various amounts. This is not hyper-technical but common sense, indeed the normal Officer Bernard specifically noted that Coleman's money was in various bills, something a Detective obviously ~~known~~ knows was significant. Thus, in the totality of the circumstances, had this information been disclosed it would have negated probable cause.

Twelth, Kroschel omits the material fact that the prosecutor denied charging Kuhl with PWID. "It takes but a few minutes more for law enforcement authorities to obtain and include sufficient particularized facts so that magistrates may perform their detached function fully informed." Weaver, 99 F.3d at 1381. However, Kroschel only wanted to describe the

situation in a misleading manner to illustrate Kuhl's involvement in criminal activity, when she truly knew that there was no probable cause to support this.

## III. THE SEARCH WARRANT IS AN UNCONSTITUTIONAL GENERAL WARRANT/SO FACIALLY DEFICIENT THAT NO OBJECTIVELY REASONABLE OFFICER WOULD PRESUME IT TO BE VALID

### Legal Standard

The Fourth Amendment protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.... [N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amendment IV; Stanford v. Texas, 379 U.S. 476, 485-86, 85 S. Ct. 506 (1965). At its very core, the Fourth Amendment protects against general warrants that authorize "exploratory rummaging in a person's belongings... by requiring a particular description of the things to be seized." Andersen v. Maryland, 427 U.S. 463, 480, 96 S. Ct. 2737 (1976).

"The requirement that warrants shall particularly describe things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." Marron v. U.S., 275 U.S. 192, 196, 48 S.

Ct. 74, 76, 72 L.Ed. 231 (1927).

Article 1, § 11 of the Michigan Constitution guarantees that "the person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things or to access electronic data or electronic communications shall issue without describing them, nor without probable cause, supported oath or affirmation."

"[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives - from the mundane to the intimate. See Ontario v. Quon, 560 U.S. 746, 760, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010). Allowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case." Riley v. California, 573 U.S. 373, 395, 134 S. Ct. 2473, 2490 (2014) (going on to discuss the vast amount of personal data stored in the average smartphone and holding that such data is protected beyond searches incident to arrest).

Due to this vast amount of private data contained within cellular phones, courts have repeatedly held that the Fourth Amendment's particularity requirement is even more important for search warrants of such devices, as well as personal computers. "The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs,

and accordingly makes the particularity requirement that much more important." U.S. v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009).

Indeed, numerous State Courts have applied the particularity requirement of the Fourth Amendment, and their own Constitutions, to a strict standard when it comes to cell phones and personal computers; Michigan definitely has not strayed this course.

"Allowing a search of an entire device for evidence of a crime based upon the possibility that evidence of the crime could be found anywhere on the phone and that the incriminating data could be hidden or manipulated would render the warrant a general warrant in violation of the Fourth Amendment's particularity requirement." People v. Hughes, 958 N.W. 2d 98, 506 Mich. 512 (Mich. 2020) (quoting People v. Herrera, 357 P.3d 1227, 1228, 1233 (Colo. 2015)). "Thus, we hold that the warrant authorizing the search of defendant's cell phone violated the particularity requirement because it authorized a general search of the entirety of the phone's contents." People v. Carson, 355925 (Mich. App. Feb. 15, 2024).

The District of Columbia and several states have established the same standard for cell phone searches. "Vigilance in enforcing the probable cause and particularity requirement is... essential to the protection of the vital privacy interests inherent in virtually every modern cell phone and to the achievement of the 'meaningful constraints' contemplated in Riley." Burns v. U.S., 235 A.3d 758, 773-74 (D.C. 2020); see also State v. McKee, 413 P.3d 1049 (Wash. App. 2018) (holding warrant specifying broad category of cell phone data

not connected to charged crimes was overbroad); Buckham v. State, 185 A. 3d 1, 19 (Del. 2018) (held that search warrant failed constitutional review because it "did not limit the search of Buckham's cell phone to any relevant time frame and authorized the search of any data on the phone"); Taylor v. State, 260 A.3d 602 (Del. 2021) ("the Taylor warrant used the open-ended language 'including but not limited to' to describe the places to be searched. The Taylor search warrant allowed investigators to conduct an unconstitutional rummaging through all of the contents of Taylor's smartphones to find whatever they decided might be of interest to their investigation"); State v. Cagle, A17-0834 (Minn. App. May 7, 2018) (reversing convictions due to search warrant for phone lacking particularity and probable cause); State v. Smith, 344 Conn. 229, 278 A.3d 481, 497 (2022) (finding unconstitutional a search warrant for all the data on a cellular phone in part because the warrant "included no time parameters to cabin the scope of the search but, rather, allowed for the entire contents of the phone to be searched for all time"); State v. Missak, 476 N.J. Super. 302, 299 A.3d 821 (N.J. Super. App. Div. 2023) (invalidating search warrant for all of phone's contents as general); State v. Bales, 630 S.W.3d 754 (Mo. 2021) (Finding that motion to suppress evidence from a general search warrant of a phone was proper); State v. Allen, 288 Or. App. 244, 406 P.3d 89, 93 (Or. Ct. App. 2017) (holding that search warrant for cell phone failed the particularity requirement because it "placed no limitations on the types of files to be seized and examined").

Several federal courts have also ruled that cell phone searches authorized by a warrant cannot be general. Indeed, the same logic applies to computers. See U.S. v. Vernelus, 1:23-cr-20033-GAYLES (S.D. Fla. Mar. 4, 2024) (held that the search warrant adequately described the phone to be searched, "[h]owever, as to the remaining things to be seized..., the warrant authorized a general search of Defendant's iPhone" and granted suppression); U.S. v. Walker, 13-64-RGA (D. Del. May 29, 2015) (finding search warrant for phones was unconstitutionally general, but was saved by good faith exception); U.S. v. Winn, 79 F. Supp. 3d 904 (S.D. Ill. 2015) (finding that search warrant for cell phone was not particular enough and suppressed evidence seized under warrant); Arkansas Chronicle v. Easley, 321 F. Supp. 2d 776 (E.D. Va. 2004) ("such a warrant essentially amounted to a general warrant giving police the authority to rummage through every single computer file and document with no limitations on which documents could be seized").

Due to the expansive amount of an individual's life details being essentially packed into cell phones today, the topic of intrusion into these devices has sparked concern across the nation amongst legal scholars, legal rights and privacy rights advocates, and even members of law enforcement. Indeed, the abuse of mobile device forensic tools (MDFT), when searching cell phone contents, has caused the Association of Chief Police Officers (APCO) to recognize that "[a]n audit trail ... of all processes applied to digital evidence should be created and

preserved. An independent third party should be able to examine those processes and achieve the same result." Logan Koepke of Upturn, Mass Extraction: The Widespread Power of U.S. Law Enforcement to Search Mobile Phones, page 65 (October 2020) quoting APCO Good Practice Guide for Computer based Electronic Evidence (March 2012).

"The risk of overbroad searches is especially worrying given the fact that it's nearly impossible for those outside of law enforcement - such as a defense lawyer - to repeat the steps that a forensic examiner took and to audit the scope of a search. A handful of agency policies do require examiners to document how a search was conducted, but the level of documentation required is still unlikely to allow a defense lawyer to meaningfully audit a search." Koepke, Mass Extraction at 51.

"As it stands today, the basic equation for digital searches of cellphones is this: technologies like MDFTs empower law enforcement to seize everything and see everything, and the plain view exception effectively allows law enforcement to do anything during those searches." Loepke, Mass Extraction at 63.

Courts have seemed to justify searches of a phone's entire data because potential suspects can and will conceal evidence within a computer's storage. However, while "someone can fairly easily change where data is stored on a computer, it's significantly more difficult - and in many instances, technically impossible - on cellphones. A cellphone's user interface is significantly more limiting than a desktop computer's, often restricting the ways that users can manipulate files.... With

cellphones in particular, the argument that evidence could be anywhere rings hollow." Id.

Koepke's concern about general searches of electronic devices is not a lonely position. "The original justifications for the plain view doctrine are not present in digital searches, and its wholesale adoption has led to an impermissible dilution of the probable cause and particularity standard, as well as the exclusionary rule." James Saylor, Computers as Castles: Preventing the Plain View Doctrine From Becoming a Vehicle for Overbroad Digital Searches, 79 Ford. L. Rev. 2809, 2811-12 (2011). "As the amount of data held on cell phones continues to grow, the need for nuanced search warrants will become even more important. Imposing restrictions on search warrants - in the form of ex ante search protocols and geographic restrictions on the applications police can search - is the best way to ensure that cell phone warrants do not become the reviled general warrants the Fourth Amendment's particularity requirement was designed to prevent." Adam Gershowitz, The Post-Riley Search Warrant: Search Protocols and Particularity in Cell Phone Searches, 69 Vand. L. Rev. 585, 638 (2016). "Allowing law enforcement to download all data from a cell phone should exceed permissible governmental action." Erica ~~Danit~~ Danielsen, Cell Phone Searches After Riley: Establishing Probable Cause and Applying Search Warrant Exceptions, 36 Pace Univ. L. Rev. 970, 985 (2016).

Accordingly, federal courts have declined to issue search warrants when law enforcement fails to include protocols that appropriately

limit how the police will search for the evidence sought within the phone's vast amount of data to prevent limitless rummaging. See In re Cellular Telephones, 14-MJ-8017-DJW, 2014 WL 7793690 (D. Kan. Dec. 30, 2014); see also Matter of the Search of Apple iPhone IMEI 013888003738427, 31 F. Supp. 3d 159, 169 (D. D.C. 2014). Certainly courts have limited a search warrant's scope by refusing to allow a search of a phone's contents that has no specific nexus to the criminal evidence sought. In re Nextel Cellular Telephone, 14-MJ-8005, 2014 WL 2898262 (D. Kan. June 26, 2014).

As laid out in Koepke's Mass Extraction, the abilities of AI software within MDFT programs is so advanced that law enforcement is informed of what a specific file on the phone contains before even opening that file. The features of this software "include basic keyword searches, as well as more advanced techniques. Some MDFTs now use machine learning-based text and image classification to categorize file contents, including individual frames in a video." Mass Extraction at 24. Images can be classified into multiple categories before being opened such as, ID/credit card, drugs, child abuse, nudity, money, weapons, and violence. Text conversations can be labeled as being related topics of drugs, sex, family, drugs, and even child luring. Portions of this categorization feature can be disabled to tailor the categories identified to the specific evidence sought by police. Indeed, the MDFT used by Wyoming PD and MSP to search Mr. Kuhl's phone, Cellebrite, had these capabilities as early

as 2017. See U.S. v. Gallegos-Espinal, 19-20427 (5th Cir. 2020). In Gallegos-Espinal, the defendant's mother was arrested for harboring/smuggling illegal aliens. Gallegos-Espinal encountered law enforcement at his home after his mother's arrest and stated he would be there to get his siblings when they came home from school. The officers had no issue with this and Gallegos was not a target of the investigation. Still officers suspected he might be involved in his mother's illegal activity and thought that evidence of such might be on Gallegos's phone. Accordingly, officers requested if Gallegos would consent to a search of his phone. The officers even made it seem routine and joked that they wanted to make sure there wasn't any child pornography. Gallegos laughed and signed a consent form. Ironically, the officer used cellebrite and left the child pornography image categorization feature enabled. Low and behold, Cellebrite alerted the officer that it has classified images on the phone as child porn and Gallegos was federally prosecuted. The officer that searched the phone stated he had no reason to suspect Gallegos's phone of containing child porn and could have disabled the image classification feature for that category but didn't. However, the Fifth Circuit upheld the general search because Gallegos consented.

Mr. Kuhl has enjoined his particularity challenge with the argument that no objectively reasonable officer would have presumed the warrant to be valid because to him it seems these issues are so intertwined that establishing one, essentially establishes the other.

With that being said, Mr. Kuhl also incorporates section I of this motion (Bare-bones affidavit) herein by reference.

Indeed, the Supreme Court referenced a warrant's lack of particularity as an example of fatal facial deficiency. "[A] warrant may be so facially deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the ~~executives~~ executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923. Thus, the particularity requirement and a warrant's facial sufficiency go hand in hand. Additionally, Mr. Kuhl believes the clear establishment of probable cause and nexus standards should also weigh in on the determination of a warrant's facial validity. Because the warrant and affidavit are extremely lacking in all of these areas, no objectively reasonable officer could presume them to be valid.

## Argument

### a. The Warrant Fails to Particularly Describe the Location of the Phones

Neither the Search Warrant nor Affidavit describe a location of where the physical phones will be found. For instance, neither of these documents state that the phones are at the Wyoming PD or the Kent County Sheriff's Office or any other location for that matter. This is insufficient to ensure that the correct phones will be searched. As an example, the MSP search warrant in this case, describes the MSP Headquarters as the location of where the phone download would be located.

b. The Warrant Fails to Particularly Describe the Phones to be Searched

While the warrant and Affidavit describe the color of the phones, there is no description beyond that. For instance, there is no model type such as Galaxy S22 for the Blue Samsung nor iPhone 13 for the Green iPhone. Moreover, there are no IMEI, Serial #, or phone # for any of the phones mentioned in the Search Warrant and Affidavit.

Additionally, the contradiction between the Affiant's statement of facts and the phones' descriptions creates uncertainty and an inadequate instruction as to the specific thing to be searched. Indeed, Kroschel states that during a search of the vehicle 2 cell phones were located, but only the Blue Samsung is described as being "collected from vehicle." Furthermore, the Wyoming PD Chain of Custody Report describes the Blue Samsung's "collection location" as "suspect," referring to Mr. Kuhl, and states the Green iPhone's "collection location" as the "back right floor board." Accordingly, the Affidavit's statement of facts contradicts the Affidavit and Warrant's description of the property to be searched (phones). Also, the Chain of Custody Report's collection locations for the phones is contradicted by the Affiant's statement of facts and both the Affidavit and Search Warrant's description of the property to be searched (phones).

Third, the Affidavit references an "Above-described cellular device" under the statement "And to there seize, secure, tabulate and

make return thereof according to law the following property or things which have been used in the commission of, or which constitute evidence of criminal conduct." However, there are three cell phones described above, which are cellular devices. Accordingly, this general "above-described cellular device" reference could be referring to any of the three phones and is insufficient to meet the particularity requirement of the Fourth Amendment and Article 1, § 11 of the Michigan Constitution.

c. The Warrant Fails to Particularly Describe the Criminal Activity For Which Evidence is Sought

The Warrant itself states that Coleman's phone (White iPhone in black case) is to be searched to seize any and all evidence related to Possession With Intent to Deliver (PWID) Marijuana, and the same is to be done to Kuhl's phone (Green iPhone) except for evidence related to PWID and Financial Transaction Device - Illegal Sale/Use. However, the Warrant does not even state that the Blue Samsung is to be searched to seize evidence of any criminal activity.

The Affidavit describes Coleman and Kuhl's phones in the same manner as the Warrant under the "And to there seize, secure, tabulate..." statement. However, in this portion of the affidavit there is a third reference to an "Above-described cellular device and associated accounts used to send, receive, capture, or store electronic

messages." Accordingly, there is no reference as to any criminal activity that may be related to this "above-described cellular device" and its associated accounts' described content, let alone a specific crime. Thus, whatever "above-described cellular device" referred to, cannot be searched because there is no particularity as to what is being searched for in relation to any crime.

Further, the Affidavit lists CSC, as well as use of a computer to commit a crime, as the crimes which evidence of, the Affiant verily believes, will be found in the contents and data of the phones. Not only is nothing mentioned as to why CSC evidence would be found in Mr. Kuhl's phones, the broad and general reference to use of a computer to commit a crime allows for a limitless rummaging to search the phones for any evidence showing such phones were used to commit any crime. The reference to CSC creates uncertainty, ambiguity, and improperly instructs the officer executing the search as to what evidence is sought and believed to be found.

Accordingly, any reasonable officer would have noticed these mistakes and, understanding the law and the strict protections of the U.S. and Michigan Constitutions, would have known this warrant was invalid. Thus, the search should have never been executed.

d. This General Template Allowed a Search of all the Phones' Contents and Data With no Time Limit and Regardless of Whether Such Contents and Data had a Specific Nexus to the

Criminal Evidence Sought, Nor Did the Warrant Prescribe Any Search Protocols

Indeed, Michigan clearly established that searching an entire electronic device for evidence of a crime is unconstitutional. Hughes, 506 Mich. 512 (Mich. 2020). Accordingly, the Wyoming PD Search Warrant was clearly unconstitutional because there was no limit as to what data could be searched on any of the phones. The template actually ensured that no data would be omitted from that authorized to be searched and seized under the warrant. Moreover, there was no time limit as to how far in the past the search could go, nor was there any protocols put in place to ensure that the search would not amount to a limitless rummaging.

Numerous courts have held such broad templates utilized in cell phone and computer searches unconstitutional. As mentioned above, it is essentially impossible to manipulate data and change where such data is stored on cell phones thus, the argument that evidence could be anywhere rings hollow. Indeed, the software of MDFTs are able to categorize data and flag and alert officers of such when searching cell phones.

In United States v. Schlingloff, 901 F. Supp. 2d 1101 (C.D. Ill. 2012), the defendant's laptop and external storage device were seized and searched for evidence of passport fraud and harboring an alien. During this search, the executing officer left the feature to flag

and alert images of child pornography enabled, despite the easy ability to disable that specific portion of the feature. Well, the software did flag and alert the officer that certain images most likely depicted child pornography. Accordingly, the officer opened the files, quickly realized they were child porn, closed the files, and obtained a subsequent search warrant to look for child porn.

Schlingloff was eventually indicted on child pornography charges and moved to suppress the evidence. He argued that the officer exceeded the scope by enabling the child pornography alert feature, and by opening the files after being alerted that they were child porn. The district court initially denied suppression under the assumption that the classification and alert features had to be applied on an all or nothing basis. Upon reconsideration, the Court realized that the alert feature portion that alerts specifically child pornography could be disabled. Accordingly, the Court agreed with Defendant that the enabling of the child porn alert, when searching for no such evidence, exceeded the scope of the warrant and granted suppression. The features discussed in Schlingloff were available almost 15 years ago, as the search occurred in December 2010, so just imagine the capability of such features available in October and November of 2022 when this Wyoming PD search warrant was prepared and executed.

Indeed, the Computer Crimes Unit (CCU) Report prepared by Sgt. Meredith used the most advanced edition Cellebrite at that time, Cellebrite Premium Version 7.58.0.193 to obtain the extraction from

Defendant's Samsung phone that was seized by Wyoming PD. It also states the extraction was examined using Cellebrite Physical Analyzer 7.56.0.20, and that the Media Classification feature was used to isolate Photo IDs and 994 images were isolated. The CCU report states that photos and videos of potential relevance were exported for review, but Gensterblum claims to have came across images of possible CSAM after receiving the phone extraction from Sgt. Meredith of CCU. Specifically, a vagina, with no other identifying features being digitally penetrated by a black female was a video found, as well as a video of a nude female in the shower touching her breast. How such depictions were exported for review as potentially relevant to a fraud investigation is beyond Mr. Kuhl. Indeed, this lays the ground for the next section of this motion arguing that Sgt. Meredith exceeded the scope of the warrant. For now, the point made is that there was no limit as to what to particularly search and seize as to the data and contents of the phones, yet the classification features make such general intrusion unnecessary.

The "Supreme Court has tasked judicial officers with the responsibility of ensuring that electronic searches 'are conducted in a manner that minimizes unwarranted intrusions upon privacy.'" In re Facebook Accounts DISRUPTJ20, Special Proceedings No. 17 CSW 658 (D.C. Super. Nov. 9, 2017) (quoting Andersen, 427 U.S. at 482 n.11).

It is quite obvious this is a general template used by Wyoming PD to search any cellphone suspected of being related to criminal activity. Indeed, three phones were being searched and all of them

for different inconsistent reasons, yet the warrant authorized a search and seizure of the exact same contents and data from each phone, but again, even the warrant and affidavit create uncertainty in this area as well. Point being, non-tailored, general cell phone search warrant templates that allow an all encompassing data search and seizure, with no description as to why the particular data may provide evidence of the specific crime suspected, run afoul of Article 1 §11 of the Michigan Constitution's guaranteed protection of electronic data and communications from general and unreasonable searches. They also run afoul of the Fourth Amendment's particularity and probable cause requirements.

In U.S. v. Taylor, 1:20-cr-00116-TWP-MJD (S.D. Ind. Sep. 4, 2024), the magistrate refused to sign off on template search warrant and affidavit until detective made handwritten alterations. In U.S. v. Rondeau, 4:23-CR-40004-KES (D.S.D. Nov. 13, 2024), the court held that the template used to draft a warrant "included a list of eleven types of data that virtually authorized the search and seizure of every piece of data that could be found...".

Defendant also incorporates by reference this section to apply to the "Bare bones" Affidavit sections, in that they are intertwined as this section will display that the affidavit did not establish a nexus between the inconsistently alleged criminal conduct and the broad array of data sought by the warrant. Accordingly, Mr. Kuhl will try his best to briefly state all of the errors pertaining to particularity

and lack of nexus to the specific data sought, in an organized manner.

1. Both the affidavit and warrant contain the language "And to there seize, secure, tabulate and make return thereof according to law the following property or things which have been used in the commission of, or which constitute evidence of criminal conduct." This statement allows for the seizing, securing, tabulating, and returning of "the following property or things" which have been used in the commission of any criminal conduct or constitutes evidence of any criminal conduct. This allows for an unconstitutional limitless rummaging of the following "property or things." Instead of stating "evidence of criminal conduct," it should say "evidence of the 'specified' criminal conduct," or "evidence of the 'described' criminal conduct."

2. After the "And to there seize, secure..." language referenced in paragraph no. 1 above, the affidavit states "And for the following property and evidence located within the above described device(s)." In between these two statements, the affidavit lists "Coleman's phone: Any and all evidence related to" PWID; "Kuhl's phone: Any and all evidence related to" PWID and FTD-Illegal Sale/Use; and "Above-described cellular device and associated accounts used to send, receive, capture, or store electronic messages." By stating "And for the following property and evidence..." after listing the devices and criminal conduct (although no criminal conduct is linked

to the 'abovedescribed cellular device'), the affidavit allows for the seizure, securing, etc. of property and evidence beyond the listed devices and the related criminal conduct. This is because the word "and" precedes "for the following." Also, "and" precedes "evidence" which extends the seizing, securing, etc. to any evidence, even beyond that specified above this statement as being related to each phone. Seeing as "the following property and evidence" is virtually the entirety of the phones' contents, such authorization allows for a limitless rummaging through these contents regardless of the relation to any specific criminal conduct.

3. The "following property and evidence located within the aboved described device(s)," does not even differentiate between one or multiple devices. This just displays the warrant and affidavit are general standard templates. Using this same template, describing the same contents and data for every phone, regardless of the criminal activity suspected, runs afoul of the clearly established Supreme Court of Michigan ruling in Hughes. This also runs afoul of the U.S. and Michigan Constitutions' particularity requirement, and nexus requirement that items to be seized be related to specific criminal activity.

4. The affidavit states that the "Affiant is investigating a" PWID and FTD-Illegal Sale/Use "that occurred on 10/13/22 at 801 Burton,

City of Wyoming, county of Kent." Accordingly, the date of the alleged criminal activities is known and stated, yet there is no temporal limit prescribed within the warrant, allowing for a search of all the phones' data far beyond the time related to the alleged crimes.

5. "Cell phone contents and data often assist with evidence showing where the phone was at during during different times, showing suspects were at the scene(s) of the crime(s)." This general boilerplate statement is on the last page of the affidavit and is the only statement that attempts to explain how searching the phones will reveal evidence to assist in the investigation, and establish a nexus between the phones' contents and the inconsistent criminal activity. Accordingly, this statement fails, because as stated above in paragraph no. 4, the Affiant is already aware of the location of the alleged crimes, and that Coleman and Kuhl were both there.

6. Because the "Cell phone contents and data" statement referenced above in paragraph no. 5, does not even differentiate between one or multiple scenes and crimes. Again, this proves the affidavit and this statement is a general standard template used to search any and all phones for any and all crimes. There was no tailoring of the template to only allow the search of data that is connected to a specific crime.

7. Section 1 of the search warrant and affidavit is "the following property and evidence" referenced in paragraphs nos. 2 and 3, that is allowed to be searched, seized, secured, etc. in addition to, the specific criminal conduct as to Coleman and Kuhl's phones listed under the "And to there seize, secure..." statement. Section 1 describes this "following property and evidence" as "including but not limited to," 10 lettered subsections which consists of virtually all possible data on a cell phone. Whatever data may not be covered by the 10 subsections, it is covered by the all-encompassing phrase "including but not limited to." Accordingly, the search warrant fails to particularly describe the items to be seized and thus, is an unconstitutionally general warrant.

8 No nexus is established between any of the 10 subsections referenced in paragraph no. 7 above, and any criminal conduct. Indeed, the contents and data do not coincide with showing where the phones were at during different times, which according to the affidavit, was the reason for needing to examine the contents and data. Subsection A was: "Data that may identify the owner or user of the above-described cellular communication device(s)." In no way does this data show where the phone was at during different times. Neither does this ~~subjection~~ subsection contain the language "related to the above-described criminal activity and further described in the affidavit in support of this search warrant, which is attached hereto and entirely incorporated

herein by reference." Accordingly, this displays the warrant was general and this data lacked any specific nexus to criminal activity.

Subsection B was: "Address books and calendars." This is not location data. While it may show addresses an individual may frequent or be associated with, it will not show that the phone was there at any specific time. Regardless, the affidavit states the date and location of the alleged crimes: 10/13/22 at 801 Burton, City of Wyoming, county of Kent. Thus, this data does not coincide with the supposed reason for examining it: showing where the phones were at during different times. Neither does this subsection contain the "related to the aboved-described criminal activity" language that is also omitted in Subsection A. Even if it had not omitted such language, subsection B still is not specifically related to any criminal activity by the affidavit. There is no mention of addresses believed to be associated with criminal activity other than that of a Citgo gas station at 801 Burton. Likewise, there are no specific dates stated within the affidavit believed to be associated with criminal activity other than 10/13/22, the date of Kuhl's arrest. Accordingly, this displays the warrant was general and this data lacked any specific nexus to criminal activity.

Subsection C was: "Audio and Video clips." This is not location data in the typical sense, especially not audio clips. While a video may depict certain landmarks or other objects indicative of where the video clip was made, there is no location suspected as being the scene of a crime other than 801 Burton St., City of Wyoming. Thus, this data

does not coincide with the supposed reason for examining it: showing where the phones were at during different times. While this subsection does contain the "related to the above-described criminal activity..." language, nothing in the affidavit states why audio and video clips will constitute evidence of criminal activity. There is no statement by the affiant as to Kuhl or Coleman recording themselves orally or visually in relation to any of the inconstistent criminal conduct. Indeed, the Samsung phone is not described as ~~be~~ being related to any criminal conduct, or person for that matter, other than possibly CSC or use of a computer to commit a crime, but nothing in the affidavit even references activity related to either. Accordingly, this displays that the warrant was general and this data lacked any specific nexus to criminal activity.

Subsection D was: "Call histories and call logs." This is not location data. Moreover, the affidavit speaks of no suspected numbers somehow related to any of the inconsistent criminal conduct underlying the warrant. Nor does the Affiant state that such data will establish a connection between Coleman and Kuhl. Even though this subsection contains the "related to the above-described criminal activity..." language, there is no information within the affidavit that establishes a nexus beetween the call histories and logs of any phones. Accordingly, this displays that the warrant was general and this data lacked any specific nexus to criminal activity.

Subsection E was: "Photographs and associated metadata." This

is not location data in a typical sense. While a photo may depict certain landmarks or other objects indicative of where photos were taken, there is no location suspected as being the scene of a crime other than 801 Burton St., City of Wyoming. Metadata will disclose the location and time a photo was taken, but again the same logic applies. Thus, this data does not coincide with the supposed reason for examining it: showing where the phones were at during different times, showing suspects were at the scene of the crime. There is no allegation that Coleman or Kuhl took photos at 801 Burton St. or reason to believe they did. Moreover, the affidavit states nothing general or specific as to why there may be incriminating photos on any of the phones. For these reasons, the "related to ~~criminal~~ the above-described criminal activity..." language does not suffice. Inddeed, the criminal activity is so inconsistent, opaque, and ambiguous that no reasonable officer could honestly say they knew what to look for and why it may be in the phones' photographs. Accordingly, this displays that the ~~general~~ warrant was general and this data lacked any specific nexus to criminal activity.

Subsection F was: "Text messages (SMS), multimedia messages (MMS), recorded messages and subscriber information modules (SIM cards)." This is not location data. It is possible that a person will say where they are located in a text, but there is no location, other than 801 Burton St., that is stated as being the scene of any crime. Thus, this data does not coincide with the supposed reason for examining it: showing where the phones were at during different times, showing ~~suspects~~ suspects were at the

scene(s) of the crime(s). Moreover, this subsection does not contain the "related to the above-described criminal activity..." languge. Even if it had, there is nothing within the affidavit that establishes a specific or general nexus between this data and criminal activity. There is no allegation that Kuhl and Coleman were or may have been texting each other about drug trafficking, or that they were messaging others about such. Nor is there any statement as to why this data may contain evidence of FTD-Illegal Sale/Use, CSC, or use of a computer to crime. Indeed, the affidavit and warrant do not even clearly state what criminal activity is connected to any phone, and is so inconsistent, opaque, and ambiguous that no reasonable officer could honestly say they knew which phone to search for what criminal activity, and why evidence of such would possibly be in the data of this subsection. Accordingly, this displays that the warrant was general and this data lacked any specific nexus to criminal activity.

Subsection G was: "E-mail messages and attachments, whether read or unread." This is not location data and thus, does not coincide with the supposed reason for examining it: showing where the phones were at during different times, showing suspects were at the scene(s) of the crime(s). While this subsection contains the "related to the above-described criminal activity..." language, nothing within the affidavit establishes a nexus between this data and criminal activity. Nothing is stated to create a possibility, let alone a probability, that this data will contain incriminating evidence. Indeed, email service is not as frequently used

as other means of more efficient and convenient communication in today's society. Moreover, the criminal activity is so inconsistent, opaque, and ambiguous as to what such activity is actually suspected of, and as to which phone, no reasonable officer could honestly and objectively say they were adequately informed what incriminating evidence to look for as to which phone, and why such evidence would possibly be in the data of this subsection. Accordingly, this displays that the warrant was general, and this data lacked any specific nexus to criminal activity.

Subsection H was: "Internet World Wide Web (WWW) browser files including, but not limited to, browser history, browser cache, stored cookies; browser favorites, auto-complete form history and stored passwords." This is not location data in the typical sense, and while it states "including but not limited to," the Internet data that is specified corresponds just seeing everything a person was viewing and accessing on the internet, as well as stored passwords stored. Thus, this data does not coincide with the supposed reason for examining it: showing where the phones were at during different times, showing suspects were at the scene(s) of the crime(s). This subsection does not contain the language "related to the above-described criminal activity..." Even if it did, nothing within the affidavit establishes a nexus between this data and criminal activity. There is nothing as to how either Mr. Kuhl or Coleman were suspected of using the internet to commit any crime, or how the internet is commonly known to the affiant to be used for any criminal activity. Accordingly, this displays that the

warrant was general and this data lacked any specific nexus to criminal activity.

Subsection I was: "Documents and other text based files." This data has no relevance to showing where the phones were at during different times, showing suspects were at the scene(s) of the crime(s). This section is broad and general, but seems to encompass documents created by programs like Microsoft Word or Adobe, as well as PDF files, digital notes, and E-books. This subsection does contain the "related to the above-described criminal activity..." language, but it does no good because the criminal activity is so inconsistent and broad no one would know what they're looking for. This allows for a limitless rummaging to look for any type of incriminating documents on the phones. Moreover, nothing in the affidavit states why evidence of any criminal evidence will be likely found in this data. Accordingly, this displays that the warrant was general and this data lacked any specific nexus to criminal activity.

Section J was: "Applications and data obtained by the application including but not limited to Messaging applications or other 'social media' applications with a messaging feature." This not location data in a typical sense. It is a means to search through any application not already described and is aimed more at private communications and the contents of those communications. Thus, this data does not coincide with the supposed reason for examining it: showing where the phones were at during different times, showing

suspects were at the scene(s) of the crime(s). Moreover, there is no limit as to what application can be searched even though nothing in the affidavit references any application let alone messaging applications and why they may contain evidence of a crime. Even if it had mentioned some messaging application or any application for that matter, this subsection is general and limitless. Additionally, this subsection does not even contain the "related to the above-described criminal activity." Accordingly, this displays that the warrant was general and this data lacked any specific nexus to criminal activity.

9. The subsections A-J of # 1 on the affidavit and warrant do not all contain the "related to the above-described criminal activity and further described in the affidavit in support of this search warrant, which is attached hereto and entirely incorporated herein by reference." However, the subsections that do contain this languge, do so in both the warrant and affidavit, but this language makes no sense in the affidavit and further displays this was a general standard template that was not tailored at all.

10. Section 2 states: "With respect to the above items listed in # 1 and its subsections above, the executing law enforcement officer(s) is/are authorized to," and goes on to give such officers free reign to do whatever they want to any and all data on the phones. This allows for access to cloud data which can contain content that was never

even present on the physical phone itself. Moreover, this can allow police to access data that the owner of the cloud creates in the future and has no relation to the phones possessed by law enforcement. Such a general limitless rummaging of electronic data and communications runs afoul of Article 1 § 11 of the Mich. Const. and the Fourth Amendment. This is especially so when the criminal evidence sought is so inconsistent and ambiguous no reasonable officer can ascertain what they are looking for, as is the case here. Indeed, some type of search protocol should be put in place that is consistent with the 9th Circuit Chief Judge Kozinski's concurring opinion in United States v. Comprehensive Drug Testing, Inc., 621 F. 3d 1162, 1178-80 (9th Cir. 2010). Such protocols would ensure that the Michigan Supreme Court ruling in Hughes would be adhered to. The fact that section #3 of the warrant allows third party law enforcement officers and agencies who are ignorant as to the facts and circumstances underlying the warrant.

11. The warrant says to search all three phones but does not authorize the seizure, securing, etc. of any data from the Blue Samsung phone. Nor is any particular crime specified as being linked to the Blue Samsung. Accordingly, this allows for an unconstitutional limitless rummaging of the Blue Samsung phone.

For these reasons, the warrant was a general warrant

that did not describe with particularity what was to be seized. The warrant and affidavit also failed to establish a concrete nexus between the items to be seized and criminal activity. Accordingly, this warrant was so facially deficient that no reasonable officer would have believed it to be valid.

## IV. THE MAGISTRATE WHOLLY ABANDONED THE JUDICIAL ROLE

### Legal Standard

"A judge abandons her judicial role when she 'does not serve as a neutral and detached actor, but rather as a rubber stamp for the police and an adjunct law enforcement officer.'" U.S. v. Long, 797 F.3d 558, 567 (8th Cir. 2015) (quoting U.S. v. Carpenter, 341 F.3d 666, 670 (8th Cir. 2003)); see also U.S. v. Decker, 956 F.2d 773, 777 (8th Cir. 1992) (holding that judge wholly abandoned judicial role by failing to recognize the application was unsigned and the warrant did not identify the property to be searched).

### Argument

Here, the numerous deficiencies within the affidavit and search warrant could only have been passed upon by a magistrate who failed to adequately review these instruments and was completely reckless in their judicial role. This affidavit and warrant

were drafted and authorized in less than 24 hours after Mr. Kuhl's arrest.

First, the judge did not correct, notice, and/or question why the affidavit contained a reference to CSC and use of a computer to commit a crime. This cannot be justified as some minor oversight. Kroschel put this in the last statement of the affidavit in a larger and bolder font than the rest of the affidavit. The judge's signature is approximately 3 inches under the reference, and Kroschel's is directly under it. Moreover, a third party executed the warrant founded on this clearly erroneous affidavit.

It is highly likely the prosecutor reviewed the affidavit and the warrant before it was submitted to the judge. Accordingly, it is likely the affidavit and warrant passed through 3 separate sets of hands and eyes before being executed by Sgt. Meredith. Kroschel, the prosecutor and the judge. If the prosecutor did not review the affidavit and warrant, it still went through Kroschel and the judge before it was executed. Thus, anyone who actually took the time to review the affidavit would have noticed this major inconsistency. It must have been intentional to notify the executing officer that this is truly what to look for. The judge was complicit or did not even read the affidavit.

Second, the lack of particularity as to where the phones are located displays the judge's blind faith in the officers. Indeed, the CCU Report prepared by Sgt. Meredith when searching the phones

describes receiving an iPhone 11 and an iPhone 13, both of which were green. Moreover, the iPhone is depicted and has a SIM card taped to the back, but there is no picture of the Samsung, at least not that Mr. Kuhl knows of. Additionally, the CCU Report describes the Samsung as an S21 when Defendant knows it was an S22, and there is no mention of a SIM card being taped to the back. Regardless, the judge should have required that the location of the phones be specified.

Third, there is no description of any phone besides it color. No phone #, IMEI, or serial # is described, nor the specific model of the phone. By not requiring a more specific description of the phones, the judge acted as a rubber stamp for police.

Fourth, the judge failed to notice, question, or correct the fact that the Samsung was not listed under the statement of the warrant that reads "And to there seize, secure, tabulate and make return ~~thereof.~~ thereof..." Yet, the Samsung is listed above this statement and is commanded to be searched. This clearly allows for a general limitless rummaging of the Samsung phone without such rummaging being limited to criminal conduct.

Fifth, the Samsung phone is not linked to either Kuhl nor Coleman, nor is it alleged to be connected to any criminal activity. Because these are the two most essential and basic requirements that must be established and described in a search warrant and supporting affidavit, there is no justifiable explanation for such reckless mistake. Due to the fact any reasonably

objective officer, let alone two, would have noticed this defect, an impartial judicial officer should have as well. Accordingly, this reckless disregard for the most basic requirements to establish probable cause by a judge must be remedied.

Sixth, the fact that the only language within the four corners of the affidavit explaining why these phones should be searched is "cell phone contents and data often assist with evidence showing where the phone was at during different times, showing suspects were at the scene(s) of the crime(s)," only provides further support that the judge wholly abandoned the judicial role. This is because this statement is ~~conclusive,~~ conclusory, general, and boilerplate. Moreover, the statement does not fit the narrative of the circumstances described in the affidavit, or the data authorized to be searched and seized. Kroschel alleges the crimes of PWID and FTD-Illegal Sale/Use occurred on 10/13/22 at 801 Burton in Wyoming and Officer Bernard clearly saw the vehicle arrive and leave the 801 Burton St location. Accordingly, Kroschel already knows the phones were at this location as well as Kuhl and Coleman. Further, the items listed in the subsections under # 1 of the warrant and affidavit are not places that would commonly show where the phone was at during different times. Address books, calendars, data that may identify the owner, call history, text messages, e-mail messages whether read or unread, internet browser history and stored passwords, documents and other text based files, and messaging applications such as social media platforms are not probable places to

find location data. Instead, this allows for a general rummaging of all the phones' data which goes against clearly established Michigan Supreme Court precedent holding such broad and general searches of cell phones is unconstitutional. The magistrate was aware of or should have been aware of such clearly established law, and abandoned the role of a detached and neutral actor by hastily and recklessly authorizing this overwhelmingly general search warrant.

Seventh, the judge knows that validity of an affidavit is limited to what is within its four corners. Accordingly, the judge should have mandated that the Affiant state in the affidavit facts that would establish a concrete and specific nexus between the phones and criminal activity. Especially seeing as the judge is aware third parties will most likely conduct the forensic examination of the phone who don't know the facts and circumstances underlying the warrant.

## V. KUHL WAS RACIALLY AND SELECTIVELY TARGETED BY WYOMING PD, AS WELL AS VINDICTIVELY

Legal Standard

The Supreme Court has recognized that a situation may present conduct of law enforcement agents so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. United States v. Russell, 411 U.S. 423, 431-32 (1973).

One may think that, as a white male, Mr. Kuhl is privileged. However, they are far from correct. Due to historical inequality against people of color, law enforcement agents are more cautious and empathetic when dealing with African-Americans. However, since white people are presumed to be privileged, law enforcement can disregard their rights and face far less scrutiny and penalty. It is known that many people stereotype black people and are prejudice. It is even more well known that such people despise even more than black people, white people who associate with black people and have an urban or ghetto persona. These white people are commonly referred to as wiggers or posers. Indeed, at 16 years old Mr. Kuhl was jumped down the street from his grandmother's home in Bangor, Michigan in 2008 because 3 older white men had called his friend a nigger. Mr. Kuhl's jaw was broken in 4 places, he lost conciousness, and had defecated on himself. The three men were all over the age of 23 and ironically did not touch Mr. Kuhl's friend but almost beat Mr. Kuhl to death for being a "racetraitor." This was because Mr. Kuhl told them to "fuck off" when they asked why he was hanging with a nigger. Point being, if people aren't even necessarily racist toward black people they despise white people who have an urban or ghetto persona, and this is very prominent amongst law enforcement.

The reason Mr. Kuhl argues that he was racially and vindictively subjected to a search of his phones by Wyoming PD is because

Coleman's phone was never searched. Despite the fact PWID was listed as being involved with one of Kuhl's phones and Coleman's phone on the warrant and affidavit, only Kuhl's phones were searched. Indeed, Coleman's phone was released to him when he got out of the jail which is why the chain of custody report never mentions Coleman's phone being turned over to a law enforcement digital forensic expert as Mr. Kuhl's phones were. Coleman was the driver, the marijuana was his and he stated so, as well as claimed ownership of the scale and bags in his mother's car. Yet, only Mr. Kuhl's phones were searched.

This was done with vindictive, malicious, and retaliatory motive. Such motive was based on Kuhl's association with a black man and his assertion of his First and Fourth Amendment to contest the police in a lawful manner and maintain his privacy. Accordingly, this clearly outrageous conduct so far violates due process and equal protection under the U.S. and MI Constitutions that suppression is warranted.

## VI. MEREDITH EXCEEDED THE SCOPE OF THE WARRANT

### Legal Standard

Mr. Kuhl urges the Court to look to United States v. Robinson, 358 F.Supp.2d 975 (D. Mont. 2005). In Robinson, police applied for a search warrant to search a house and vehicle, but the operative language of

the application sought a warrant "to enter such vehicle more particularly described above and search for evidence of crimes..." Accordingly, the judge who issued the warrant authorized only a search of "the vehicle, more particularly described above" for evidence of the crimes alleged.

Because the police searched the vehicle and the house, the Court ruled they had exceeded the scope of the warrant by searching the house. Accordingly, the court suppressed the evidence obtained under the warrant. The government argued that it was a simple "cut and paste" error and suppression should not be granted. The court held that "[t]he Fourth Amendment's warrant requirement has no exception for a mistake in cutting and pasting, nor does it authorize a reviewing court to divine what seems obvious but is clearly outside the scope of the application and warrant authorizing the search." Id at 976.

"When searching officers follow the commands of a search warrant as to the places to be searched but unlawfully seize items not authorized under the warrant, the unlawfully seized items must be suppressed, but the lawfully seized evidence need not be excluded." United States v. Mulamba, 4:21-CR-40153-KES, at 17-18 (D.S.D. Feb. 13, 2025) citing Waller v. Georgia, 467 U.S. 39, 43 n. 3 (1984).

Argument

a. The Warrant Did Not Authorize The Seizure of Any Data From

The Samsung Phone

As mentioned previously, the Samsung phone is not listed under the statement "And to there seize, secure, tabulate and make return..." Accordingly, when Meredith seized (extracted) the data of the Samsung phone, the scope of the warrant was exceeded. Indeed, the fact that the Samsung was not particularly linked to a person or criminal activity, it is highly probable the judge declined to authorize seizure of this phone's data.

Even if one could say the affidavit authorized seizure of the Samsung's data, such claim does not suffice to save the warrant. The judge did not allow seizure of anything from the Samsung specifically and officers must abide by what is authorized by the warrant. Moreover, the affidavit only lists an "above-described cellular device" under the "And to there seize, secure, tabulate..." Thus, by seizing data from the Samsung Meredith exercised discretion that is not allowed under the particularity requirement and exceeded the scope.

b. Even Assuming the Affidavit Authorized Seizure of Data From the SAMSUNG, MEREDITH SEIZED Data Beyond What Was Authorized

Even if the Government claims the "above-described cellular device" referenced in the affidavit under the "And to there seize..."

statement, describes the Samsung sufficiently it only states it and "associated accounts used to send, receive, capture, or store electronic messages." Accordingly, it states that only the phone itself can be seized and associated accounts used to send, receive, etc. electronic messages, not the actual messages themselves. The CCU Report shows that Meredith seized data from inside the device and beyond just accounts. Indeed, even if one said that electronic messages could be received, much more than communications were seized. Photographs, videos, contacts, and other data beyond communications were seized and thus, Meredith exceeded the scope of the warrant.

c. Even if Data Beyond What is Described Above in Subsection b Could be Seized Meredith Went Beyond the Scope by Seizing Data Other Than Evidence of PWID and FTD-Illegal Sale/Use

The CCU Report states Media Classification was used on the Samsung's extraction to isolate Photo IDs and 994 images were isolated. It then states that 113 contacts were exported for the investigator to review and Device Connectivity and Network stats showing the Network name that grants internet access. While the 994 isolated images may relate to fraud the Network name for internet access is beyond the warrant's scope, and so are the contacts. The CCU Report claims that the Telegram App on the Samsung was

open to chats discussing fraud, but only 8 of the 113 contacts were from Telegram. Accordingly, the remaining contacts should not have been exported.

Further, the CCU Report states videos and photos of potential relevance were exported for review. However, the data exported (seized) was turned over to MSP Gensterblum and there were supposed videos of a vagina being digitally penetrated and Minor 1 nude in the shower. These are not potentially relevant to FTD-Illegal Sale/Use or PWID. Even though the CCU Report only mentions Telegram containing chats about fraud, it states Messages and Chats were exported for review without reference to relevance of any crime. Thus, the extraction (seizure) and export of all the data on the phone exceeded the warrant's scope. Indeed, Gensterblum claims to have "come across" this sexual conversation between Mr. Kuhl and Minor 1 that was in no way related to fraud or PWID.

## VII. CONCLUSION

Seeing as the grounds above clearly show that the search warrant of Wyoming PD did not adhere to the protections and ~~gaur~~ guarantees of the Michigan and U.S. Constitutions, and was contrary to clearly established Michigan law under Hughes, all data/evidence obtained under such is fruit of the poisonous tree and must be suppressed. Due to this evidence being the sole factor

leading to the MSP CSC/CSAM investigation, and this federal case being founded upon such investigation, the entirety of the evidence the Government intends to prove its case with is derived from the tainted evidence unlawfully obtained by Wyoming PD. Accordingly, the evidence seized under the MSP search warrant and interview of Minor 1, as well as the evidence obtained from Defendant's Facebook and cell phones by the federal government must all be suppressed. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963).

Although Mr. Kuhl asserts that this motion itself establishes grounds for the relief requested, if the Court feels that further inquiry is necessary Defendant asks that an evidentiary/Franks hearing be held on this matter.

Respectfully submitted,

S. Kuhl 5/15/25

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349

S. Kuhl 6118951O
1035 James
P.O. Box 845
White Cloud, MI 49349



Clerk of Court
U.S. Dist. Court
399 Fed. Bldg.
110 Michigan NW
Grand Rapids, MI 49503

THIS MAIL HAS ORIGINATED
FROM THE NEWAYGO COUNTY JAIL