# EXHIBIT 4

Pages from Logan Koepke's Mass Extraction: The Widespread Power of Law Enforcement to Search Mobile Phones

analyze, and present data that's stored on the phone.[3] As one expert puts it, with the amount of sensitive information stored on smartphones today, MDFTs provide a "window into the soul."[4]

Law enforcement agencies of all sizes across the United States have already purchased tens of millions of dollars worth of mobile device forensic tools. The mobile device forensic tools that law enforcement use have three key features. First, the tools empower law enforcement to access and extract vast amounts of information from cellphones. Second, the tools organize extracted data in an easily navigable and digestible format for law enforcement to more efficiently analyze and explore the data. Third, the tools help law enforcement circumvent most security features in order to copy data.

The proliferation and development of mobile device forensic tools in large part mirrors the adoption of smartphones across the United States. In 2011, only 35% of Americans owned a smartphone.[5] Today, it's at least 81% of Americans.[6] Moreover, many Americans — especially people of color and people with lower incomes — rely solely on their cellphones to connect to the internet.[7] For law enforcement, "[m]obile phones remain the most frequently used and most important digital source for investigation."[8] In many ways, mobile device forensic tools have helped to vastly expand police power in ways that are rarely apparent to communities.

In 2014, the Supreme Court decided *Riley v. California*, holding that the warrantless search of a cellphone incident to an arrest was unconstitutional.[9] As a result, today law enforcement need a warrant to search a cellphone.[10] Since this landmark decision, the public debate surrounding

3 There are a surprisingly large range of tools that can serve these purposes: some work to get easily accessible data on all popular phones, and some are tailored to specific systems or phones; some can be purchased and used as much as police want, and others cost per-use or can only be used so many times.

4 C.M. "Mike" Adams, "Digital Forensics: Window Into the Soul," Forensic, June 10, 2019, available at https://www.forensicmag.com/518341-Digital-Forensics-Window-Into-the-Soul/.

5 Pew Research Center, "Mobile Fact Sheet," June 12, 2019, available at https://www.pewresearch.org/internet/fact-sheet/mobile/.

6 *Id.* (Noting 96% own a cellphone of some kind.)

7 Camille Ryan, U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau, "Computer and Internet Use in the United States: 2016," American Community Survey Reports, August 2018; Jamie M. Lewis, *Handheld Device Ownership: Reducing the Digital Divide?*, March 2017, https://www.census.gov/library/working-papers/2017/demo/SEHSD-WP2017-04.html.

8 Cellebrite Annual Industry Trend Survey 2019: Law Enforcement, at 3.

9 Riley v. California, 573 U.S. 373 (2014). In this case, police searched two individuals' cellphones after they had been arrested: David Riley in August 2009 for driving with expired registration tags, and Brima Wurie in September 2007 for allegedly making a drug sale. In both cases, police officers at first manually examined the phones at the police station — scrolling through contact lists, and looking through videos and pictures. Police did not obtain a warrant to search either phone. *See* People v. Riley, D059840 (Cal. Ct. App. Feb. 8, 2013) https://casetext.com/case/people-v-riley-263; United States v. Wurie, 728 F.3d 1 (1st Cir. 2013) https://casetext.com/case/united-states-v-wurie-4.

10 Riley v. California, 573 US 373 (2014).

Despite the widespread proliferation of these tools, there is almost no public accounting of how often or in what kinds of cases law enforcement use these tools. The under-the-radar adoption of these tools also means that there has been little public debate about the risks of these tools and how they shift power to the police.

The records we obtained through our public records requests demonstrate that law enforcement use mobile device forensic tools as an all-purpose investigative tool for a wide array of cases. Law enforcement use these tools to investigate not only cases involving major harm, but also for graffiti, shoplifting, marijuana possession, prostitution, vandalism, car crashes, parole violations, petty theft, public intoxication, and the full gamut of drug-related offenses. Few departments have detailed policies governing how and when officers can use this technology. Most either have boilerplate policies that accomplish little, or have no policies in place at all.

This report proceeds as follows. In Section 2, we describe the precise technical capabilities of mobile device forensic tools. With that technical background, in Section 3, we then trace the widespread proliferation of mobile device forensic tools throughout local law enforcement agencies nationwide. Next, in Section 4, we show how agencies routinely use these tools, even for the most mundane cases. In Section 5, we explain the unconstrained nature of these uses, especially as most agencies have no specific policies in place. Finally, we offer policy recommendations for state and local policymakers in Section 6.

This report seeks to not only better inform the public regarding law enforcement access to mobile phone data, but also to recenter the conversation on how law enforcement's use of these tools entrenches police power and exacerbates racial inequities in policing.

# A Primer

Mobile device forensics is typically a two-step process: data extraction, then analysis. MDFTs help law enforcement accomplish both.[17] An MDFT is a computer program and its supplemental equipment (*e.g.*, cables, external storage) that can copy and analyze data from a cellphone or other mobile device.[18] The software can run on a regular desktop computer, or on a dedicated device like a tablet or a "kiosk" computer. These tools are sold by a range of companies, including Cellebrite, Grayshift, MSAB, Magnet Forensics, and AccessData.

The investigator initiates the extraction process by plugging the phone into the computer or tablet. With Cellebrite software (which is similar to other tools), once the tool recognizes the phone,[19] it will prompt the investigator to choose the kind of extraction to be performed, and, sometimes, the categories and time range of data to be extracted, as shown in Figures 2.1 and 2.2.[20] Often, in order to extract data, tools may bypass a phone's security features by taking advantage of security flaws or built-in diagnostic or development tools.

In essence, to extract data from a device, some methods work with the phone's built-in features, while others work around them. Circumventing the phone's built-in features usually entails more data access, but any extraction method can be invasive because of how much data people store on their phones.[21]

17 In order to assess the technical capabilities of current mobile device forensic tools, we reviewed technical manuals, examined software release notes, marketing materials, webinars, and digital forensics blog posts and forums. We also visited the office of one of the few public defenders in the US with these forensic tools (and forensic staff) in-house.

18 We borrow the umbrella term "mobile device forensic tools," from the National Institute of Standards and Technology. *See* NIST, *Mobile Security and Forensics*, *available at* https://csrc.nist.gov/Projects/Mobile-Security-and-Forensics/Mobile-Forensics. ("When mobile devices are involved in a crime or other incident, forensic specialists require tools that allow the proper retrieval and speedy examination of information present on the device. A number of existing commercial off-the-shelf (COTS) and open-source products provide forensics specialists with such capabilities.")

19 Typically, the tools either detect what kind of phone has been connected, or allow law enforcement to look up the kind of phone by its brand or model number. Some rarer phones running Android, Windows, and other operating systems may not be supported, but the vast majority of phones used in the US are.

20 Display of the categories and time range of data is highly fact-specific, dependent on phone make, model, operating system version, settings of the device, and extraction type. This feature is sometimes available, but not always.

21 We make these distinctions to give a sense of how the tools work and to explain how searches can technically be limited in scope based on the physical state of data when it is copied.

**Figure 2.8**



*Figure* ***2.8*** *shows a screenshot of Cellebrite Analytics, now called Cellebrite Pathfinder, which infers a social graph based on communication events. This graph shows the participants of communications extracted from the phone, as well as a histogram of communication volume over time.*[49]

Ultimately, MDFTs offer law enforcement a powerful window into almost all data stored on — or accessible from — a cellphone, as well as substantial amounts of data that users cannot see. These tools are invasive, especially for people who depend on their phone for internet access because they do not have a computer or broadband.

49 Heather Mahalik, Cellebrite Blog, "When Data Overwhelms You, Cellebrite Pathfinder Empowers You With Actionable Insights," March 19, 2020, *available at* https://www.cellebrite.com/en/ask-the-expert/when-data-overwhelms-you-analytics-empowers-you-with-actionable-insights/.

**Figure 2.9**




***Figure 2.9** sshows Cellebrite Pathfinder, which allows investigators to perform an image-based search using pre-generated filters, like "Flags," "Faces," "Drugs," "Weapons," or "Tattoos." The software also has features, shown at the top, such as "Timeline" (for viewing events on the phone chronologically), "Graph" (to make a social network graph of contacts and communications), "Map" (to display all phone events and media with location data on a map), "Gallery" (to view all media like photos and videos in one place regardless of source), and "Persons" (to view profiles of discrete users on the phone).*[53]

MDFTs can also apply these visualization features to data from multiple phones or other data sources together, to find links across the devices, like common contacts, call or text records, or account information. They can even look for common geolocation or purchase data between phones, to show that the phones were at some point near each other, say, to buy things at the same place and time. What might otherwise take weeks to do manually can be done automatically.

53 Cellebrite, "Cellebrite Pathfinder," *available at* https://www.cellebrite.com/en/pathfinder/.

a BFU extraction by Oxygen Forensic Detective.[68] There are thousands of files available, and as one software reviewer highlights: "Yes, all this data is from BFU extraction. Pay attention to the 'Image Categorization' – this [is] the new built-in feature . . . that allows [you] to detect, analyze, and categorize images from twelve different categories, such as weapon, drugs, child abuse, extremism and more."[69]

**Figure 2.10**




*Figure 2.10 shows the result of a "Before First Unlock" extraction by Oxygen Forensics Detective on an Apple iPhone running iOS 12.4. The software detects thousands of files, including 11,000 Telegram files, 712 Discord files, 11 Apple Notes files, 53 Contacts files, 144 files from Google Mail, 26 files from Apple Wallet, and 13 files marked as "Accounts and Passwords."*[70]

68 Vladimir Katalov, "BFU Extraction: Forensic Analysis of Locked and Disabled iPhones," December 20th, 2019, Elcomsoft Blog, https://blog.elcomsoft.com/2019/12/bfu-extraction-forensic-analysis-of-locked-and-disabled-iphones/.

69 *Id.*

70 Vladimir Katalov, Elcomsoft Blog, "BFU Extraction: Forensic Analysis of Locked and Disabled iPhones," December 20, 2019, *available at* https://blog.elcomsoft.com/2019/12/bfu-extraction-forensic-analysis-of-locked-and-disabled-iphones/.

Map 1



***Map 1** shows the proliferation of MDFTs across agencies in the United States. Each dot represents an agency that has purchased at least one MDFT based on our records. We believe many more agencies in the U.S. have purchased MDFTs than the ones we were able to identify.*

considered the most advanced iPhone extraction device — costs between $15,000 and $30,000.[88] Cellebrite products vary in cost, but a UFED product costs about $10,000, with a $3,000 to $4,000 annual license fee. The level of spending documented below would allow a law enforcement agency to buy dozens of licenses for different kinds of MDFTs each year, such that they could extract data from numerous phones every day.

88 The $15,000 unit is an "online" version, which permits 300 uses. The $30,000 "offline" version permits unlimited use.

# Almost Every Major Law Enforcement Agency Has These Tools

From documents we've obtained, it is clear that the vast majority of large U.S. law enforcement agencies have purchased or used a range of MDFTs. They include:

- Every one of the 50 largest local police departments,
- State law enforcement agencies in all 50 states,
- At least 25 of the 50 largest sheriff's offices and,
- At least 16 out of the 25 largest district or prosecuting attorneys' offices.

These departments have spent hundreds of thousands of dollars on these tools. For example, the Las Vegas Metropolitan Police Department has spent at least $640,000 on MDFTs, the Miami-Dade Police Department has spent at least $330,000, the San Diego Police Department has spent

Map 3




***Map 3** displays the total amount of money that law enforcement agencies that responded to our public records requests have spent on MDFTs since 2015. Some agency amounts are "unknown" if their response indicated they purchased MDFTs, but did not share with us specific purchase orders or invoices. Appendix C contains the full data underlying this map.*

Other policies ask officers to seek broad search authority from the courts, and only to narrow their search when making internal requests to forensic examiners. For example, the Indianapolis Metropolitan Police Department directs officers requesting forensic analysis to describe "the evidence you expect to recover from the exam. Be specific as to what information the examiner should search for, such as 'Evidence of Dealing Narcotics' . . . [d]on't list types of data (e.g. call log, text, email, etc. . . .) as *your search warrant should cover all data*."[149] Similarly, the Jacksonville Sheriff's Office policy notes that failing to provide "details of the investigation and what detailed information the detection seeks from a forensic analysis . . . will greatly increase the processing and analysis time."[150] In other words, to the extent that law enforcement policies do speak to narrow forensic searches, they do so with reference to productivity and efficiency, not legal authority or constitutional protections.

Relatedly, few policies provide guidance on what examiners should do if they encounter potential evidence of another crime that is not detailed in the initial search warrant. Using a search warrant to look for digital evidence of one potential crime, only to then search for digital evidence of a completely separate crime, raises serious constitutional questions. This practice and limitation is crucial, because without it, law enforcement could go on a "fishing expedition" in search of evidence of any crime, far beyond the original justification for a search. We observed only two policies that provided any guidance on this point.[151]

The risk of overbroad searches is especially worrying given the fact that it's nearly impossible for those outside of law enforcement — such as a defense lawyer — to repeat the steps that a forensic examiner took and to audit the scope of a search.[152] A handful of agency policies do require examiners to document how a search was conducted, but the level of documentation required is still unlikely to allow a defense lawyer to meaningfully audit a search.

149 *See* Indianapolis Metropolitan Police Department, Request Form for Mobile Device Forensics, https://beta.documentcloud.org/documents/20391585-mobile_forensics_request_form_02-20-2019. (emphasis added)

150 *See* Jacksonville Sheriff's Office, Computer Forensic Investigations, Order 392, https://beta.documentcloud.org/documents/20392554-redacted_upm_392_computer_forensic_investigations_.

151 For example, the Santa Clara District Attorney's Office advises that if an "[e]xaminer discovers evidence of another crime(s) that is outside the scope of the submitted search warrant, the Examiner may continue the examination for items named in the warrant. The Examiner should contact the submitting agency and/or the prosecutor handling the case for guidance before conducting any searches for evidence not named in the original warrant." *See* Santa Clara District Attorney's Office, Santa Clara County Crime Laboratory Computer Forensic Standard Operating Procedures, https://beta.documentcloud.org/documents/20394644-2019-08-19-pra-resp-email-att-standard-operating-procedures-rev-26-112820181. As another example, the San Diego Police Department says that if "an examiner discovers evidence of another crime(s) that is outside the scope of the submitted legal authority, the examiner will notify the assigned prosecutor and/or submitting investigator of the discovery and nature of any evidence of other crime(s) outside the scope of the original search warrant." *See* San Diego Police Department, Forensic Technology Unit Manual, https://beta.documentcloud.org/documents/20392583-forensic-technology-unit-manual-082218-current.

152 Repeatability refers to obtaining the same results when using the same method on identical test items in the same laboratory by the same operator using the same equipment within short intervals of time. Reproducibility refers to obtaining the same results being obtained when using the same method on identical test items in different laboratories with different operators utilizing different equipment.