UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIG

FILED - GR
May 22, 2025 12:36 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW SCANNED BY: JW 5-22

UNITED STATES OF AMERICA,

Plaintiff,

v.

SAMUEL ALEXANDER KUHL,

Defendant.

Case no. 1:23-cr-44

Hon. Jane M. Beckering

# MOTION TO SUPPRESS EVIDENCE

Defendant now comes before this Honorable Court seeking suppression of all evidence in this case. Suppression is necessary because evidence derives from the unlawful seizure and arrest of Mr. Kuhl. The investigations of MSP and the FBI exploited the unlawfully obtained seizure and arrest by using the phones seized as a result to build its case. Accordingly, the entirety of the investigations and evidence underlying this case are tainted beyond exception and must be suppressed.

Attached is a supporting Memorandum of Law.

# MEMORANDUM

## BACKGROUND

On November 20, 2021, Indiana authorities were contacted by a woman who claimed her daughter from Michigan was possibly being held against her will in a vehicle traveling on the highway. The police located a vehicle matching the description of that in which the daughter may be in. Officers attempted to stop the vehicle and a chase ensued which ended in a head on collision between a police cruiser and the suspect vehicle.

Upon investigating after the crash, the police found out it was only a dispute in the vehicle and not a kidnapping. A search of the car yielded 5 cell phones, approximately 30 debit cards, and a firearm. 2 of the cell phones belonged to Defendant and at least 1 of them is at issue in this case. Accordingly, Mr. Kuhl was in the vehicle and left at the time of the crash under the impression he had possession of his both iphone and Samsung phones.

On or about December 4, 2021, Indiana State Police mailed the cell phones to FBI Special Agent Brent Johnson in Portage, Michigan. All of this was unknown to Mr. Kuhl who assumed the phones had fell from his hoodie pocket while in the woods. Indeed, Mr. Kuhl had asked his attorney in Indiana, Jesse ~~Hap~~ Harper, if his phones had been located as well as his car keys, but Mr. Harper claimed there was no mention of either.

Immediately upon being released, Mr. Kuhl transferred the same

number and information from both of his lost cell phones to new phones. One phone was an iPhone 12 Pro Max and the other a Samsung Galaxy S21. Both of these phones were searched by Special Agent Buttery of the FBI on 6/29/22 in relation to a fraud investigation, and again on 1/25/23 in relation to the instant case.

This fraud investigation also resulted in at least 2 of Mr. Kuhl's Facebook accounts being searched by SA Buttery pursuant to a federal search warrant authorized on March 8, 2022. One of these Facebook accounts was later authorized to be search pursuant to a search warrant on February 8, 2023 in relation to the instant case. Both the search warrants of 1/25/23 and 2/8/23 were predicated on and derived from the evidence and information relayed to SA Buttery from Michigan State Police (MSP) Detective Gensterblum. Gensterblum entire knowledge and evidence is a result of exploiting Mr. Kuhl's unlawful seizure and arrest by Wyoming PD of Wyoming, Michigan. The Wyoming incident is the basis of this entire case and the focus of this motion.

On October 13, 2022, a Wyoming City police officer conducted a traffic stop on a vehicle that was driven by Shaquan Coleman. Mr. Kuhl was the only passenger seated in the rear on the passenger side. Eventually backup was called to the scene and asked Mr. Kuhl to exit the vehicle so he could be detained while they searched. Mr. Kuhl got out of the car and reached

back inside and grabbed one of his phones without incident. Defendant reached back inside to grab his second phone and the police told him to stop and Mr. Kuhl stated he was just grabbing his phone. The officers pushed and pulled him in separate directions and were upset Mr. Kuhl had continued to reach for his phone.

Officer Pfingsten, who was currently being trained, frisked Kuhl for weapons and stated Kuhl was being detained while they searched the car. At this time Defendant was placed in the backseat of the cop car. The officers said that Mr. Kuhl was not under arrest but only detained multiple times. However, eventually Pfingsten arrested Defendant for "hindering."

Once transported to the jail, Mr. Kuhl was informed by Officer Tromp that Kuhl was charged with a misdemeanor for disobeying a lawful command and a felony for possession with intent to deliver marijuana. The following morning Mr. Kuhl was taken to a hospital for a medical emergency and released due to the prosecutor declining to pursue either charge. However, the jail claimed not to have either of Defendant's phones and Wyoming PD would not release them.

Unbeknownst to Defendant, Wyoming PD Det. April Kroschel had applied for a warrant to search both of Kuhl's phones, as well as Coleman's phone. The warrant was executed by Internet Crimes Against Children (ICAC) Sgt. Meredith.

Upon searching the Samsung phone belonging to Kuhl, Meredith claims to have discovered evidence of fraud and turned the phone, and a flash drive containing its contents, to Det. Gensterblum of the MSP.

While Gensterblum was reviewing the Samsung's contents he claims, inconsistently, that he came across images of possible CSAM or a text conversaition indicating possible sexual contact with a minor. Whichever it truly was, Gensterblum opened a CSC/CSAM investigation alongside the fraud investigation.

On November 2, 2022, Mr. Kuhl was going through trial in the 9th Circuit Court of Kalamazoo County, Michigan for 2 counts of felony firearm, one count of felon in possession, and one count of assault with a dangerous weapon. During a recess taken before closing arguments, Mr. Kuhl left and did not return. The following day, 11/3/22, Kuhl was arrested and lodged at the Kalamazoo County Jail on a bench warrant for leaving trial which resulted in a guilty verdict on all 4 counts.

While in the Kalamazoo County Jail, SA Buttery was listening to Mr. Kuhl's phone calls. One of these calls was made to the law office of attorney Christopher Trainor where Mr. Kuhl sought help in bringing a lawsuit against the Wyoming police officers for unlawful arrest. Due to SA Buttery hearing this call in pursuit of his ongoing fraud investigation into Mr. Kuhl, Buttery told his sidekick, Kalamazoo Police Officer and FBI Task Force Officer

(TFO), John Stolsonburg about a possible case in Wyoming, Michigan.

Accordingly, Stolsonburg reached out to Wyoming PD and learned of the arrest, the debit cards and phones taken from Mr. Kuhl, and that the phones had been turned over to MSP due to the discovery of evidence indicating fraud. Stolsonburg then made contact with MSP and learned of both the fraud and CSAM investigations into Mr. Kuhl. Gensterblum gave Stolsonburg a copy of the flash drive containing the contents of Kuhl's Samsung phone, which Stolsonberg gave to Buttery who put the flash drive in evidence pending a federal search warrant for CSAM.

So, as you can see, the entirety of this case exploited Kuhl's unlawful seizure and arrest by Wyoming PD on 10/13/22. Had Kuhl not been arrested, no cards would have been seized nor his 2 cell phones. Thus, none of the evidence leading to the MSP investigation, and eventually this federal indictment would've been discovered if not for Kuhl's unlawful arrest. Due to this case's entirety of evidence deriving from the exploitation of an illegality all the evidence must be suppressed.

## ARGUMENT

1. The traffic stop was unlawfully extended in both scope and duration

Legal Standard

"If an officer can complete traffic-based inquiries expeditously, then that is the amount of time reasonably required to complete the stop's mission." Rodriguez v. United States, 575 U.S. 348, 358, 135 S. Ct. 1609 (2015). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355, citing Delaware v. Prouse, 440 U.S. 648, 658-60 (1979). "[A] traffic stop prolonged beyond that point is unlawful." Rodriguez, 575 U.S. at 358.

"Because there is no de minimis exception to this rule, even incremental extensions beyond the time reasonably necessary to complete a traffic stop are unlawful." United States v. Brown, 23-3657 at 5 (6th Cir. Sep. 19, 2024); see also United States v. Lott, 954 F.3d 919, 924 (6th Cir. 2020) ("Even minor police actions aimed at detecting evidence of ordinary criminal wrongdoing or any purpose beyond addressing the traffic infraction are not tasks incident to the stop.") "Good faith alone on the part of police is insufficient to justify an intrusion." Brown, 23-3657 at 4, citing Terry v. Ohio, 392 U.S. 1, 22 (1968).

"Importantly... 'prolonging' includes any extension of time, no matter how minimal." United States v. Malone, 2:23-CR-00120-11-JRG-CRW (E.D. Tenn. Sep. 13, 2024) (quoting United States v. Alderson, 3:21-cr-00068, 2022 U.S. Dist. LEXIS 144379, at 11 (M.D. Tenn. Aug. 12, 2022)). "If an officer exceeds the scope or duration of the traffic stop, he

must have 'reasonable suspicion' to continue the stop on unrelated grounds." United States, v. Whitley, 34 F. 4th 522, 529 (6th Cir. 2022). Reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch." Id. at 532, quoting United States v. Sokolow, 490 U.S. 1, 7 (1989).

As the Sixth Circuit held in Whitley, it is not a question of "when a detour took place, we look at 'what the police in fact d[id]' and whether it related to the purpose of the traffic stop. Thus, if the stopped party can show 'either that the [police activity] was not tied to the infraction or that the traffic stop reasonably should have been already completed,' then the traffic stop has been prolonged and independent reasonable suspicion is required." Id at 531-32, quoting Hernandez v. Boles, 949 F. 3d 251, 257 (6th Cir. 2020).

a. Officer Bernard Unlawfully exceeded the Scope and Duration of the Initial stop.

Coleman and Kuhl were at a gas station in Wyoming, MI at approximately 7:35 pm on 10/13/22 and it was dark outside. At some point Coleman went to urinate on the side of the gas station due to it having no public restroom. As Coleman was attempting to urinate, Officer Bernard pulled into the parking lot and Coleman immediately abandoned his attempt. Coleman walked directly beside and across the front of Bernard's patrol car to get back to his vehicle. Coleman

took a few minutes to discard some trash from his car then got in the driver seat and left the gas station. Kuhl never got out of the car and was seated in the backseat on the passenger side.

Upon leaving the gas station, Bernard followed Coleman's car and conducted a traffic stop shortly after. Bernard came to the rear passenger window where Mr. Kuhl was sitting and knocked on the window indicating to roll it down. Once down Bernard stated he stopped the vehicle for tinted windows and Coleman said "aww tinted windows?" Bernard answers in the affirmative, steps to the front passenger window and asks for it to be rolled down. Coleman immediately hands Bernard his ID and Bernard stated "just tinted windows don't worry no ticket from me." Coleman stated he doesn't care about no tinted windows and he and Bernard discuss the window tint laws in Michigan for about 30 seconds.

Bernard then asks Coleman if he is the owner of the car and Coleman answers in the affirmative. Bernard then asks if Coleman if he has paperwork for the car, registration and insurance. Coleman reaches and grabs the paperwork and immediately hands it over the passenger seat out of the passenger window for Bernard to grab. However, Bernard turns to look at Kuhl in the rear and asks Kuhl if he has ID as well. This is the first instance of Bernard exceeding the scope and duration of the stop. Instead of grabbing the vehicle's insurance and registration, Bernard diverted his attention and took time to question Kuhl for ID without any reasonable

suspicion Kuhl was involved in criminal activity, nor that any criminal activity was afoot.

At this point Kuhl asked if he had to have an ID on him and Bernard answered, "I was just curious, nope." This took about 5 seconds and at this time Bernard turned back toward Coleman and took the vehicle documents. While holding the papers Bernard looks at them but also continues to stop and ~~his~~ shine his flashlight back towards Coleman to ask "what you guys up to, just hanging out?" Bernard continues to ask questions as to where they're from and what they're doing "way out here," although Wyoming is only about 20 minutes from Kalamazoo. Kuhl and Coleman state they were just out there to see some girls.

This continuous stopping of looking at the documents and asking questions unrelated to the tinted windows exceeded the scope and duration of the traffic stop. Bernard cannot portray that he is merely checking the vehicle's documents but truly holding them unnecessarily to ask unfettered questions unrelated to the mission of the stop. Indeed, when Bernard first stopped the vehicle he stayed in his car for over a minute to check the vehicle's information by running the plate. Accordingly, this is the second instance of exceeding the scope and duration of the stop.

Right after telling Bernard that they had been in the area seeing some girls, Coleman's phone rang and he answered the call. At this point Bernard just seems to be staring at Coleman on the phone and Coleman

asks Bernard, "am I good?" Bernard seems to stammer as he replies "oh yeah, no I uhh just wanted to know is anything illegal in the car?" Guns, drugs, knives, bazookas anything crazy like that?" Coleman replies "no sir." Bernard then says "okay. no. Sooo let me run this make sure everything's good to go and then uhhh I'll be back with you and we'll get y'all outta here okay?"

The delay by Bernard doing nothing while Coleman is on the phone with his mother telling her to hold on because he is pulled over, to the questions about anything illegal being in the car, was the third instance of Bernard exceeding the scope and duration of the stop. There was no reasonable suspicion anything illegal was in the car; there was no relation between such questioning and window tints.

Bernard turned and began to start walking back to his vehicle, stopped turned around and stepped back to Coleman's window. At this point Bernard says "one more thing, what were you doing on the side of the propane?" Coleman tells Bernard that he was going to pee but Bernard scared him pulling in. Bernard replied that he thought that was what going on and asked if the gas station had a public restroom. Coleman stated that they do not and Bernard says he was just curious about that and that he'll be right back.

Asking Coleman about being on the side of the gas station was the fourth instance of Bernard exceeding the scope and duration of the stop. Indeed, Bernard had plenty of time and oppurtunity to question Coleman about this matter at the gas station.

b. Bernard Unlawfully Continued Kuhl's Detention

After Bernard went back to his car to check Coleman's ID, he returned to the driver window where Coleman was seated and asks Coleman to step out real quick. Bernard tells Coleman to set the phone on the top of the car and tells Coleman to place his hands behind his back. Bernard says "you can't be driving man." At this point you hear Coleman's mother through the phone say "let me come get my car," and Bernard says "lets just hang that up" and ends the call.

Coleman asks if he has to go to jail for driving and Bernard says "no uhh we just gotta do all this so I'm gonna cuff you up and put you in the backseat real quick." Before taking Coleman back to the car he asks Kuhl again if Kuhl has ID because he doesn't want to tow the car and if Kuhl has ID then he can just drive and Kuhl and Coleman can be on their way. Kuhl tells Bernard no and Bernard says "nooo," in a questioning manner and again Kuhl says "No. I'm free to leave?" Bernard does not reply and takes Coleman back to the patrol vehicle.

At this point Kuhl should have been free to go on his way. Not only that, Bernard had no right to impound the vehicle seeing as Coleman's mother, the owner of the car, was on the phone trying to come get her vehicle. Moreover, the vehicle was not in the roadway or on private property. Indeed, attached to this motion is Order Number 400.V.1, which is the Vehicle Disposition/Impound Policy for Wyoming

PD. On page 4 of this Order Number is Section Q "Arrest of a driver in lawful possession of a vehicle" which contains 3 subsections:

1) If the driver is going to be lodged either by this department or another, the responsibility for the vehicle falls on the arresting officer.*

2) Using time and convenience as considerations, the arresting officer should have the vehicle turned over to the designee of the arrested person if one is readily available. If this is not possible, the vehicle shall be impounded if the vehicle is in the roadway or on private property.

3) If the vehicle is legally parked and not on private property, the owner may authorize us to leave it at the scene. The vehicle should then be locked and the keys given to the arrested person. This information shall be included in the officer's written report.

Firstly, Bernard claims that Coleman was not being arrested for driving while license revoked (DWLS). Indeed, officers do not typically arrest or even detain people for such offense. Usually they give a warning and tell the person to drive the car somewhere close and park it or tell them to call a licensed driver to come drive the vehicle and leave the scene. Sometimes officers will write a ticket. Mr. Kuhl has been personally involved in such situations on at least 5 different occasions and never once was the driver arrested. Twice as the driver, and three times as a passenger. Accordingly, Coleman was not

even under arrest supposedly and thus, there was no justification to impound the car.

While one may claim that Kuhl lacks standing to challenge the detention of Coleman or the impounding of his vehicle, such a claim fails because Coleman's sham detention and vehicle impoundment was a pretext to unlawfully extend the detention of Mr. Kuhl to investigate his identity. Indeed, after Bernard came back from putting Coleman it the back of the patrol vehicle, he asked through the open driver door "so you do not have, is your, do you have, you don't have an ID?" Kuhl responds "I don't wanna ID myself I'm not committing a crime I shouldn't have to." Bernard then ask if Coleman is Kuhl's buddy and states that he is trying to not have the car towed. Bernard then asks if Kuhl has a valid license and Kuhl says that he does not and asks if he can go. Bernard responds "alright just give me one second."

At this point Kuhl has tried to leave twice, once when Coleman first got cuffed by Bernard for DWLS and again when he told Bernard that he did not have a valid license. Instead of focusing on issuing the ticket to Coleman for DWLS and allowing Coleman to have his mother or another designee come to drive the vehicle, Bernard diverted his attention once again to Kuhl's identity, and thus unlawfully exceeding the scope and duration of the stop.

Additionally, as noted above, Bernard used the sham detaining of Coleman for DWLS and vehicle impoundent as a pretext to detain

Kuhl longer, absent reasonable suspicion, to investigate Kuhl's identity and ordinary criminal wrongdoing.

"In general, a police officer may arrest without a warrant anyone who commits an offense in his presence," but this rule is "however, subject to restriction and limitation where the arrest is a sham, or where the search exceeds permissible bounds." Hill v. United States, 418 F.2d 449, 452 (D.C. Cir. 1968) citing Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961) and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420 (1932).

"Presumably, should an arrest be made solely as a pretext to bonduct (sic) a search, that search would not be in accordance with regular departmental procedure. Certainly, the lower courts have firmly refused to allow evidence gathered from such a search to be used against the defendant." United States v. Cupps, 503 F.2d 277 n.13 (6th Cir. 1974) citing Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968).

Upon cuffing Coleman and before placing him in the back of the patrol vehicle, Bernard completely searched Coleman's person. Such a search was unnecessary because, again, supposedly Coleman was not under arrest and officers are not to search people who aren't under arrest. All of this is occurring while Kuhl is continuously being detained unlawfully in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as Sections 11 and 17 of the Michigan Constitution's Article 1.

Furthermore, the decision to impound a vehicle must be "exercised according to standard criteria and on the basis of

something other than ~~crimi~~ the suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375-76, 107 S. Ct. 738 (1987); see also People v. Towns, 351931 at 3 (Mich. App. Dec. 10, 2020) ("Compliance with established departmental procedures is necessary to prevent police officers from using inventory searches as a 'ruse for general rummaging in order to discover incriminating evidence.'") (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

Moreover, Kuhl's presence was not required for Bernard to conduct an inventory search and impound the vehicle. See People v. Blair, 347885 (Mich. App. Oct. 29, 2019) (allowing passenger to leave after driver was arrested, but before inventory search because passenger did not have a valid license); see also Commonwealth v. Roscoe, J-S04038-15, No. 751 MDA 2014 (Pa. Super. Ct. Apr. 6, 2015) (allowing driver and passenger to leave before conducting inventory search even though officers smelled marijuana); State v. Irelan, 375 N.J. Super. 100, 886 A.2d 1023 (N.J. Super. 2005) (passenger allowed to leave after driver was arrested for drunk driving but before inventory search).

When Coleman was removed from the vehicle for DWLS Mr. Kuhl should have been free to leave. When Bernard came back to the vehicle and asked Kuhl again about ID and a valid license, Kuhl should have been allowed to leave when he stated he did not have a valid license and asked to go. It was only after Kuhl did not identify himself, that Bernard decided to call his sergeant and move to search the vehicle. Nothing under the totality of the

circumstances established reasonable suspicion that Kuhl was committing or had committed any crime. Indeed, refusal to provide ID is not enough.

The Supreme Court has squarely held that law enforcement may not require a person to furnish identification if not reasonably suspected of any criminal conduct. See Brown v. Texas, 443 U.S. 47, 52-53, 99 S. Ct. 2637 (1979). Seeing as Mr. Kuhl had done nothing wrong there was no need or obligation for him to identify himself. People v. Murawski, 365852 (Mich. App. Oct. 26, 2023); see also United States v. Lang, 652 F. Supp. 3d 820, 833 (E.D. Ky. 2023) ("Only something more, added to the refusal to provide identification, can allow the refusal to help produce reasonable suspicion."); United States v. Chivers, 1:19-CR-119 (S.D. Ohio Sep. 28, 2020) ("A citizen's refusal to listen or answer does not, without more, provide reasonable grounds to suspect criminal activity."); Andrews v. Scott, 17-14377 (11th Cir. Apr. 5, 2018) ("Individuals are free 'verbally to oppose or challenge police action without thereby risking arrest.'") (quoting City of Houston, Texas v. Hill, 482 U.S. 451, 462-63 (1987)); United States v. Landeros, 913 F.3d 862, 870 (9th Cir. 2019) ("Regardless of whether the first request for [Kuhl's] identification was lawful, law enforcement's refusal to take no for an answer was not."); Risbridger v. Connelly, 122 F. Supp. 2d 857, 866-67 (W.D. Mich. 2000) ("this Court concludes that the Fourth Amendment precludes a police officer from compelling an individual subject to a Terry-type stop to

disclose his identity and that a state may not subvert the probable cause requirement, of the Fourth Amendment by penalizing an individual for his failure to do so").

Bernard describes the initial traffic stop in a misleading manner. Twice Bernard states that Shaquan "added" that he was the owner of the vehicle and that he was on his way to see some females. This infers that Coleman merely offered this information, when truly it was provided as answers to Bernard's questions. Also, Bernard lies and says that Coleman stated that he thought Bernard had stopped him for trying to urinate on the side of the gas station, when truly Coleman only stated he didn't know why Bernard had stopped him. Moreover, Bernard states that, after Coleman supposedly said he thought he'd been pulled over for trying to urinate, Coleman then handed Bernard his Michigan Identification card along with proof of insurance. Actually, Coleman immediately gave Bernard his ID as mentioned above, and later on Bernard asked for insurance and registration. Bernard misleadingly states what happened in a manner tailored specifically to try to defeat any claim that the duration and scope of the stop had been exceeded unlawfully.

Indeed, Bernard completely omits the fact that he tried multiple times to obtain Kuhl's identity unsuccessfully and that Kuhl had asked to leave twice. "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an

inquiry left unanswered would be intentionally misleading.'" United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977) (quoting United States v. Prudden, 424 F.2d 1021, 1033 (5th Cir. 1970)).

Furthermore, Bernard describes the "ARREST OF SHAQUAN AKIA COLEMAN" as the incident when he cuffed Coleman, searched him, and put him in back of the patrol vehicle. Nowhere does it state that Coleman was only detained. Bernard also omits that Coleman's mother tried to come get her car immediately and Coleman tried to have multiple people come get the car or leave it legally parked where it was.

Point being, Bernard repeatedly lied on the scene and within his report. Bernard did not follow the Wyoming PD Vehicle Impound/Disposition policy and procedure. Bernard unlawfully continued Kuhl's detention because he did not identify himself. As of this point Bernard had no grounds to justify not allowing Kuhl to leave.

Only after failing to obtain Kuhl's identity, Bernard decided to portray that he suspected possible marijuana delivery. As Coleman was being cuffed, Bernard claims to have seen several individually packaged bags of marijuana in the driver door pocket which runs along the bottom of the driver door. However, as shown by the MSP Procedure Manual Page 6 attached to this motion, "marijuana in a vehicle or otherwise possessed on one's person may not alone establish probable cause that marijuana is evidence of a crime or

contraband subject to seizure and shall not be seized under the plain view doctrine without additional facts."

Moreover, Bernard's tendency for dishonesty or bending the truth is displayed again. The door cubby within the driver door is very deep and you can see and hear Bernard's suprise as he removes the bags from the door's pocket. A larger bag is removed first which then reveals a few smaller bags underneath. Indeed, after Bernard failed to identify Kuhl and thus called the Sergeant, Bernard got back in his patrol car and told Coleman "so this is what's gonna happen we're gonna search the car." Coleman says "okay go ahead." Bernard says "you're cool with that?" Coleman says "hell yeah." However, Coleman does not know he has the right to refuse and at first Bernard said "listen so you're not off guard we're gonna search the car." Bernard doesn't ask Coleman to search the car, he says that's what he is going to do.

Bernard asks is there "anything in the car I should know about?" Coleman says its "just some marijuana in there." Bernard says "just that weed in the door panel I can see visibly?" Coleman states that he has some other little baggies of weed that are different flavors because he likes to smoke different kinds of weed. Bernard does not state that he saw several individually packaged bags of marijuana because he didn't. As mentioned above, the marijuana was tucked deeply in the door pocket and a larger bag rested over the top of a few smaller bags.

Indeed, Bernard deceitfully states in his portion of the police report that "Several photos of the evidence and where the evidence was located were taken on my department issued work phone." However Bernard did not take photos of where the marijuana was located. There is no photo of the marijuana in the door jam before it was removed. Instead, Bernard took all of the weed, regardless of where it was located and took a photo of it all together sitting in the driver seat and then spread out on the hood of Coleman's car.

Again, Mr. Kuhl only obtained these photos through his own investigation and due diligence. The Government only provided the Wyoming PD police report and the search warrant and affidavit, it took multiple FOIA requests and months for Mr. Kuhl to get these material photographs.

Further, Bernard tells Coleman that because of the weed in the door and the lump sum of money Coleman had he is going to search the car. One, as good old Fulton County DA Fani Willis claims, along with her father, keeping cash is a "Black thang" and indeed Coleman is African-American. Coleman tells Bernard that he doesn't even have $1000 on him and constantly told Bernard that he likes to smoke after work although Bernard never asked what Coleman did for work. Again, Bernard misleadingly states that Coleman "did not explain to me what he did for a living," but Bernard never asked.

Point being, Bernard only saw some marijuana in the driver

door cubby and could not tell if it was multiple individually packaged bags, let alone several. Indeed, as Bernard is removing the marijuana from the door pocket you can hear his astonishment as he digs deeper and finds more small bags of weed. Thus, Bernard based his reasonable suspicion to continuously detain Kuhl and Coleman at this point because of some weed and cash on Coleman. Some people, especially those from lower class society, rather see their money and be able to count it as it is spent and do not trust banks and/or debit cards. Indeed, it is easier to obtain card data and steal someone's money than it is to physically take cash from someone.

Regardless, Bernard told Coleman he was not worried about the weed. Indeed, this is why Bernard specifically asked Coleman if there was anything else in the vehicle Bernard should know about. Problem is, Bernard was asking all of these questions without Mirandizing Coleman. See People v. Nino, 344364 (Mich. App. 2021) (similar circumstances where officers arrested driver for reckless driving and asked if there was "anything in the vehicle we should know about" before Mirandizing the driver. The court found the broad question of a person in custody was investigative and because the driver had not waived his Miranda rights, the statement that marijuana was in the car was suppressed). Again, Bernard was not truly worried about the marijuana as he stated, instead Bernard was focused on continuing Kuhl's detention to actually investigate Kuhl's identity and to search for any criminal evidence based on an ill-defined hunch, not particularized objective facts.

Moreover, marijuana possession is legal for anyone 21 years of age or older in Michigan. The sight or "smell of marijuana, by itself, does not give rise to probable cause unless it is combined with other factors that bolster the concern about illegal activity that may flow from the smell of marijuana." People v. Armstrong, 344 Mich. App. 286, 300; 1 NW 3d 299 (2022). Indeed, one week prior to this incident, on October 6, 2022, former President Biden pardoned citizens "who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act." Thus, even under federal law during the Biden Administration, prosecution for marijuana possession was highly unlikely. Proclamation No. 10467, 87 Fed. Reg. 61441 (Oct. 6, 2022). Furthermore, Coleman did not lie about possessing the marijuana. See Armstrong at 298, distingushing People v. Moorman, 331 Mich. App. 481, 487-88; 952 N.W. 2d 597 (2020).

The Michigan Supreme Court recently upheld the Armstrong decision. People v. Armstrong, 165233 (Mich. Apr. 2, 2025). In doing so, the Court relied on the Michigan Regulation and Taxation of Marihuana Act (MRTMA). Indeed, the Sixth Circuit has held that activity deemed lawful by a state cannot be, by itself, enough to establish reasonable suspicion. Northrup v. City of Toledo Police Dept., 785 F. 3d 1128 (6th Cir. 2015).

By law, there was no crime Bernard could have had reasonable suspicion was occurring, let alone probable cause. MCL 333.27955 states that possessing, using or consuming, internally processing, transporting,

purchasing, or processing 2.5 ounces or less of marijuana is not grounds for seizing or forfeiting property, arrest, prosecution, penalty in any manner, search or inspection, or to deny an individual 21 or older, any other right or privilege. Moreover, Coleman's car was not readily mobile as Coleman was in custody and Kuhl stated he did not have a valid license. Indeed, such factor is required for the warrantless search of automobiles exception. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment... permits police to search the vehicle without more." Armstrong, 165233 at 11, quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

Again, one may claim that Kuhl has no standing to challenge the search of Coleman's car. However, Mr. Kuhl has standing to challenge his continued seizure by police to search the vehicle. Indeed, when officers Pfingsten and Tromp arrived as backup, they clearly state they are detaining Kuhl while they search the vehicle. Additionally, Bernard refused to let Kuhl leave when Bernard first cuffed Coleman before placing him in the patrol car and again when Bernard asked if Kuhl had a valid license.

Even if reasonable suspicion did exist as to Coleman, it did not extend to Kuhl. The weed that Bernard saw was in the driver door cubby out of sight and reach of Mr. Kuhl seated in the back on the passenger side. Defendant's "mere propinquity to [Coleman, who was] independently suspected of criminal activity does not, without more,

give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 86, 100 S.Ct. 338 (1979) (citing United States v. Di Re, 332 U.S. 581 (1948)).

Once officers Tromp and Pfingsten arrived, Bernard told them because of the weed in the door and the money on Coleman, they're going to search the car. Bernard states Kuhl is nervous, "his knees are shaking he's tweeking out." Bernard also says Kuhl isn't cooperating because Kuhl won't give Bernard his name and says to the backup officers "I don't know if you guys wanna detain him for the time being," talking about Kuhl. Tromp says "yeah, he's uncooperative lets put him in handcuffs." Bernard says "and try to get a name outta him because he's freaking out."

Tromp eventually comes to the rear passenger side door and tells Kuhl "wanna step out real quick man" after opening the door. Kuhl says "why I'm not doing anything just tryna leave." Tromp says "you're just being detained real quick while we search the car." Kuhl gets out of the vehicle and then reaches to grab his phone which results in an incident that will be discussed more later on. However, at this time Kuhl should've been able to go yet the officers already decided they were, not only gonna detain him, but put him in cuffs.

Accordingly, this continued detention of Mr. Kuhl was unlawful and far beyond the scope of the stop. The allegation that Kuhl was tweeking out nervous and maintaining his privacy was not grounds to create reasonable suspicion. Kuhl was being detained because he was maintaining

personal privacy. The "Fourth Amendment protects two different interests - the interest in retaining possession of property and the interest in maintaining personal privacy." United States v. Sanders, 719 F.2d 882, 886 (6th Cir. 1983).

Once in cuffs Pfingsten briefly frisked Kuhl for weapons placing him in the backseat telling Kuhl he was only detained. Pfingsten pulls out his notepad as if he's going to ask Kuhl for ID and Kuhl says "I don't have to ID myself" and states he was only a passenger, had done nothing wrong, and this was harassment. Pfingsten asks "how is it harassment?" Kuhl states that its harassment because he is being cuffed and put into the back of a police car and hasn't done anything wrong. Pfingsten starts explaining that a passenger during a traffic stop has to get out of or into the vehicle when an officer says to do so. Kuhl states that is all he was doing and "you guys are telling me I'm detained." Kuhl continues and tells Pfingsten he told Bernard he was trying to leave since the car was being towed. Pfingsten says that is between Kuhl and the first officer and Kuhl says "no no," but Pfingsten continues saying that the officers don't know who's stuff is in the car or if there's a crime being committed. Kuhl says "what crime? There's no crime being committed at all." Pfingsten says "we're not gonna talk about that right now, if you want to talk about it I'll read you your Miranda rights. Then we can go into a full blown interview but I don't wanna deal with all that right now because this isn't my call its my partner's call."

Pfingsten then asks again if Kuhl has ID and Kuhl asks "why

do I need ID? I shouldn't have to ID myself." Pfingsten says "okay." Kuhl says "I haven't done anything wrong, I don't have any drugs or anything illegal. I don't have any weapons, nothing I don't have any warrants." Pfingsten says "Ok, well I'll believe you as far as I can throw you because people lie to me all the time" and leaves.

At this point Mr. Kuhl is truly under arrest without probable cause. Yet Pfingsten is not stating Kuhl is under arrest or required to provide ID. Indeed, after leaving the patrol vehicle, Pfingsten goes to the vehicle as Bernard and Tromp are searching. Pfingsten says "is there a way to have him identified? You forcing that?" Bernard says "ahhh" and Pfingsten says "H+O, H+Ooo" dragging out the "O" to try and get Bernard to agree that Kuhl hindered and obstructed officers although Bernard clearly doesn't agree. Pfingsten continues, "for that little stunt he pulled at the car?" This time Bernard says "nahhh." Tromp chimes in and says "I don't know, don't think we got enough."

It should be noted that Pfingsten was an officer in training from a different state consistently trying persuade fellow senior officers to arrest Kuhl without probable cause in order to force identification. This is clearly vindictive, retaliatory, and arbitrary unconstitutional conduct in violation of due process, freedom from cruel and unusual punishment, freedom from unreasonable search and seizure, and taken in retaliation against Kuhl for exercising free speech.

Still pressing to get his way, Pfingsten says "he's a passenger in a vehicle, you can be ordered in or out at any time during a traffic stop." Bernard says "I guess yeah." Tromp still in disagreement says "he did get out." Bernard says "he's gonna have some warrants for sure." Bernard and Tromp go searching the area for where Kuhl had reached to grab his phone. Bernard laughs and says "there's gotta be something there," but they find nothing illegal. Bernard says "I'm gonna check with Sarge to see if he thinks we got enough to get like a finger print on him."

Indeed, Pfingsten did not believe Mr. Kuhl had hindered and obstructed the officers. When transporting Kuhl to the police cruiser, Pfingsten said "you're just detained not under arrest for hindering." Pfingsten was upset that Kuhl was challenging him and told Tromp, "yeah he's trying to play roadside lawyer." Indeed, all of the officers were consistently trying to identify Kuhl, but never said he had to ID himself. Tromp was telling Bernard to run the name of a piece of mail he'd found in Coleman's vehicle to see if it might be Kuhl. As Coleman was being held in the police vehicle but continuously being told he wasn't under arrest he asked "what is yall doing bro?" Bernard stammers "whats up man?" Coleman asks "what's going on now? What happened?" Bernard hesitantly say "right now we're just trying to figure out," Tromp chimes in "what your boy's name is." Coleman says "oh, so I'm good right?" The conversation continues for about 30 seconds and Tromp says again "right now we're just trying to figure out who

your boy is."

Later on Pfingsten comes to speak to Coleman as Coleman is in the back of Bernard's car. Pfingsten tells Coleman "well your boy doesn't wanna listen so." Coleman says that doesn't have anything to do with him and asks what did Kuhl do and if Kuhl is going to jail? Pfingsten specifically says "no. He's detained and like wants to disagree with us about everything." Again, this clearly displays Pfingsten did not believe what Kuhl did was hindering and obstructing, but only arrested Kuhl because he was "playing roadside lawyer" and "disagreeing with [police] about everything."

This is quite similar to the Andrews v. Scott case of the Eleventh Circuit cited above. "The First Amendment 'protects a significant amount of verbal criticism and challenge directed at police officers.'" Id at 15, quoting Houston v. Hill, 482 U.S. at 461. Moreover, Kuhl's detention in this instance constituted a de facto arrest.

In an effort to clearly state all of the grounds warranting suppression because of the unconstitutional conduct by the Wyoming officers, Kuhl will list them.

1. Bernard diverted his attention from Coleman when the vehicle's insurance and registration were being handed to him so that he could ask Kuhl for ID.
2. Bernard asked questions outside of the mission of the stop about why Coleman and Kuhl were in Wyoming and where they were from.
3. Bernard asked if anything illegal was in the car like guns, drugs, knives,

or bazookas.

4. Bernard stopped going back to his car to ask why Coleman had been on the side of the gas station although Bernard already knew the answer.
5. Bernard detained Coleman as a pretext to search Coleman, obtain Kuhl's identity, and continue Kuhl's detention, under the guise of Coleman DWLS.
6. Bernard used the threat of towing the vehicle in an attempt to get Kuhl to identify himself even though towing the vehicle under the circumstances was not in compliance with departmental standards.
7. Bernard did not allow Kuhl to leave after cuffing Coleman for DWLS.
8. Bernard did not allow Kuhl to leave after coming back to the car again trying to ID Kuhl using the vehicle impound as a ruse.
9. Bernard lacked reasonable suspicion or probable cause that any marijuana delivery was occurring, especially as to Mr. Kuhl and used the vehicle search as a means to unlawfully continue Kuhl's detention.
10. Officers kept Kuhl detained in retaliation to him maintaining personal privacy and exercising free speech. This was also a result of vindictiveness.
11. Kuhl's extended detention was actually a de facto arrest.
12. Questioning by Bernard of Coleman if anything was in the car without Mirandizing Coleman was unlawful and any statement as to what was in the vehicle being grounds to detain Kuhl while the car was searched was not lawful so Kuhl's detention if a result of such was unlawful.

Accordingly, because of these grounds the subsequent arrest of Kuhl and seizure of his phones were unlawful and all evidence that resulted from or exploited these illegalities must be suppressed. Indeed, if Kuhl had been allowed to leave he would've never been arrested.

2. KUHL'S ARREST WAS UNLAWFUL AND A RESULT OF VINDICTIVENESS, RETALIATION, AND MALICE

Legal Standard

"[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32 (1973).

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 398 (2019). Specifically, the Supreme Court noted in Nieves that while "probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." Id. at 406.

While Kuhl asserts that no probable cause existed for his arrest for hindering or PWID, even if the Court finds probable cause existed, officers would not typically arrest someone for what Kuhl did in this instance had he not contested officers and maintained his personal privacy. Accordingly, the arbitrary and retaliatory arrest under such circumstances shocks the conscience, especially seeing as it was done in retaliation to free speech, and thus to deter such conduct suppression is the proper action.

"Probable cause exists only when the police officer discovers reasonably reliable information that the suspect has committed a crime." Osberry v. Slusher, 17-4242 (6th Cir. Sep. 13, 2018).

"A probable cause determination is based on the totality of the circumstances, and must take account of both the inculpatory and exculpatory evidence then within the knowledge of the arresting officer." Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). "[I]n the process of determining whether probable cause exists, [officers] cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." Ahlers v. Schebil, 188 F.3d 365, 372 (6th Cir. 1999); see also Wesley v. Campbell, 864 F.3d 433, 439-40 (6th Cir. 2017) ("Because both inculpatory and exculpatory evidence must be taken into account when deciding if probable cause exists, officers cannot ignore known exculpatory evidence when making a probable cause determination."); Mulcahey v. Chocolay Twp., 2:24-CV-7 (W.D. Mich. Feb. 27, 2025) ("this

does not mean officers may make hasty, unsubstantial arrests without impunity"); Malley v. Briggs, 475 U.S. 345-46 (1986) (An officer must exercise reasonable professional judgment so as to minimize the danger of an unlawful arrest).

a. Hindering and Obstructing

Legal Standard

"[A] suspect must be released once an officer determines the suspect's identity and obtains information dispelling the officer's suspicions." Cooper v. Cnty of Washtenaw, 22-10197 (E.D. Mich. Sep. 27, 2023) citing Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984). See also Van Herbert v. City of St. Clair Shores, 61 Fed. Appx. 133, 136 (6th Cir. 2003). Although these cases rest partly on the detained person identifying themself, the identification issue does not apply here because officers were not seeking a known suspect in a crime and never told Kuhl he was required to identify himself. However, as will be explained, any suspicion that Mr. Kuhl was hindering or obstructing was dispelled before the arrest.

While the officers claimed Kuhl was eventually arrested for hindering, the felony charge of resisting arrest is what was presented to and denied by the prosecutor. Indeed, Hindering and obstructing seems to be a misdemeanor under the City of Wyoming Code 618.30. The charge of resisting and obstructing that was presented to the prosecutor is MCL

750.81d(1), which states "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a [police officer or sheriff] who the individual knows or has reason to know is performing his or her duties is guilty of a felony.... 'Obstructs' includes... a knowing failure to comply with a lawful command."

See Davis v. Walleman, 596 F.Supp. 3d 877 (E.D. Mich. 2022) (finding a genuine issue of material fact as to whether an officer possessed reasonable suspicion to conduct a Terry stop, and whether that reasonable suspicion was dispelled during the interaction with the arrestee). As with reasonable suspicion, probable cause depends on the totality of the circumstances and officers "cannot look only at the evidence of guilt while ignoring all exculpatory evidence." Brown v. Knapp, 75 F.4th 638, 647 (6th Cir. 2023).

In D.D. v. Scheeler, 645 F. Appx. 418 (6th Cir. 2016), the Sixth Circuit found that an officer lacked probable cause to arrest a woman for obstructing official business where the officer told her to leave a church festival and she refused. Id at 419-20. Following a fistfight between some teenagers, the officer instructed the woman "three or four times to leave the festival." Id at 420. Although the woman began to comply and walked toward the exit, she stopped to call her sister so they could go home together. The officer again told the woman to leave, but "she said she couldn't until she reached her sister." Id. The officer then asked twice for the woman to give him the phone - but she refused - and the officer arrested her. Id.

The Sixth Circuit determined that there was no probable cause because she "lacked the purpose of obstructing [the officer], and she informed him of her reason for remaining at the festival." Id. at 426. See also Patrizi v. Huff, 690 F.3d 459, 465 (6th Cir. 2012); Rainey v. Patton, 534 F. Appx. 391, 398-99 (6th Cir. 2013).

In Osberry, No. 17-4242, the Sixth Circuit found that Osberry's refusal to comply with the officers' orders, failure to leave when commanded, and arguing with officers did not supply probable cause to arrest for obstructing officers. Id at 14. The Sixth Circuit went on to add, "[a]nd regardless, Osberry lacked the purpose of obstructing the officers." Id. "Rather than simply refusing to comply with the officers' orders, Osberry informed the officers of her reason for remaining in the driveway - i.e., to pick up her ~~neice~~ niece and nephew. Thus, Osberry has plausibly alleged that the officers did not have probable cause to arrest her for obstructing official business." Id. at 14-15.

"[T]he officers had neither probable cause nor arguable probable cause" where "the officers failed to consider the honest alternative" for the arrestee's behavior. Schwartz v. Marcantonatos, 567 Fed. Appx. 20, 23 (2nd Cir. 2014); see also Gardenhire, 205 F.3d at 315-16 (holding that a suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause exists); Coney v. City of Warren, 14-10842 (E.D. Mich. Jul. 16, 2015).

In Ty Putrich v. Peterson, 1:21-cv-957 (W.D. Mich. Mar. 22, 2023), Putrich and his girlfriend Gina Szpak had a dispute about a truck, among other things, because they were breaking up. Gina's cousin contacted the police as the argument continued and officers Mark Peterson, Derek Guthrie, and Joseph Geiser arrived on the scene.

Putrich and Gina had a business they financed and profited from together, Armonia Aesthetics. Although Gina sold 50% of the Armonia shares to Putrich, she remained listed as the president, treasurer, secretary, and director of Armonia. Id at 2. Gina showed officers documentation that showed her as the sole officer of Armonia and that the truck was registered to her. Id. at 3. Gina also told the officers that Putrich accused her of embezzling money from Armonia.

Putrich told officers that Gina did embezzle funds to purchase the truck and he wanted Gina to be charged for embezzlement and filing a false police report. Id. Putrich became agitated and said he wanted to be arrested and charged with a felony for stealing the truck, and that he possessed the keys to the truck, had possessions in the truck, and intended to take the truck to his mother's home in Illinois. Officer Peterson told Putrich that the issue was a civil matter between Putrich and Gina.

Putrich walked toward the driver door of the truck although the officers told him he could not take the truck because it was Gina's and she wanted back. The police had to physically grab Putrich and

told Putrich they were detaining him for safety reasons. Putrich did not resist being cuffed. Peterson searched Putrich removing his phone, cash, and a wallet, and put Putrich in the backseat of a cop car.

Peterson stood near the patrol vehicle while Officers Guthrie and Geiser gave Gina the keys to the truck and remove Putrich's belongings from inside the truck and place them on the hood of Putrich's Toyota Avalon in the driveway. Putrich, who was still detained, stood up out of the patrol car and Peterson told Guthrie to go to the rear driver side door, reach inside and pull on Putrich's handcuffs to get him back into the patrol car. Together both officers were able to physically force Putrich back into the car who claims his neck was ~~was~~ hurt in this interaction so police called an ambulance. After Putrich was discharged from the hospital, Peterson took him to the Kalamazoo County Jail where Putrich was charged with Resisting and obstructing police. Id. at 5.

The Honorable Judge Jarbou, of this District, held that the handcuffing of Putrich exceeded the bounds of an investigatory detention. Id. at 11. The Judge also held that the officers did not diligently pursue a means of investigation that was likely to confirm or dispel their suspicions quickly. Because Putrich was detained for approximately 23 minutes and the officers went beyond investigating the truck's ownership by ordering Gina to remove Putrich's belongings from the truck and telling Putrich to leave in his toyota Avalon. Id. at 11-12.

Two main points to draw from TY Putrich are the fact that he clearly disobeyed the officers by moving to take the truck after being told not to, but they did not arrest him for this. Indeed, officers only charged Putrich for what he did in the patrol car after he was only "detained." Accordingly, the simple miscommunication between the officers and Kuhl as Kuhl was only trying to grab his phone, which only lasted a few seconds and was not followed by any physical resisting or hostile language, is a situation officers would not typically arrest someone for. Indeed, multiple times the officers stated that Kuhl was only detained and not under arrest. Tromp even told Kuhl while speaking to Kuhl as he was supposedly only "detained," that there was no need for Kuhl to apologize about the phone incident and that Tromp knows the incident was just result of a "little miscommunication."

The other matter is that the officers exceeded the bounds of an investigatory detention by cuffing Kuhl and putting him in the back of a police car and taking his phone in the process. Indeed, the officers had already decided they were cuffing Kuhl before the phone incident due to Bernard saying Kuhl was uncooperative by not wanting to give his name and was nervous tweeking out. However, Kuhl asked Bernard if he needed to have ID and Bernard said no. Never once did Bernard command Kuhl to identify himself or give any order that Kuhl did not comply with. Bernard even left the option to Tromp and Pfingsten, who had just arrived, as to whether

they wanted to detain Kuhl. Bernard did not say he believed Kuhl may run or posed a threat to officer safety.

Even after the phone incident, Kuhl did nothing to make officers think he would run or was dangerous. Indeed, the phone that Mr. Kuhl was reaching for was right there in the seat which he explained the officers knocked from his hand. Moreover, Kuhl did not resist the officers cuffing him at all and was not hostile in his language at all. Kuhl just stated "this is crazy" "I was only grabbing my phone brother." Thus, the cuffing of Mr. Kuhl exceeded the bounds of an investigatory detention. Mr. Kuhl was approximately 145 pounds to 3 officers probably at least 200 pounds and taller than him as Kuhl is only 5'8. Further, the officers had truly decided they were going to cuff Kuhl before this incident as can be seen on Bernard's body cam.

And actually, three points should be taken from TY Putrich. The third being, Kuhl was detained beyond 20 minutes even though the officers had very quickly conducted the search of the vehicle. Indeed, they had specifically looked in the area where Kuhl had reached to grab his phone and found nothing there. Officers continuously detained Kuhl because they were "just trying to find out his name," as they told Coleman multiple times. Only after they failed did they arrest Kuhl for hindering and upon removing the cash from Kuhl's pocket, they then also decided to charge him with PWID. Kuhl's detention evolved into a full blown arrest which no probable cause

existed for.

"'[H]andcuffing is ordinarily not incident to a terry stop, and tends to show that a stop has ripened into an arrest.'" United States v. Howard, 423 F. Supp. 3d 493, 498 (M.D. Tenn. 2019) (quoting Grice v. McVeigh, 873 F. 3d 162, 167 (2nd Cir. 2017)); see also United States v. Richardson, 949 F. 2d 851, 856-57 (6th Cir. 1991) (An arrest occurs if a reasonable person in Mr. Kuhl's position would "have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way.") "The use of handcuffs exceeds the bounds of a Terry stop when circumstances do not warrant the precaution." Howard, 423 F. Supp. 3d at 498 citing United States v. Foster, 376 F. 3d 577, 587 (6th Cir. 2004).

"[A] clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest." Centanni v. Eight Unknown Officers, 15 F. 3d 587, 590 (6th Cir. 1994). Indeed, "Officers are not permitted to continue a detention solely to obtain identification." Robinson v. City of Tupelo, 1:17-cv-55-SA-DAS (N.D. Miss. May 23, 2018) Robinson is also informative that the brief miscommunication about Kuhl reaching to grab his phone was not enough to establish probable cause for arrest. Although Robinson was somewhat concerned about providing identification, no officer ever told Kuhl he was required to provide ID. Indeed, this was because the officers truly knew they had no grounds to do so.

Another case to provide guidance is Young v. City of Battle Creek,

1:23-cv-10 (W.D Mich. Mar 27, 2025). Accordingly, Young was in the very close proximity of a man known to possess firearms as a convicted felon. This felon had posted a video on Snapchat possessing a gun at 10:05 pm, on the porch of his residence. At 10:30, officers pulled up to the residence of the felon because they saw the video and planned to arrest the felon and seize the gun. Young, his brother Stein, and the Felon were all near each other in front of the place where the video, posted just 25 minutes prior, had been produced.

The felon got up and started walking away and at least one officer followed him. The other officer walked up to Young and grabbed him to frisk Young for weapons. Young resisted and there was a physical altercation and Young was arrested and charged with resisting arrest. Eventually the state court held that officers lacked reasonable suspicion to grab and detain Young to search for weapons even though the officer claimed he knows felons will pass firearms to those without felonies to avoid an unlawful possession charge.

The Honorable Judge Maloney of this District held that the officer lacked reasonable suspicion to stop Young and had nothing more than a mere hunch. Accordingly, Bernard had nothing more than a mere hunch. Kuhl was in the backseat when there were no other passengers, he was from Kalamazoo approximately 20 minutes away, Kuhl was nervous, did not want to identify himself, and there was some weed in the driver door cubby out of sight and reach of Kuhl.

Thus, there was no reasonable suspicion to detain Kuhl after Coleman was detained/arrested for DWLS. Moreover, backup officers had no right to detain Kuhl and place him handcuffed in the back of a cop car.

Another case of guidance is that of Kuslick v. Roszczewski, 10-1082 (6th Cir. Apr. 11, 2011). "I want to blow up the school" was found written on the wall of a bathroom stall at Hale High School in Hale, MI. The Plaintiff's daughter, Sarah, was developmentally disabled, 19 years old, and suspected of writing the statement at issue. Roszczewski was the MSP Trooper assigned to the case and got a search warrant for handwriting samples from Sarah.

While at the MSP Post with Sarah, Plaintiff wanted to be in the room with her daughter when the handwriting samples were being taken. MSP told Plaintiff she could wait just outside the room where she could hear and see what was going on. As Sarah was doing the samples, MSP officers told Plaintiff to go around the corner away from the room where Sarah was multiple times but Plaintiff refused. Later on Roszczewski filed an affidavit for Plaintiff's arrest which included a false statement that Plaintiff obstructed the execution of the search warrant for Sarah's handwriting samples. The warrant was executed beyond what was required as 30 samples were sought and Sarah submitted 100.

The Court looked at the fact the situation was different than an on-scene warrantless arrest because applying for a warrant does not

involve spur-of-the moment decisions that warrantless arrests do. However, while this differs from Kuhl's incident, in all actuality it really doesn't much. The situation about the phone lasted less than any substantial amount of time to establish a purpose to obstruct or intent to do so. Moreover, the officers did not immediately arrest Kuhl for this incident and confirmed he was not reaching for a weapon or trying to hide contraband but was simply grabbing his phone. Indeed, the officers took ample time discussing it and at least 2 agreed that the situation did not establish probable cause for hindering. It is important to note that no affidavit was ever drafted as to probable cause for Kuhl's arrest, but one was drafted for Coleman. This further displays that the officers truly knew no probable cause existed to arrest Kuhl but did so only to forcefully search him and abtain his identity.

Indeed, in Kuslick, the Sixth Circuit stated: "We are unpersuaded that a magistrate would have found probable cause if the only allegations... were Kuslick's refusal to move around the corner or leave the post when she was asked by troopers other than Roszczewski." Similarily, Pfingsten states in his report that Tromp told Kuhl to stop reaching inside the car, not Pfingsten himself. Indeed, Tromp stated to Pfingsten that the incident wasn't enough to even force Kuhl to ID himself, let alone charge Kuhl with a crime. Yet Pfingsten is the one who arrested Kuhl for hindering and supposedly spoke to Sergeant to get permission. Pfingsten was in training and was clearly upset Kuhl was

"playing roadside lawyer" and "disagreeing about everything." Accordingly, detaining Kuhl for all that time just to ask a Sergeant to arrest him was a de facto arrest lacking ~~prop~~ probable cause and the officers did not diligently pursue a means of investigation that was likely to confirm or dispel their suspicions quickly.

Argument

Kuhl had no purpose to obstruct or hinder officers just as D.D. and Osberry didn't in the Sixth Circuit cases cited above. Kuhl did nothing to physically resist officers, indeed he grabbed his first phone from the floor with no incident directly before reaching for his second phone. This can be clearly seen on Bernard's body cam. Thus, Mr. Kuhl was not intentionally disobeying a command and was stating he was only grabbing his phone. Moreover, Kuhl was reaching slowly and his body was already being pushed to the right as Tromp started pulling back and up on his right arm while pushing against Kuhl's upper back.

Kuhl had possession of his phone and was already raising his left hand to show that but Pfingsten roughly grabbed his left arm and knocked the phone from Kuhl's hand. Kuhl explained this and Pfingsten said "you weren't reaching like someone grabbing a phone I've been doing this a long time." However, the phone was right there and there was no reason or purpose for Kuhl to hinder the officers. He only wanted his belongings since the car was being towed.

The officers should have considered this honest explanation and exculpatory evidence instead of making a hasty, reckless, and unsubstantial arrest. Instead, this information was wrongly and unlawfully ignored. The result was the unlawful arrest of Mr. Kuhl.

Next, the officers detained Kuhl without cause using handcuffs and placing him in the police car. There was nothing showing that Kuhl may flee or posed a threat to the officers. Moreover, they seized his phone (Samsung) that he did have in his possession at this time and did so unlawfully.

Additionally, the officers searched the vehicle and determined that Kuhl could not have been trying to hide anything or obtain a weapon quickly, but still kept Kuhl detained while they were trying to figure out who he was as can be seen and heard multiple times throughout the body cam and patrol vehicle footage. Their suspicions had been dispelled already by searching the car and Kuhl's explanation about his second phone. Accordingly, holding Kuhl beyond this point required probable cause which the officers lacked.

Another case for guidance to the court is Cooper v. Washtenaw County cited above. Cooper put his hand out against the chest of an officer trying to compel Cooper to ID himself. The officer sought Cooper's ID because Cooper came to a home where a stabbing occurred earlier and Cooper was black with dreads and about the same height and weight of the suspect. Cooper was not the suspect and repeatedly refused to ID himself despite the officer explaining the

investigation and telling Cooper he must provide ID.

The Court found after a while that the officer's reasonable suspicion was dispelled and he truly felt Cooper was just "playing a game by purposely being evasive." Id. at 11. Eventually another cop came as Cooper had called 911 and Cooper ID'd himself to the second cop who told Cooper "listen... if you didn't do anything and you're innocent you'll be let go." This was in response to Cooper telling the first officer "Assaulting a police officer? Is you serious?... I didn't assault you, I asked you to move out my way.... I tried to walk away because you blocked me from getting in my car." Cooper stated this in protest to the first officer saying he was arresting Cooper for assault on an officer when Cooper pushed him in the chest. Id at 13.

This is quite similar to what occurred when Tromp was speaking with Kuhl as Kuhl was cuffed in the back of the police car. Tromp said they were investigating the marijuana and the phone issue was just a little miscommunication. Kuhl says he has nothing to do with Marijuana or anything else in the car except himself. Tromp said if that's true and Kuhl has nothing to do with the marijuana then Kuhl will be able to leave "because that's the law and the law is what I go by." Accordingly, Kuhl's arrest for hindering was unlawful and only made vindictively and in retaliation to Kuhl maintaining his personal privacy and disagreeing verbally with officers.

Only after Kuhl was arrested and the money removed from his pocket, did the officers charge ~~wil~~ him with PWID. Thus, if Mr. Kuhl had not been unlawfully arrested for hindering, he would've never been charged with PWID. Indeed, as mentioned above, officers do not arrest people for the circumstances that occurred here with Mr. Kuhl's phone. Surely just this month of May, several government officials stormed an ICE facility and the mayor of Newark, NJ was arrested. As officers were arresting the mayor a woman who was part of Congress is seen pushing and shoving multiple law enforcement agents who attempting to arrest and remove the mayor but this woman was not arrested.

Defendant will attempt to list all the reasons why this seizure, continuing detention, and arrest was unlawful based on the facts above.

1. Defendant lacked a purpose to Hinder or obstruct the officers.
2. Cuffing Defendant and putting him in the back of the cop car exceeded the bounds of a Terry stop.
3. (In relation to no 1) There was no probable cause Kuhl hindered or obstructed officers which is why they did not file an affidavit for probable cause of arrest.
4. The officers lacked probable cause / reasonable suspicion to detain Kuhl in the first place to search the car.
5. If any reasonable suspicion did exist it was dispelled by Kuhl's

explanation and the search of the vehicle where he was reaching and therefore his continued detention in attempt to learn his identity and/or wait for the Sergeant was unlawful.

6. Even if probable cause existed for hindering, the officers would not typically arrest under these circumstances and did so with vindictive and retaliatory motive because Kuhl exercised his First and Fourth Amendment rights and thus, the officers violated Kuhl's due process, freedom of speech, and freedom from unreasonable search and seizure.

b. PWID

Legal Standard

Under MCL 333.27965, "[a] person who commits any of the following acts, and is not otherwise authorized by this act to conduct such activities, may be punished only as provided in this section and is not subject to any other form of punishment or disqualification, unless the person consents to another disposition authorized by law.:"

"2. Except for a person who engaged in conduct described in section 4, a person who possesses not more than twice the amount of marihuana allowed by section 5, cultivates not more ~~that~~ than twice the amount of marihuana allowed by section 5, delivers without receiving any remuneration to a person who is at least 21 years of age not more than twice the amount of marihuana allowed by section 5, or possesses with intent to deliver not more than twice the amount

of marihuana allowed b section 5: (a) for a first violation, is responsible for a civil infraction and may be punished by a fine of not more than $500 and forfeiture of the marihuana; (b) for a second violation, is responsible for a civil infraction and may be punished by a fine of not more than $1000 and forfeiture of the marijuana."

"The amount of marihuana allowed by section 5" is 2.5 ounces. Accordingly, a person at least 21 years of age may possess with intent to deliver up to 5 ounces and not be subject to any other form of punishment than a fine up to $500 and loss of the weed. Supposedly 179.2 grams of marijuana was recovered from Coleman's vehicle, approximately 6 ounces, yet Kuhl and Coleman were charged with PWID. Both Kuhl and Coleman technically can possess with intent to distribute up to 5 ounces each. Thus, charging them both for only 6 ounces is impossible. Indeed, to charge them both, there would have must of been over 10 ounces present.

Moreover, possession, transportation, processing, giving away or otherwise transferring without remuneration no more than 2.5 ounces of marijuana is completely lawful in Michigan. Thus, even if Coleman was charged with possession with intent to deliver over 5 ounces, the remaining amount of marijuana left attributable to Kuhl was less than 2.5 ounces and thus, completely lawful.

Even if the marijuana was split in half so that approximately 3 ounces were attributed to Kuhl and Coleman each, they would only be subject to a civil infraction, a non-arrestable offense.

This is only if any of the marijuana belonged to Kuhl, however, none of it did.

Upon being arrested for hindering, the officers searched Kuhl and removed approximately $3,400 from his pocket. Only after seeing this money did the officers choose to charge Kuhl with PWID as well. Accordingly, had Mr. Kuhl not been unlawfully arrested for hindering, he would've never been charged with PWID. Moreover, as will be shown in this motion, there was no probable cause to arrest Kuhl for PWID.

"'[M]ere presence, as a passenger, in a car found to be carrying drugs is insufficient to implicate the passenger in the conspiracy.'" United States v. Garcia-Rodriguez, 93 F.4th 1162, 1166 (10th Cir. 2024) (quoting United States v. Jones, 44 F. 3d 860, 865 (10th Cir. 1995)); see also United States v. Flenoid, 718 F. 2d 867, 868 (8th Cir. 1983) ("Mere presence as a passenger in a car from which the police recover contraband or weapons does not establish possession."); United States v. Blue, 957 F. 2d 106, 108 (4th Cir. 1992) ("'it is well established that mere presence as a passenger in a car from which the police recover [contraband] does not establish possession. The mere proximity of [contraband] to a passenger in a car goes only to its accessibility, not to the dominion or control which must be proved to establish possession.'") (quoting United States v. Soto, 779 F. 2d 558, 560 (9th Cir. 1986)).

"[I]t is without question that 'presence alone' near a gun...

does not 'show the requisite knowledge, power, or intention to exercise control over' the gun to prove constructive possession." United States v. Grubbs, 506 F.3d 434, 439 (6th Cir. 2007) (quoting United States v. Arnold, 486 F.3d 177, 183 (6th Cir. 2007) and United States v. Birmley, 529 F.2d 103, 107-08 (6th Cir. 1976)); see also United States v. Chairez, 33 F.3d 823, 826 (7th Cir. 1994) (citing Ybarra v. Illinois (1979), holding that mere propinquity is not enough, and nothing but presence in a vehicle driven by someone else and owned by a third person during a drug transaction demonstrated the defendant companion's knowledge that a gun was present under his seat); United States v. Tehrani, 49 F.3d 54, 59 (2nd Cir. 1995) (holding that more than companionship is required for probable cause to arrest the arrestee to taint the companion); United States v. Chambers, 918 F.2d 1455, 1459 (9th Cir. 1990) ("[T]he element of control necessary for possession [is not] satisfied if it [i]s shown that the defendant was merely 'in the presence of the contraband and could reach out and take it' if he so desired.") (quoting United States v. Terry, 911 F.2d 272, 280 (9th Cir. 1990)).

"Finding that an individual constructively possesses drugs requires more than the mere fact that the individual may be in the presence of those drugs." People v. Merriweather, 333040, at 3 (Mich. App. Nov. 16, 2017) (citing People v. Wolfe, 440 Mich. 508, 520; 489 NW2d 748 (1992)). In People v. Stansberry, 359611 (Mich. App. Dec. 15, 2022), the Michigan Court of Appeals remanded a case charging Stansberry ~~with~~

with CCW to the Berrien County Circuit Court for dismissal.

Stansberry was driving a vehicle that had an unreadable temporary license plate. Upon being pulled over, Stansberry could not produce his driver's permit and officers ordered him out of the car. One passenger, a female named Mikayla Alexander, sat in the front passenger seat with a red bag on the floor at her feet. When Stansberry exited the car, Mikayla shoved the bag under her ~~feet~~ seat and officers told her to exit the vehicle also. Because officers could not ascertain the identity of the vehicle's true owner they decided to tow the vehicle and conducted an inventory search.

Nothing was found on the driver's side of the car, but a handgun was found in the red bag under the front passenger seat. Although Stansberry and Mikayla told the officers the gun was Mikayla's, they still charged Stansberry with CCW because Stansberry stated he knew Mikayla had a gun and that he had touched it before.

The district court refused to bind over the charges, but the prosecution convinced the Circuit Court of Berrien County to reinstate the charge and add charges of felon in possession and felony firearm. (Mr. Kuhl urges the Court to read this case where it quotes the district court's decision to dismiss the CCW charge) Stansberry appealed the Circuit Court's decision to reinstate the charge and the Michigan Court of Appeals initially denied the application, but the Supreme Court of Michigan remanded to the Court of Appeals as on leave granted. Finally, common sense and justice prevailed and all charges

were dismissed.

In Zandate v. State, 779 So. 2d 476 (Fla. App. 2000), the defendant was a front seat passenger in a vehicle that was pulled over and because the officer smelled marijuana he opened the ashtray and found a residual amount of marijuana. The officer then searched the driver who indicated the weed was not his. The officer then proceeded to search Zandate and located a bag of marijuana and cocaine in Zandate's pocket.

Zandate moved to suppress the drugs because the search of his pocket was unlawful. Initially the motion to suppress was denied, but the Florida Court of Appeals reversed, holding that "there was no probable cause to arrest Zandate for possession of marijuana because the evidence did not show that Zandate knew of the presence of the substance in the closed ashtray." In reaching its decision the Court relied on Rennard v. State, 675 So. 2d 1006 (Fla. 2d DCA 1996). Mind you, unlike Florida, marijuana is legal in Michigan and was so at the time of Kuhl's arrest.

Multiple State Courts of Appeal and Supreme Courts have adopted 5 factors to consider when determining constructive possession of contraband found in a vehicle with multiple occupants. (1) was the contraband in plain view; (2) was it with defendant's personal effects; (3) was it found on the same side of the car seat as the defendant's or immediately next to him; (4) was the defendant the owner of the vehicle; and (5) was there suspicious activity by the defendant. 25 Am.

Jur. 2d Drugs and Controlled Substances §149 at 355. See State v. Atkinson, 620 N.W.2d 1, 4 (Iowa 2000) and Plotts v. State, 297 Ark. 66, 759 S.W.2d 793, 795 (1988).

In another Florida case State v. Snyder, 635 So. 2d 1057 (Fla. Dist. Ct. App. 1994), the defendant was a front seat passenger in a car driven by his codefendant, John Parker. The two drove to a post office where, as the defendant knew, Parker was expecting the arrival of a shipment of meth. Parker picked up the shipment and offered some to Snyder, who said he would like to try some.

Parker began to form two 'lines' onto a cassette case and placed the rest under his seat. Police arrived before he completed the lines. Parker's affidavit stated that Snyder had not acquired possession of the drug because he had no right or oppurtunity to exercise dominion and control over it. Id. at 1058. The state showed the defendant had prior knowledge of the delivery of the drugs and that he intended to try some of the meth had police not arrived. The trial court ruled that the state had failed to show dominion and control. Id. The Court of Appeals affirmed.

In United States v. Beverly, 750 F.2d 34 (6th Cir. 1984), the Sixth Circuit held that constructive possession was not proven by evidence that defendant was standing close to a wastebasket which contained two guns, one of which contained the defendant's fingerprints.

Even "[w]here the defendant shares possession of the premises

where contraband is found, additional incriminating evidence must show the defendant knew of and controlled the contraband." United States v. Wren, 528 Fed. Appx. 500, 506 (6th Cir. 2013). "Mere presence on the scene plus association with illegal possessors is not enough to support a conviction for illegal possession." Birmley, 529 F.2d at 107.

Argument

Bernard claims ~~leave~~ to have found weed in the driver door jam and the center console of Coleman's vehicle. However, watching Bernard's body cam it is clear that he removes marijuana from the door jam/cubby and underneath the driver seat and places it on the driver seat. No marijuana is seen being removed from the center console. This further negates any credibility Bernard should be given.

Regardless, the center console is a closed compartment that is accessible only from a latch at the front of the compartment. Kuhl was a backseat passenger on the passenger side. Thus, whether the marijuana was tucked down in the driver door cubby, shoved under the driver seat, or in the closed center console, none was in sight or reach of Kuhl.

As noted by Bernard's report, a scale was also located under the driver seat and out of reach and sight of Kuhl. Moreover, the vehicle was registered to Coleman's mother and Coleman was the driver and

admitted that the weed and scale were his. Bernard is seen lifting up an empty box of pizza in the backseat directly behind the driver which had a hat resting on it and some other miscellaneous items. Under the box is a box of ziplock bags which Bernard exclaims "holy shit" when he sees them. These bags were not visible and were as far over on the rear seat from where ~~Kuhl~~ Kuhl sat as possible. Furthermore, there were things covering the bags from view and lying on the seat between Kuhl and the bags. Regardless, Coleman told Bernard the bags were his which he used to keep different strains of marijuana separate from each other. Also, in Coleman's pocket was a pack of Backwood Cigars most commonly used for smoking marijuana and multiple empty Backwood Cigar wrappers were strewn around on the driver floor and resting under the center console.

Ironically, the officers completely ignored the totality of the circumstances and turned a blind eye to the ~~overtoh~~ overwhelming exculpatory evidence negating probable cause Kuhl possessed any of the marijuana, let alone intended to deliver it. As Mr. Kuhl told the officers, had he been an African American and screamed racism, they surely would have conducted themselves more according to law and not made this unlawful arrest of Kuhl. These types of unreasonable arbitrary arrests are exactly what the Fourth Amendment prohibits as well as Article 1 § 11 of the Michigan Constitution.

Accordingly, had this arrest not occurred and Mr. Kuhl not frivolously charged ~~$~~ with PWID, his phones would've never been

seized and the search warrant leading to the discovery of the Government's evidence in this case, would have never been issued. Thus, the Government's entirety of evidence is derived from and based on the exploitation of this unlawful arrest and suppression is a must.

3. THE SEIZURE AND RETENTION OF KUHL'S PHONES UPON HIS ARREST AND AFTER RELEASE WAS UNLAWFUL

Legal Standard

"[T]he Fourth Amendment protects possessory interests against government infringement in the same way that Founding-era common law protected possessory interests against private infringement. And the common law authorized actions for damages and recovery of property that was lawfully taken, but then unlawfully possessed. History thus indicates that the government's continued possession of the plaintiffs' property must be reasonable." Asinor v. Dist. of Columbia, 111 F. 4th 1249, 1253 (D.C. Cir. 2024). "There is a Fourth Amendment seizure if the government (1) meaningfully interferes with possessory interests in ~~both~~ property in a way that (2) would have been understood to be an actionable property tort at common law." Id. at 1254.

"[A seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition

on unreasonable seizures." United States v. Jacobsen, 466 U.S. 109, 124 (1984). The Supreme Court further explained that a seizure could become "unreasonable because its length unduly intruded upon constitutionally protected interests." Id at 124 n. 25.

Also, see Segura v. United States, 468 U.S. 796, 812 (1984) ("Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons."); id. at 823 (Stevens, J., dissenting) ("Even a seizure reasonable at its inception can become unreasonable because of its duration.").

In Manuel v. City of Joliet, 580 U.S. 357 (2017), the Supreme Court held that after a person is arrested, the Fourth ~~Amed Amed~~ Amendment requires any pretrial detention to remain reasonable even after the commencement of formal legal process. Id at 359-60. The Court explained that the continued detention of an individual is an ongoing seizure: Manuel alleged that the government officials "detained - which is to say, seized - [him] for 48 days following his arrest. And that detention was 'unreasonable,' the complaint continued, because it was based solely on false evidence, rather than supported by probable cause." Id. at 364 (cleaned up). And the Fourth Amendment required continuing reasonableness over time, Manuel argued, even after the start of criminal process. See id. at 362. The Court agreed, holding that "Manuel's claim fits the Fourth Amendment, and the Fourth Amendment fits Manuel's claim, as hand in glove." Id at 364.

The same logic applies to Kuhl's phones, which the Wyoming PD refused

to release the day following Kuhl's arrest, despite no criminal charges being authorized. Kuhl contacted the jail and the Wyoming PD and the jail told him the phones weren't in the jail's property and Wyoming PD essentially told Kuhl they didn't know and the phones may have been seized. No probable cause existed to seize Kuhl's phones as no probable cause existed Kuhl had committed a crime and further that the phones would contain evidence of such. Indeed, Kuhl asked for legal advice from Don Sopannos and Christopher Trainor ~~for leg~~ in how to get his phones from Wyoming PD.

Accordingly, the deprivation of Kuhl's property as a result of the unlawful seizure and retention of his phones violates due process. No probable cause existed that Mr. Kuhl possessed marijuana, let alone intended to deliver it, nor that his phones were involved in such. Moreover, Pfingsten ran the names on all of the cards through TIMS and received negative results plus one card had Kuhl's last name. Indeed, no card was reported stolen that was in Kuhl's possession. Thus, Kuhl's phones should have been given to him immediately upon release.

Had Kuhl's phones not been unlawfully seized and detained, they would have never been searched and this investigation based on that seizure, detention, and search would never have initiated and the underlying evidence never discovered. To prevent such injustice from continuing and deter officers from such unconstitutional conduct, suppression is a must.

## 4. OFFICERS TAMPERED WITH/FABRICATED EVIDENCE AND LIED IN REPORTS AND PROSECUTOR BOIVIN ENGAGED IN MISCONDUCT NOT INTIMATELY ASSOCIATED WITH JUDICIAL PROCESS

### Legal Standard

"Examples of prosecutorial conduct not intimately associated with the judicial process... include investigative efforts to obtain arrest warrants, authorizing wiretaps, advising the police, making statements at press conferences, and making statements in arrest warrant affidavits." Giles v. Garland, 1:24-cv-10138 (E.D. Mich. Apr. 5, 2024) citing Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

The Sixth Circuit has recognized fabrication-of-evidence claims under the Fourth and Fourteenth Amendments. Clark v. Abdallah, 23-1730 (6th Cir. Mar. 13, 2025) citing Hoskins v. York, No. 23-5325, 2024 WL 2894648, at 2 (6th Cir. June 10, 2024). Other Circuits agree. "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012).

### Argument

As noted above, the officers claim Kuhl's iPhone was on the seat after Mr. Kuhl reached to grab his phone so they did not believe Kuhl was trying to grab his phone when reaching toward the floorboard. However,

the Wyoming PD chain of custody report, attached to the contemporaneously filed motion to suppress, based on the Affidavit and Search Warrant for Kuhl's phones by Wyoming PD, clearly states the iPhone was collected from "BACK RIGHT FLOOR BOARD."

Kuhl knew he had grabbed his second phone and that ~~his~~ it was knocked from his hand by Pfingsten. Because the officers said it was on the seat and not the floorboard, Kuhl assumed that the phone fell onto the seat when it was knocked from his grip. However, the officers likely lied about the phone being in the seat to try and justify their brief disbelief that Kuhl was reaching to the floorboard for a phone. Proof of their lie is in the Chain of Custody Report.

Another issue is the fact that the officers falsely stated a SIM Card was taped to the back of Kuhl's blue Samsung. However, on Tromp's body cam you can see the back of the Samsung phone as Pfingsten is holding it and there is no SIM Card taped to the back. Ironically, Kuhl has learned that the SIM Card is removed from phones before they are digitally examined using tools like Cellebrite, which is what law enforcement used to search the Samsung. No picture was taken of any phones at the arrest, yet pictures were taken of the marijuana, the cards from Kuhl's wallet, Kuhl's money, and the bags from Coleman's car. However, the CCU Report attached to the contemporaneously filed motion has a picture of the Green iPhone and it shows a SIM card taped to the back, but that is because police removed the SIM Card to search the phone.

Police illegally tampered with and searched these phones before ever getting a warrant and found what they believed was CSAM, specifically the pictures of Minor 1 with her breasts exposed or video, whichever it truly is. Or they found the conversation between Kuhl and Minor 1 which is why Kruschel did the intentional slip of CSC and use of a computer to commit a crime at the end of her affidavit.

Another issue is Bernard lying that he found weed in the driver door and center console when he truly found it under Coleman's seat and in the driver door. He made this lie about the center console to try and place the weed in a more common area of the vehicle and closer to Kuhl.

Another issue is the fact that the prosecutor advised the police to investigate Kuhl's phones for evidence that may prove he possessed the cards unlawfully and/or was involved in marijuana sales. This was done in an effort to obtain probable cause for an arrest warrant because the prosecutor knew none existed with the facts presented.

All of this conduct is clearly conscience shocking and unconstitutional. Kuhl's rights were clearly violated, both due process and freedom from unreasonable searches and seizures. To prevent and deter such conduct, suppression is a must.

4. CONCLUSION

Because this unlawful conduct established in this motion, is the direct source of all of the Government's evidence in this case, all of

that evidence must be suppressed as fruit of the poisonous tree. Due to this evidence's suppression, there is no sufficient grounds to continue the current prosecution and this case must be dismissed.

Please see the attached exhibits as well as the exhibits of the contemporaneously filed motion to suppress. If the Court needs more review of the claims and arguments of this motion, Kuhl asks for an evidentiary hearing.

Respectfully submitted,

S. Kuhl

S. Kuhl 61189510
P.O. Box 845
White Cloud, MI 49349

Samuel Alexander Kuhl #61189-510
Newaygo County Jail
P.O. Box 845
White Cloud, MI 49349




THIS MAIL HAS ORIGINATED
FROM THE NEWAYGO COUNTY JAIL

Clerk of Court
U.S. Dist. Court
399 Fed. Bldg.
110 Michigan NW
Grand Rapids, MI 49503

LEGAL MAIL