RECEIVED- GR
November 4, 2025 12:52 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JJM SCANNED BY: [signature] / 11/4

U.S. v. Kuhl, 1:23-cr-44-JMB

REPLY TO GOVERNMENT'S RESPONSE
(ECF No. 361)

This is my response. Tell your cronie Graham to adopt it or file it since he won't argue for me!

[signature] 11/01/25
S. Kuhl 61189510

# I. ERRONEOUS COURT RULINGS

## A. Denying Motion to Sever as Untimely (PageID. 3838-3840)

Government repeatedly misled me stating that I requested the depictions and did not clearly identify which depictions were actually going to be presented as evidence for Count 1 until one week before Trial. Thus, I could not ascertain these allegations until receiving the texts directly related to the depictions which were sent 3-4 years ago. As soon as I got those texts I realized that not one reference or request was sent by me for depictions directly surrounding any of the depictions described in discovery at that time. I believe I filed the motion to sever in the end of May immediately after I got the texts; specifically one or two days later.

As to prejudice and reason for severance, it is the specific conduct and circumstances that are distinguishable between the two counts. The fact that S.D. sent me videos she produced herself, outside of my presence, it would have to be proven I somehow persuaded her to do so. However, none of the messages support this requisite proof. And the images are temporally attenuated from the specific dates of Count 2. Thus, messages which were not related to the images, and the inflammation created by those messages, but were related to Count 2 spilled over and what may have seemed to be persuasion for sexual intercourse was not persuasion for the purpose of producing child porn. The lack of evidence of direction or persuasion

as to Count 1 was shadowed and overlooked due to spillover from Count 2 evidence. The government cites United States v. Wise, 134 F.4th 745 (3rd Cir. 2025) (PageID. 3840), but Wise is distinguishable due to the short time frame, clear evidence, and multiple victims.

B. Failure to Require Disclosure of Information Regarding Count One (3840-3842)

This information about the date and time the depictions were produced is needed in furtherance of the interests of justice to avoid false and misleading narratives being presented to support a conviction. If it is alleged I persuaded S.D. to produce and send me these videos, proof that a video was produced at a time substantially attenuated from the time it was sent would negate such a theory.

They claim that the expert was provided the dates/times of the specific images (PageID.3841). However, looking to Kelly's report, he notes that he was provided a timestamp corresponding with a picture of S.D. buttocks while wearing a thong for ~~tet~~ 5/27/2022, not the vagina video. Moreover, this date/time description provided only identifies when I received the depictions not when they were made.

As to my argument that the government failed to disclose the evidence showing that the producing material, and the Court erred by not ordering such disclosure, the government ~~[illegible]~~ argues that producing

includes copying images onto another storage device (PageID. 3841). The government cites United States v. Lively, 852 F.3d 549, 559-560 (6th Cir. 2017) for support. However, the videos were only received and I did not take any action to store them as Kelly clearly stated, and I tried to present by calling him as a witness.

This logic of production provides even more support that transmitted should have been omitted from the instructions or specially defined. Surely storing is not transmitting. Yet the inclusion of transmitted created a theory that sending a depiction is analogous to production. Accordingly, regardless of when or why the sexually explicit conduct was actually depicted, a person can be convicted on the theory that he caused a minor to send him that depiction.

C. Failing to Define "Transmitted"

While someone can produce a live visual depiction, one cannot "transmit" a non-live visual depiction under §2251(a). Again, if transmitted simply meant send or transport in §2251(a), why is it not used in the receiving and distributing child pornography statutes? Moreover, the Public Law which corresponds with the 2008 amendment of §2251(a), which added the "transmit a live visual depiction" language, specifically identifies the amendment's purpose as being the prevention of broadcasting live content of child abuse.

The use of transmitted created a misunderstanding of the law and creative an alternative theory of conduct not passed upon by the grand jury, and that I was not put on notice of to defend against.

## II. PROSECUTORIAL MISCONDUCT

### A. Alleged False Testimony

Firstly, the government should not be allowed to knowingly prevent false testimony simply because it is considered to be immaterial. This would result in a manifest miscarriage of justice and remove any integrity left in the judicial system.

Meredith falsely testified that I was listed as the owner of the Samsung phone on the search warrant. The government knew this was false and went beyond not correcting it - they also fought to prevent me from correcting it to conceal the truth. In such extraordinary instances of dishonesty and misconduct, materiality should go out the window.

As to the statements that S.D. had no phone when we began talking was a lie which was exploited by the government. They first said I bought S.D. a phone to further my goal of persuading her to have sex and communicate with her to do so. Basically grooming her by buying a phone. However, this was false and the government knew because

B. Exhibits 11 and 11A

The government argues I waived any argument against Exhibits 11 and 11A because I moved to enter exhibit 11A. However, I only did so after the Court ~~objected~~ denied my objection to Exhibit 11 being presented. The government cites ~~United~~ Lawn v. United States, 355 U.S. 339 (1958) as supporting precedent. However, Lawn is distinguishable in multiple ways: 1) the exhibit he objected to had already been entered by a prior exhibit and surrounding context of that exhibit to which Lawn did not object; 2) Lawn used the content of the exhibits to present argument prior to the government moving to admit them.

Exhibit 11 was entered over my objection and I merely admitted 11A to try and present the entirety of the content for Exhibit 11. This type of circumstance is not what Lawn was meant to apply. Furthermore, I contested to Exhibit 11 being entered at all due to it not being authentic and complete electronic evidence, and if it the Court allowed such Exhibit, they allow only Exhibit 11A to be entered. I did not waive any argument to Exhibits 11 and 11A.

C. Alleged Brady/Giglio Violations

The interview of S.D. would show impeachment and exculpatory evidence as to [redacted] whether she had a phone when we first started

of S.D.'s statements during MSP Interview and her Facebook data which discloses the login device used to access the Facebook account.

The government also exploited this false statement to paint a false narrative that S.D. used an iPhone I bought her to produce the videos underlying Count 1. Again, the government knew this was false by S.D.'s MSP Interview, as well as the Facebook message where S.D. tells her friend I bought her the iPhone after August 24, 2022. Aug. 24, 2022 was the latest date of the 4 videos underlying Count 1 and the government knew this message existed because Gensterblum put it in his report.

The government misstates my argument pertaining to testimony by S.D. about the group sex matter. The government claims "Kuhl further argues that S.D. "falsely testified" about the number of times that Kuhl requested group sex with A.C. and about the number of times S.D. said she was 17 years old." (PageID. 3845). However, I was stating that S.D. falsely testified that I only stated once that I just wanted to have sex with A.C. and it did not need to be a threesome. As can be seen by the discovery pages I referenced, I made such statement multiple times. This negates from the theory I was persuading S.D. to actually engage in illegal sexual activity, but was only using her to try to persuade A.C. to have legal sex with me.

As to the statements by S.D. about how many times she claimed to be 17, the government tried to say I was recklessly disregarding her age. Then the way VerHey argued in closing for the verdict form to be interpreted allowed this to come into play. Specifically, the verdict form stated that the government find at any time I violated §2422(b); then to agree that illegal sexual activity occurred or was attempted to be completed on two dates, regardless if such activity was the product of direct persuasion by way of phone or internet. Moreover, the inference and case statement that stated I used Facebook and phone service to violate §2422(b) added to the materiality of the age issue because all Facebook messages ceased before S.D. ever said anything about not being 17.

The government also argues the inconsistencies as to S.D.'s claims of being 17 are immaterial due to the two dates on verdict form for Count 2. The government claims both dates are after S.D. claimed to be 1 , both orally and via text, but that is not necessarily true because S.D. only clearly stated this after the discussions concerning A.C. and sex were concluded and we were arguing about personal matters and her coming outside. This is material because prior to the Halloween incident S.D. had only stated she was not 16 or 17 but did not state a definite age.

talking because to the FBI/Prosecution preparation of S.D. she claims to have had no phone. This contradicts the statements of S.D. during MSP Interview. Furthermore, S.D. stated she did not wish to testify or be involved during the government's prep session - S.D. clearly stated this in Court.

Moreover, S.D. stated in the government's prep session we ceased any relations prior to August of 2022. This would negate the government's theory of Count 2 that we had sex at a hotel on Aug. 24, 2022.

The fact that A.C. was living in Florida, but here family resided here in Michigan, alongside the fact that the government paid A.C.'s way to come to Michigan and back to Florida, is exculpatory and provides incentive for A.C. to color his testimony to comport with the government's desired narrative. A.C. lied in stating that I told her about sexual relations between S.D. and I. Moreover, A.C. was able to use the trial and corresponding payments from the government to visit her family and take a vacation.

In U.S. v. Schneider, 801 F.3d 186 (3rd Cir. 2015), the Third Circuit rejected an argument that the government violated the Brady doctrine by not disclosing payments made to the victim to testify. However, this was because the payments were disclosed to defense counsel on the second

day of trial, which was two days before the victim testified. Id. at 202. This did not occur in my case. Indeed, the payments were never disclosed.

In United States v. Spencer, 21-cr-253-pp (E.D. Wis. Aug. 14, 2024), it was held that the payment to witnesses who were victims was appropriate. Accordingly, the court gave a curative instruction when Spencer's counsel questioned the witness about such payments. Still, the prosecution did disclose the payments. Id at 85. The court in Spencer also recognized that use of witness payments, even when authorized by law, could be improper and subject to inquiries by defense in a trial if such payments were used as incentives to influence indigent and/or reluctant witnesses to testify. Due to S.D. statements outside the jury clearly she expressed reluctance to cooperate with the government. The government played on her emotions, gave and promised payment, and defamed and ridiculed me to influence S.D. to testify. These payments and promises for more, were reason for S.D. to simply concede to improper leading by the prosecution and give false testimony to bolster the government's case.

## III. NEWLY DISCOVERED EVIDENCE

The government claims the receipt was not discovered after trial which is entirely untrue. After trial my uncle, who purchased the phone for me, went to AT&T to ask the date that the phone was bought.

I did not know the date the iPhone 13 ProMax was bought prior to or during trial and did not realize such information was relevant because the government never said anything about the materials S.D used to produce the depictions. They only ever presented evidence that my phones were relevant and were produced outside of Michigan.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. A. Counsel's Failure to Use the Exact Words or Phrases Chosen by Kuhl Does Not Render Him Ineffective.

This is a mischaracterization of my argument. Counsel specifically misstated that S.D. told MSP detectives I bought her one or more phones. This was due to lack of investigation and preparation because S.D. unequivocally states, multiple times, in the MSP interview that I only bought her one phone. A reason why I held off on directly questioning S.D. more intensely on cross-examine is because Counsel said to impeach her through Gensterblum.

### B. B. My Failure to Call a Specific Witness Does Not Render Standby Counsel Ineffective

Firstly, I did not have Kelly's work product until after pretrial conference so I was unaware of what testimony Kelly could give in time to subpoena him. Moreover, Counsel refused to contact Kelly

for me and orchestrated the schedule and payment of Kelly which resulted in such late work product. This is why I failed to object at pretrial to Counsel's statement that Kelly had no reason to testify. Indeed, Kelly found I took no act to store or save the videos at issue which the government contends constitutes the conduct of production!

As to my "I don't know" statement the government references (PageID 3852), that was in response to if Kelly would be able to testify. Counsel refused to contact Kelly for me to see if he'd be available to testify and to ask him to testify. Thus, Counsel not only was ineffective but also hindered my pro se abilities in violation of Due Process and Sixth Amendment.

C. Counsel's Failure to Provide Kuhl With Legal Training Does Not Render Him Ineffective

This is, again, an improper characterization of my argument. It is clearly noted that the government does not even address Counsel's failure to extend the pretrial motion deadline despite knowing my Faretta hearing was set for the day after.

As to suppression motions, they would be meritorious. Without being allowed to submit them or argue the reasons supporting suppression, the government cannot claim that such arguments

have no merit.

Counsel made promises in his standby capacity to assist me in trial preparation in separating specific messages to present as exhibits and discuss certain matters about trial. This was supposed to take place by Counsel visiting me the weekend before trial but that never happened. The Court should have removed standby counsel altogether in light of the substantial distrust and utter contempt Counsel and I hold for each other. However, we all know that would never happen because this Court don't WANT THE REAL TRUTH! DO YOU?? DOOO YOU!!???

Get him off my case flatout!

S. Kuhl ~~10/31~~ 11/01/25
S. Kuhl 61189510

S. Kuhl 61189510
P.O. Box 845
White Cloud, MI 49349




"This mail has originated from the Newaygo County Jail."

U.S. Dist. Court
399 Fed. Bldg.
110 Michigan NW
Grand Rapids, MI 49503

LEGAL MAIL